# Exhibit A

# Ideal Murfreesboro, LLC

**A Wyoming Limited Liability Company**

# Operating Agreement

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

**Article One**         **Introductory Recitals** ...................................... 1

**Article Two**         **Company Formation and Purposes** ............................ 2
Section 2.01     Formation of the Company ................................. 2
Section 2.02     Name of the Company .................................... 2
Section 2.03     Principal Office Address and Mailing Address ................... 2
Section 2.04     Duration of the Company ................................. 2
Section 2.05     Business Purposes for Creation of the Company ................ 2
Section 2.06     Company's Authority to Make Transactions to Fulfill
the Business Purposes .................................... 2
Section 2.07     Registered Agent ....................................... 3
Section 2.08     Certificates or Statements of Membership Interest ............ 3

**Article Three Members and Meetings** ................................ 4
Section 3.01     Classes of Membership Interests .......................... 4
Section 3.02     Names and Addresses of Members, Member
Principals, Managers and Assignees ...................... 4
Section 3.03     Voting of Interests ...................................... 4
Section 3.04     Meetings of Members and Participation ..................... 4
Section 3.05     Limited Liability ....................................... 5

**Article Four**         **Capital Contributions and Capital Accounts** ............. 6
Section 4.01     Initial Capital Contributions .............................. 6
Section 4.02     Voluntary Additional Capital Contributions ................... 6
Section 4.03     Mandatory Additional Capital Contributions .................. 6
Section 4.04     Establishment of Capital Accounts ........................ 7

**Article Five**         **Allocations and Distributions** ............................ 8
Section 5.01     Allocation of Profits and Losses .......................... 8
Section 5.02     Distributions to Members ................................ 8

**Article Six**         **Management** ............................................ 9
Section 6.01     Management of the Company ............................. 9
Section 6.02     Compensation of Managers ............................. 10
Section 6.03     Authority of Managers .................................. 10
Section 6.04     Powers of the Managers ................................ 10
Section 6.05     Employment Powers ................................... 12

24-01421-FPC11    Doc 70-1    Filed 09/19/24    Entered 09/19/24 12:06:52    Pg 3 of 74

| Section 6.06 | Actions Requiring Approval or Consent of Members....... 12 |
|---|---|
| Section 6.07 | Bank Accounts .................................................................. 13 |
| Section 6.08 | Appointment of Tax Matters Member................................ 13 |
| Section 6.09 | Standard of Conduct for Managers .................................. 13 |

**Article Seven**    **Records and Accounting ............................................ 14**

| Section 7.01 | Records and Accounting.................................................... 14 |
|---|---|
| Section 7.02 | Access to Financial and Accounting Records ................... 14 |
| Section 7.03 | Annual Financial and Tax Information ............................. 14 |
| Section 7.04 | Accounting Decisions ...................................................... 15 |

**Article Eight**    **Dissolution and Winding Up....................................... 16**

| Section 8.01 | Events Causing Termination ............................................. 16 |
|---|---|
| Section 8.02 | Effective Date of Dissolution; Winding Up ..................... 16 |

**Article Nine**    **Definitions................................................................... 17**

| Section 9.01 | Definitions ....................................................................... 17 |
|---|---|

**Article Ten**    **Miscellaneous Provisions............................................ 19**

| Section 10.01 | Amendments .................................................................... 19 |
|---|---|
| Section 10.02 | Conflicts between the Articles of Organization and this Operating Agreement..................................................... 19 |
| Section 10.03 | Binding Effect and Governing Law ................................. 19 |
| Section 10.04 | Severability...................................................................... 19 |
| Section 10.05 | Multiple Counterparts....................................................... 19 |
| Section 10.06 | Additional Documents and Acts........................................ 19 |

Exhibit A  Members, Capital Contributions & Ownership

Exhibit B  Managers

24-01421-FPC11    Doc 70-1    Filed 09/19/24    Entered 09/19/24 12:06:52    Pg 4 of 74

# Article One
# Introductory Recitals

The Members of Ideal Murfreesboro, LLC, a Wyoming Limited Liability Company, (hereinafter referred to as the "Company" or the "LLC"), desire to adopt this Operating Agreement (hereinafter referred to as the "Agreement"), to govern certain aspects of the operations of the Company, to secure and retain able and competent management of the Company, and to set forth the rights and obligations of the Members and Managers, including any additional Members and Managers, as well as their successors and assigns, as further defined in this Agreement.

The Company was formed under the laws of the State of Wyoming by the filing of the Articles of Organization (the "Articles"), pursuant to the Wyoming Limited Liability Company Act, WS § 17-29-101 et seq., hereinafter referred to as the "Act", on behalf of the Initial Members and Initial Managers.

This Agreement is made and entered into among the Members of the Company, in consideration of the mutual covenants and agreements contained in this Agreement, and the Members intend to be legally bound by the terms of this Agreement. The rights and obligations of the Members in the Company and the Company's administration shall be governed by this Agreement.

1

# Article Two
# Company Formation and Purposes

### Section 2.01      Formation of the Company

This Company is formed pursuant to the Act. The rights and liabilities of the Members and Managers shall be as provided under the Act, the Articles and this Agreement. The Members and Managers agree to abide by all of the terms and conditions of the provisions of the Articles, the Act and this Agreement.

### Section 2.02      Name of the Company

The name of this limited liability company is Ideal Murfreesboro, LLC

### Section 2.03      Principal Office Address and Mailing Address

The Company's Principal Office Address and Mailing Address is:

> 125 S King St Ste 2A
>
> PO Box 1045
>
> Jackson Wyoming 83001

### Section 2.04      Duration of the Company

As allowed by the Act, the Company shall exist for a perpetual duration from the date of filing of the Articles of Organization with the Secretary of State of the State of Wyoming, unless dissolved according to law or this Agreement.

### Section 2.05      Business Purposes for Creation of the Company

The Company has been created and organized to accomplish the following purposes:

- To own and manage real estate;
- To conduct any and all business as permitted by law; and,
- To manage and/or develop assets owned or acquired by the Company.

### Section 2.06      Company's Authority to Make Transactions to Fulfill the Business Purposes

The Company is authorized to conduct any and all business and investment activities that are permitted by law. The nature of the business and the objects and purposes to be transacted, promoted or carried on, and for which the Company is organized, are to carry on and engage in and/or conduct any lawful business or investment activities, and exercise all of the powers, rights and privileges which a limited liability company organized under Wyoming law may have and exercise.

2

## Section 2.07     Registered Agent

The Company shall maintain a Registered Agent in the state of Wyoming, or in any other state is which the Company is registered to do business. The current Registered Agent of the Company in the state of Wyoming shall be:

> Company Agent, LLC
> 125 S King St Ste 2A
> PO Box 1045
> Jackson Wyoming 83001

## Section 2.08     Certificates or Statements of Membership Interest

The ownership Interests in the Company may be reflected or represented by a certificate or a statement of membership interest executed by the Managers of the Company, and in a form agreed to by the Managers.

# Article Three
# Members and Meetings

### Section 3.01  Classes of Membership Interests

The Company shall have only one class of Membership Interests.

### Section 3.02  Names and Addresses of Members, Member Principals, Managers and Assignees

The names, business, residence and mailing addresses of all Members and Assignees shall be listed on Exhibit A attached hereto and incorporated herein by reference. Each Member and Assignee shall notify the Company within thirty (30) days of any change in any of the above-described addresses. The Managers shall, from time to time as necessary, update the attached Exhibits to accurately reflect any changes in the addresses of the Members, Managers and Assignees.

### Section 3.03  Voting of Interests

Each holder of a Membership Interest shall be entitled to one vote per Unit as to any matters on which the Members are entitled to vote. Unless this Agreement specifically provides otherwise, any decision requiring the approval, consent, determination, or vote of the Members (or the Company) shall mean the approval, consent, or affirmative vote of the holders of a majority of the Units, then entitled to vote.

With respect to any Units held jointly by two or more people, all of the votes available to such Unit may be voted by any joint owner or, if written demand is made by any joint owner to the Company prior to the time the vote is taken, the votes shall be divided equally between or among the joint owners, and each owner may cast his or her vote(s) independently.

### Section 3.04  Meetings of Members and Participation

The following provisions shall govern matters involving Member participation in the Company and meetings:

#### (a)  Meetings of Members

The Company may elect to hold an annual meeting of the members. Meetings of the Members may be called by the holders of a majority of the Units or the Managers. Meetings may be held in person or by any form of technology that is available to all Members (such as, without limitation, phone conference calls and internet teleconferencing). Unless notice is waived, notice of any Member meeting shall be given at least ten (10) days previously thereto and shall state the purpose of the meeting and a proposed agenda. Notice may be given orally or in writing. If notice is given orally, it shall be deemed delivered at the time of the communication personally with the Member to whom notice is being given. If it is given in writing, it shall be deemed given five (5) days after the date such notice is placed in the U.S. mail. If written notice is given by any other means (such as email, fax, etc.) it shall be deemed given only after the recipient acknowledges receipt of the notice. If

4

notice is given orally, the Member receiving such notice may request that a written agenda be provided to him within five (5) days of such oral notice. Notwithstanding the foregoing, any Member may waive the notice requirements for any meeting. It is incumbent upon the person giving oral notice to be able to prove such oral notice was given.

**(b)      No Ability to Participate in Management**

A Member has no ability and shall not take any part in the control, management, direction, or operation of the affairs of the Company and shall have no power to bind the Company unless such Member is also elected as a Manager and has management powers delegated to him under this Operating Agreement.

**(c)      Informal Action**

Any action permitted to be taken at a Member meeting or upon a vote of the Members may be taken without a meeting if the action is evidenced by a written statement describing the action taken, signed by the Members certifying that the proposed action was put to a vote of the Members entitled to vote, and indicating the number of votes cast in favor, against, and abstaining on such issue, and the date such action was approved. The Members may also later ratify any action or vote taken by the Members, if the action or vote was not evidenced by a written statement.

**(d)      Proxies**

At Member meetings at which Members are permitted to vote on any issue(s), a Member may vote in person or by proxy, executed in writing by the Member or by his duly authorized attorney-in-fact. Such proxy shall be filed with the Company before or at the time of the meeting. Proxies shall be valid unless and until revoked in writing by the individual who granted the Proxy, or unless otherwise provided in the proxy.

**(e)      Conduct of Member Meetings**

At any Member meeting, an individual designated by the Members shall serve as Chairperson of the meeting. The Chairperson shall preside over and conduct the meeting and shall appoint someone in attendance to make accurate minutes of the meeting.

**Section 3.05      Limited Liability**

No Member, in his capacity as a Member or Manager, shall be personally liable for the losses, costs, expenses, liabilities or obligations of the Company in excess of such Member's Capital Contributions or other obligations required under this Agreement.

5

# Article Four
# Capital Contributions and Capital Accounts

## Section 4.01  Initial Capital Contributions

The Members shall contribute as their initial capital contributions to the Company all of their right, title and interest in and to the property described in Exhibit A. The Members agree that the property described in Exhibit A has the fair market value (net of liabilities assumed or taken subject to by the Company) listed opposite the scheduled property.

Each Member's Interest will be credited with an initial contribution equal to the fair market value as specified in Exhibit A.

## Section 4.02  Voluntary Additional Capital Contributions

The Members may make Additional Capital Contributions to the Company. Any Additional Capital Contribution shall be made *pro rata*, according to the Member's Membership Interest, unless agreed to by the Company. Consent does not need to be evidenced in writing and will be presumed to have been obtained unless there is clear and convincing evidence to the contrary.

The fair market value of any property other than cash or publicly traded securities to be contributed as an Additional Capital Contribution will be as agreed upon by the contributing Member and a majority in interest of the Members at the time of contribution. Alternatively, a disinterested appraiser selected by the Manager may determine the fair market value of any contributed property.

## Section 4.03  Mandatory Additional Capital Contributions

The Company may require Additional Capital Contributions upon the approval of the Members if an Additional Capital Contribution is reasonably needed to pay:

>Existing or anticipated expenses of operation and administration;

>Debt service for any amounts borrowed by the Company;

>Insurance and tax payments; or

>The cost of acquiring, maintaining, and selling property of the Company.

Required Additional Capital Contributions may not be discriminatory. If there is a call for an Additional Capital Contribution, all Members and any Assignees must contribute capital, *pro rata*, based upon their respective Interests. A required Additional Capital Contribution must be satisfied within 60 days from the date the call is issued.

If a required Additional Capital Contribution is not satisfied in full, other Members may satisfy the deficiency. The Membership Interests will be reallocated in the manner provided herein. Alternatively, the Manager may withhold the distribution of profits from any Member or Assignee who fails to satisfy the required Additional Capital Contribution and apply those undistributed profits towards the obligation of the Member or Assignee.

6

In addition, the Company may charge interest at the highest lawful rate to the Member or Assignee involved on part of any required Additional Capital Contribution that remains unsatisfied after the expiration of the 60-day period. The Company may institute legal action against a delinquent Member or Assignee and the delinquent Member or Assignee will be responsible for paying all costs and legal fees reasonably incurred by the Company concerning the action.

## Section 4.04     Establishment of Capital Accounts

A Capital Account will be established for each Member and will be maintained at all times during the existence of the Company in a manner that complies with the Internal Revenue Code and Wyoming Law.

# Article Five
# Allocations and Distributions

### Section 5.01    Allocation of Profits and Losses

The Company shall allocate all net profits and losses for each calendar year of the Company, to each Member *pro rata* in accordance with the Member's respective Membership Interest during the period over which the profits and losses accrue. For purposes of this section, "profits and losses" include every item of income, deduction, depreciation, gain, loss, and credit for the calendar year.

### Section 5.02    Distributions to Members

The primary intent of the Company is to retain Company funds to meet the reasonable needs of the business or investments of the Company and other needs as provided in this Agreement. No Member may demand distributions of any Company funds or assets.

The Company may distribute enough cash to each Member each year to cover the amount of income tax that each Member is required to pay because of the distribution.

When any distributions of funds or other Company assets are made, the Company may satisfy those distributions as follows:

### (a)    Distributions of Cash

The Company may make distributions of Company cash to the Members on a *pro rata* basis as the Manager, in its discretion, determine.

### (b)    Distributions in Kind

The Company may make distributions in kind of Company property to the Members on a *pro rata* basis.

8

# Article Six
# Management

## Section 6.01    Management of the Company

The business and affairs of the Company shall be managed, directed, supervised, and conducted by the appointed Managers. Managers need not be Members of the Company or residents of the State of Wyoming. The Company may have one or more Managers. Unless this Agreement specifically provides otherwise, or the Members otherwise agree, any decision requiring the approval, consent, or vote of the Managers shall mean the approval, consent, or affirmative vote of a Majority of the Managers. Each Manager shall be entitled to one vote.

The number of Managers in the Company shall be fixed from time to time by the Members, in accordance with this Article.

### (a)    Appointment of Managers

The Managers of the Company shall be appointed by the Members and, once appointed, shall continue to serve as Managers until they resign, die, become bankrupt or incompetent, dissolve (if an entity), or are removed. The initial Managers of the Company are set forth in the attached Exhibit B. The Company may have periodic elections to appoint the Managers of the Company.

### (b)    Delegation of Management Powers

The Managers may from time to time appoint officers and other agents to carry out management powers and duties on behalf of the Company. The appointed officers and agents shall have such powers as may be delegated to them by the Managers.

A Manager may delegate to any one or more other Managers, the ability to execute documents, make decisions, or take any action on behalf of the delegating Manager.

### (c)    Resignation, Removal and Vacancies

A Manager may resign from his position as a Manager at any time, by providing notice to any remaining Managers, or to the Members. Such resignation shall become effective when such notice is received, unless a delayed effective date is specified in the notice. The resignation of a Manager who is also a Member shall not affect such resigning Manager's rights as a Member, and shall not constitute a resignation or withdrawal of the Member.

Subject to the provisions of the Act and this Agreement, and subject to the satisfaction of the conditions specified in this Section, the Members may remove any Manager, with or without cause. Any removal of a Manager shall become effective when written notice thereof is given to the removed Manager, unless a later effective date is specified in the notice.

Should a Manager be removed who is also a Member, such removal shall not affect his rights as a Member, except as may otherwise be provided in the Act, the Articles, or this Agreement.

9

## Section 6.02    Compensation of Managers

For serving as a Manager, the Company may pay the Manager reasonable compensation for the services rendered, as the Members and the Manager may agree. Management compensation shall be commensurate with the scope of the management duties. The Company may also reimburse the Managers for all reasonable out-of-pocket expenses incurred on behalf of the Company. No Manager shall be prevented from receiving such compensation by reason of the fact that he is also a Member of the Company. The Company may pay to the Manager a bonus, as compensation for services rendered to the Company.

The compensation arrangement relating to the Manager may be reflected in a separate management agreement, which shall govern in the event of any conflict with this Agreement.

Members may be reimbursed for out-of-pocket expenses and may be paid for services rendered, upon approval of the Members.

## Section 6.03    Authority of Managers

Managers shall have the authority to manage the day-to-day business affairs of the Company. Unless authorized to do so under this agreement, or unless approval is obtained by the Members, no attorney-in-fact, employee, or other agent of the Company shall have any power or authority to manage or bind the Company in any way, to pledge its credit, or to render it pecuniarily liable for any purpose. No Member shall have any power or authority to bind the Company, unless the Member has been authorized to act as an agent of the Company.

## Section 6.04    Powers of the Managers

The Managers shall be responsible for the general overall supervision of the business and affairs of the Company. On behalf of the Company, the Managers may sign such deeds, mortgages, bonds, contracts, or other instruments which have been appropriately authorized to be executed by the Managers, except in cases where the signing, approval or execution thereof shall be expressly delegated or reserved to the Members, or some other officer or agent of the Company.

The specific authority and responsibility of the Managers, subject to the provisions of this Agreement, shall also include the following:

### (a)    General Powers

- To acquire real and personal property, whether by purchase, lease or exchange, in the ordinary course of business;

- To sell, exchange, or lease Company property in the ordinary course of business;

- To open and maintain bank accounts, investment accounts, and other similar accounts on behalf of the Company;

- To borrow money for the Company from banks or other lending institutions, on such terms as the Managers deem appropriate, and in connection

10

therewith, to hypothecate, encumber, and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

- To pay debts and obligations of the Company, to the extent that funds are available therefore;

- To execute for the Company all instruments and documents, including, without limitation, checks, drafts, notes, contacts, agreements and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, leases, and any other instruments or documents necessary, in the ordinary course of business;

- To employ accountants, legal counsel, managing agents, or other experts to perform services for the Company and to compensate them from Company funds;

- To enter into any and all other agreements on behalf of the Company and to execute and deliver any and all instruments in writing that are necessary to carry out any of the powers granted in this Agreement or in the ordinary course of business;

- To collect funds due to the Company;

- To make elections available to the Company under the Internal Revenue Code;

- To make investment decisions for the Company;

- To register or organize the Company under the laws of any other state, in addition to the State of Wyoming; and

- To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

**(b)    Brokerage and Investment Powers**

- To invest any Company funds in any type of investment that is consistent with the investment goals of the Company; and

- To buy, sell, trade, and otherwise deal in stocks, bonds, mutual funds, and other securities;

**(c)    Real Property Powers**

- To purchase, exchange, lease for any period, mortgage, manage, alter, improve and in general deal in and with real property, in the ordinary course of business;

- To enter into contracts to sell real estate, and to enter into leases and grant options to lease Company property, in the ordinary course of business. For such purposes, the Managers may enter into any contracts, covenants, and warranty agreements that they deem appropriate; and

11

- To inspect Company property to determine compliance with or to respond to any federal, state, or local law, rule, regulation, or ordinance relating to Company property.

## Section 6.05    Employment Powers

The Managers may employ agents, servants, employees, accountants, attorneys, investment advisors, or other experts and independent contractors or management companies, to assist with the management and operation of the Company or Company investments and compensate them with Company funds.

## Section 6.06    Actions Requiring Approval or Consent of Members

The following actions shall require the approval or consent of the Members prior to such actions being taken by the Managers, Members, or the Company, pursuant to the provisions of this Agreement:

- To change the numbers of Managers of the Company;
- To appoint Managers;
- To remove a Manager of the Company;
- To approve payment of a management fee or other compensation to a Manager or a Member;
- To amend this Agreement or the Articles;
- To dissolve the Company;
- To merge the Company with another entity or reorganize the Company into any other form;
- To knowingly do any act in contravention of this Agreement;
- To mortgage, pledge, or otherwise encumber Company property, outside the ordinary course of business;
- To prepay, refinance, modify, extend, or consolidate any existing mortgages or encumbrances on Company property;
- To sell, exchange, lease, assign, or transfer Company property, other than Company property held for sale in the ordinary course of business;
- To loan Company funds in excess of $50,000;
- To contract any debt or incur any liability on behalf of the Company in excess of $50,000;
- To cause the Company to make any capital expenditure in any single transaction in excess of $50,000; or
- To conduct any other act outside the ordinary course of business.

12

### Section 6.07  Bank Accounts

All funds of the Company shall be deposited in the name of the Company into such checking and savings accounts, or timed certificates of deposit, or other accounts as the Managers may elect.

### Section 6.08  Appointment of Tax Matters Member

The Company shall be taxed as a partnership, or any other type of entity for tax purposes as the Members may agree. The Members may designate a Tax Matters Member on behalf of the Company.

### Section 6.09  Standard of Conduct for Managers

The Managers shall perform their duties in good faith, in a manner the Managers reasonably believe to be in the best interests of the Company and its Members, and with such care as an ordinary prudent person in a like position would use under similar circumstances. A Manager who is also a Member of the Company is not liable for any action taken as Manager, or any failure to take any action, unless the Manager has breached or failed to perform the Manager's duties and the breach or failure constitutes willful misconduct or recklessness.

13

# Article Seven
# Records and Accounting

## Section 7.01    Records and Accounting

The fiscal year of the Company for financial reporting and for Federal income tax purposes shall be the calendar year, unless otherwise determined by the Members. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for Federal income tax purposes. The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business, and shall be kept at its principal office. The Manager shall keep the following records:

A current list of the full name and last known address for delivery of notices of each Manager and Member;

A copy of the Articles of Organization (together with any amendments) and copies of any powers of attorney under which any certificate has been executed;

Copies of the Company's federal, state, and local income tax returns and reports, if any, for the 3 most recent years;

Copies of this Agreement (together with any amendments);

Copies of any financial statements of the Company for the 3 most recent years; and

Any other documents required by law.

## Section 7.02    Access to Financial and Accounting Records

Each Member and Manager, and his duly authorized representative, shall have the right, at the Member's or Manager's own expense, to inspect and copy the Company records at the principal office of the Company, upon reasonable request during ordinary business hours, pursuant to the below restrictions. If any documents are available by public record, the Member or Manager shall obtain such records through the public agency rather than through the Company. Greater access to records than as stated below may be available only by the consent of the Members or by Court order.

## Section 7.03    Annual Financial and Tax Information

The Managers shall use their best efforts to cause the Company to deliver to each Member, within ninety (90) days after the end of each fiscal year, all information necessary for the preparation of such Member's federal and state income tax returns. If requested by the Members, the Managers shall also use their best efforts to cause the Company to prepare, within one hundred twenty (120) days after the end of each fiscal year, a financial report of the Company for such fiscal year containing a balance sheet as of the last day of the year then ended, an income statement for the year then ended, and a statement of reconciliation of the Members' Capital Accounts.

24-01421-FPC11    Doc 70-1    Filed 09/19/24    Entered 09/19/24 12:06:52    Pg 18 of 74

## Section 7.04    Accounting Decisions

All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Managers. The Managers may rely upon the advice of the Company's certified public accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

# Article Eight
# Dissolution and Winding Up

## Section 8.01    Events Causing Termination

The Company shall terminate and be dissolved upon the happening of any of the following:

- The latest dissolution date, if any, specified in the Company's Articles of Organization; or

- The written consent of the Members; or

- The order of any court of competent jurisdiction requiring such termination and dissolution.

## Section 8.02    Effective Date of Dissolution; Winding Up

Dissolution of the Company will be effective on the date on which the event occurs giving rise to the dissolution. The Company will not be wound up until the Company is dissolved and the assets of the Company have been distributed as provided in this Agreement or applicable law.

During the period in which the Company is winding up, the business of the Company and the affairs of the Members will continue to be governed by this Agreement.

24-01421-FPC11    Doc 70-1    Filed 09/19/24    Entered 09/19/24 12:06:52    Pg 20 of 74

# Article Nine

# Definitions

## Section 9.01 Definitions

Unless otherwise expressly provided in this Agreement, certain terms used in this Agreement shall have the meanings specified in this Article, as set forth below:

### (a) Act

"Act" means the Wyoming Limited Liability Company Act, WS § 17-29-101 et seq., as the same may be amended from time to time.

### (b) Agreement or Operating Agreement

"Agreement" or "Operating Agreement" means this Operating Agreement, as originally executed and as the same may be amended from time to time.

### (c) Articles

"Articles" means the Articles of Organization filed by the Company with the Wyoming Secretary of State, and as the same may be amended or restated from time to time.

### (d) Capital Account

"Capital Account" means the account established and maintained for each Member in the manner prescribed by this Agreement and in the manner provided in U.S. Treasury Regulation § 1.704-1(b)(2)(iv), as amended from time to time.

### (e) Capital Contribution

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Treasury Regulation § 1.704-l(b)(2)(iv)(d)), to the Company by a Unit Holder, net of liabilities secured by the contributed Property that the Company is considered to assume or take subject to under § 752 of the Code, and as more fully set forth in this Agreement.

### (f) Code

"Code" means the Internal Revenue Code of 1986 as it may be amended from time to time. All references in this Agreement to Code Sections shall include any and all corresponding provisions of succeeding law and applicable Treasury Regulations.

### (g) Company or LLC

"Company" or "LLC" refers to this Wyoming Limited Liability Company.

### (h) Managers

"Managers" or "Manager" as used in this Agreement shall mean the Managers of the Company, all as more fully set forth in this Agreement.

**(i)    Member**

"Member" means a Person admitted to membership in the Company, in accordance with the provisions of this Agreement, and as to whom a Withdrawal Event has not occurred, and shall include any other Person that becomes a Member of the Company prior to, contemporaneously with, or after the undersigned Members.

**(j)    Membership Interest, Interest, Percentage Interest or Unit**

"Membership Interest", "Interest", "Percentage Interest" or "Unit" means an individuals or entities ownership interest in the Company. These terms may be used interchangeably in this Agreement.

**(k)    Organizer**

An "Organizer" is a Person who has created the Company by filing Articles of Organization with the Wyoming Secretary of State.

**(l)    Percentage Interest**

"Percentage Interest" means, as to a Member, the percentage set forth after the Member's name on the attached Exhibit A that provides such information, as amended from time to time, and, as to a Unit Holder who is not a Member, the percentage of the Member whose Membership Interests has been acquired by such Unit Holder, to the extent the Unit Holder has succeeded to that Membership Interests.

**(m)    Person**

"Person" means an individual, corporation, a general or limited partnership, an association, a limited liability company, a business trust, trust, estate or any other legal or commercial entity.

**(n)    Property**

"Property" means all real and personal property (including cash) acquired by the Company and any improvements thereto.

**(o)    Treasury Regulation or Regulations**

"Treasury Regulation" or "Regulations" means the income tax regulations, including any temporary regulations, promulgated under the Code as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

**(p)    Unit Holder**

"Unit Holder" means any Person who holds a Membership Interest or a Unit, whether as a Member or as an un-admitted Assignee of a Member.

# Article Ten
# Miscellaneous Provisions

## Section 10.01    Amendments

This Operating Agreement and the Articles may be amended upon approval of the Members.

## Section 10.02    Conflicts between the Articles of Organization and this Operating Agreement

In the event of any conflict between the Company's Articles of Organization, as amended from time to time, and this Agreement, as amended from time to time, the Operating Agreement shall govern.

## Section 10.03    Binding Effect and Governing Law

The provisions of this Agreement shall be construed according to the laws of the State of Wyoming. Each of the Members understands that, by agreeing to the terms and provisions of this Agreement, including provisions as to amendments hereto, he shall be bound, along with his estate and any and all claiming by, through or under him.

## Section 10.04    Severability

If any provision of this Agreement is held to be illegal, invalid, unreasonable or unenforceable under the present or future laws effective during the term of this Agreement, such provision shall be fully severable. This Agreement shall be construed and enforced as if such illegal, invalid, unreasonable, or unenforceable provision had never been a part of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, unreasonable, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid, unreasonable, or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, unreasonable, or unenforceable provision as may be possible and be legal, valid, reasonable and enforceable.

## Section 10.05    Multiple Counterparts

This Agreement may be executed in multiple counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument. However, in making proof with respect to this Agreement, it will be necessary to produce only one copy of this Agreement signed by the party to be charged.

## Section 10.06    Additional Documents and Acts

Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions and conditions of this Agreement and the transactions contemplated by this Agreement.

By signing this document, each party hereby acknowledges and agrees that he/she has read the Operating Agreement and Exhibits attached hereto and agrees to be bound by the terms of these documents.

Dated effective as of February 23, 2022.

Ideal Property Investments, LLC, a Washington State company

_____

By: Ryan Wear, Member

# Exhibit A

## Members, Capital Contributions & Ownership

| Member Name | Member Address | Capital Contribution* | Membership Units | Percentage Interest |
|---|---|---|---|---|
| Ideal Property Investments, LLC, a Washington State company | PO Box 1045 Jackson WY 83001 | | 100 Units | 100% |
| | | | | |
| | | | | |
| | | | | |
| **Totals:** | | | 100 Units | 100% |

\* If the capital contributions have not been listed here, or if there is any question that current or additional capital contributions had been made, or if ownership interests have been modified by the members and not reflected in this document, the books and records of the company shall serve as evidence of the capital contributions or of modifications to ownership interests.

# Exhibit B
# Managers

The Initial Manager is:

    Ideal Property Investments, LLC

# Exhibit B

## CONTRACT FOR PURCHASE AND SALE

**THIS CONTRACT FOR PURCHASE AND SALE** (the "Contract") is executed this 19____ day of March, 2024 (the "Effective Date"), by and between **IDEAL PROPERTY INVESTMENTS, LLC**, a WA____ limited liability company ("Seller"), whose address is 2732 Grand Ave. Ste. 122, Everett, WA 98201 and **S. BENNETT MAXWELL**, individually, or his assignee (collectively "Buyer"), whose address is ____7834 Highway 100 Nashville, TN 37221.

**WHEREAS**, Buyer desires to purchase and pay for and Seller desires to sell that certain parcel of real property, as more particularly described in Paragraph 1 of this Contract (the "Property"), upon and subject to the terms and conditions of this Contract.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Description of Property**. The approximately **30,500 SF** comprised of ten (10) industrial or flex condominium units located at 730 Middle Tennessee Blvd., Murfreesboro, Tennessee, commonly known as Suites 9-15 and 18-20, which property is more particularly described on **Exhibit "A"** attached hereto and incorporated by reference (the "Property").

Included in the Purchase Price and the sale hereunder is all of Seller's right, title, and interest (if any) in and to the following:

(a)    all of the improvements, fixtures, and all other personal property owned by Seller and located on the Property utilized in connection with the operation of the Property at the time of Closing (the "Personal Property");

(b)    transferable licenses, impact fees, approvals, service agreements, contracts and permits utilized in connection with the Property at the time of Closing (the "Service Agreements");

(c)    all easements, rights-of-way, streets, and other appurtenances incidental to the operation of the Property at the time of Closing (the "Easements"); and

(d)    all leases, occupancy agreements, rental contracts and agreements ("Income").

2.    **Purchase Price and Deposits.**

(a)    The Purchase Price to be paid by Buyer for the Property is **Three Million Nine Hundred Thousand and No/100 Dollars ($3,900,000.00)** (the "Purchase Price"). This amount in United States dollars, as adjusted by the credits and prorations described herein, shall be paid at Closing by a Federal wire transfer to an account designated by Escrow Agent.

(b)    Within five (5) days of the Effective Date, Buyer shall pay and deliver to Fidelity National Title Insurance Company, 6840 Carothers Pkwy., Suite 200, Franklin, TN 37067, Attn: Al Frazier. ("Escrow Agent"), as earnest money hereunder, the sum of **Sixty Thousand and No/100 Dollars ($60,000.00)** (the "Earnest Money"). The Earnest Money shall be held by Escrow Agent in a non-interest-bearing account. The Earnest Money shall be held and paid over by Escrow Agent in accordance

with the terms of this Contract. Except as otherwise provided elsewhere in this Contract, the Earnest Money shall be credited to and considered as payment of part of the total Purchase Price for the Property at the time of and upon consummation of the Closing hereunder.

    3.    **Closing.**  The closing (herein the "Closing") shall take place through the escrow services of Escrow Agent. The Closing shall take place on the date which is **thirty (30) days** (the "Closing Date") following the later of: (i) expiration of the Inspection Period, or (ii) the date that all conditions for closing of the Property have occurred. At the Closing:

    (a)  Seller shall execute, acknowledge and deliver to Buyer:

    (i)    General Warranty Deed(s) and Quitclaim Deed based on the Survey legal descriptions (collectively the "Deed") in recordable form conveying to Buyer fee simple marketable record title to the Property, and improvements, along with other appropriate transfer or assignment documents required by governmental authority with jurisdiction over the Property, transferring title to the sewer and water taps, connection fees, impact fees and reservation fees, if any, and all easement rights and entitlements related to use and development of the Property.

    (ii)    Absolute Bill(s) of Sale transferring the Personal Property, including all licenses and permits (collectively the "Bill of Sale").

    (iii)    Form 1099-S.

    (iv)    If the Seller is not a natural person, a Good Standing Certificate issued by the appropriate office of the jurisdiction under which laws the Seller is organized reflecting that Seller is duly organized, validly existing and in good standing under the laws of such jurisdiction, and if the Seller is not organized under the laws of the State of Tennessee, a Certificate of Authority to Transact Business issued by the office of the Secretary of State of the State of Tennessee.

    (v)    Lien, Possession and Encumbrance Affidavit sufficient for the Escrow Agent to delete the standard exceptions related thereto.

    (vi)    All instruments necessary to effectuate compliance with Section 1445 of the Internal Revenue Code and the regulations promulgated thereunder (commonly referred to as the "Foreign Investment in Real Property Tax Act" or "FIRPTA"), and if required by FIRPTA, withholding of any required portion of the Purchase Price.

    (vii)    Closing Statement.

    (viii)    Such Affidavits and other instruments in form reasonably satisfactory to the Escrow Agent to evidence the fact that the signatures on the Deed are sufficient to bind Seller and convey the Property to Buyer, to provide "gap" coverage and to provide any special endorsements to the Title Policy required by Buyer or Buyer's lender.

    (ix)    Assignment of Leases and Security Deposits and Assignment of Service Agreements and impact fees, if applicable.

(x)     Certification of Representations and Warranties.

(xi)    Such other documentation as Buyer may reasonably request from Seller as shall otherwise be reasonably necessary to be executed or delivered in order to consummate the transaction contemplated hereby.

(b)     Buyer, or its permitted successors or assigns, shall deliver, or cause to be delivered, to the Escrow Agent, for disbursement to Seller upon consummation of Closing, (i) the balance of the purchase price and other monies as provided herein and (ii) such additional and further documents as shall otherwise be reasonably necessary to be executed or delivered in order to consummate the transaction contemplated hereby.

(c)     Buyer and Seller shall instruct the Escrow Agent, upon delivery of all of the aforementioned documents and funds, and subject to such further instructions as may be given it by Seller and Buyer, to (i) cause the Deed to be recorded together with any other instruments of conveyance which have been executed by Seller and have been requested by Buyer to be recorded; (ii) deliver the funds representing the Purchase Price to Seller; and (iii) issue a fee title insurance policy in the name of Buyer and in the full amount of the Purchase Price, as provided for above.

4.     **Warranty of Title and Title Insurance**.   Prior to the expiration of the Inspection Period, Escrow Agent shall cause to be delivered to Buyer a title insurance commitment ("Commitment") issued by a title insurance company reasonably acceptable to Buyer (the "Title Insurance Company") and all supporting documents for the issuance to Buyer or Buyer's designee(s) of a 2021 form ALTA Owner's Policy(ies) of Title Insurance for the Property (collectively, the "Title Policy") in an amount equal to the Purchase Price. The Title Policy shall show fee simple title to the Property vested in Buyer at the Closing, subject in each case only to (a) current real estate taxes not yet due and payable as of the Closing Date, and (b) covenants, conditions, easements, and exceptions to title as Buyer may agree in writing (collectively, the "Permitted Exceptions"). Other than as specifically consented to in writing by Buyer, the Commitment and the Title Policy to be issued by the Title Company shall have all Standard and General Exceptions deleted so as to afford full "extended form coverage," subject to specific matters disclosed on a survey of the Property that Buyer has consented to in writing and shall, at the option of Buyer, contain endorsements as may be reasonably requested by Buyer. At the Closing, Seller shall deliver or cause to be delivered such affidavits or other instruments as the Title Company may reasonably require to delete the Schedule B-I requirements, to delete Standard and General Exceptions, to provide "gap coverage," to provide the special endorsements required hereunder, and otherwise to deliver to the Buyer the Title Policy in form reasonably acceptable to the Buyer. Seller shall convey good, marketable, and insurable title by a general warranty deed in accordance with the standards adopted from time to time by the Tennessee Bar, subject only to the Permitted Exceptions. After recording of the original Deed, Escrow Agent shall cause the Title Policy to be issued to Buyer as provided for above. Seller shall deliver the Property free and clear of any tenancies other than the leases described on Exhibit "C" attached hereto and incorporated herein ("Rent Roll").

5.     **Curative Rights**.   On or before the expiration of the Inspection Period, the Buyer's attorneys shall notify Seller of Buyer's objections to the status of title or said objections shall be waived. Upon the date of receiving notice of defects from the Buyer, Seller shall have until the Closing Date in which to have the exceptions removed from the Commitment or the defects cured to the reasonable satisfaction of the Buyer. In the event Seller is unable or unwilling to cure the defects in title on or before the Closing Date, Buyer may accept the condition of title despite any such defects, or may terminate this Contract and receive a full refund of all Earnest Money paid hereunder. Any mortgage, security deed, lien, judgment, or other claim in a liquidated amount which constitutes an exception to Seller's title to the Property (a "Liquidated Claim") shall not constitute a Permitted Exception hereunder, but such Liquidated Claim shall be paid or satisfied out of the sums payable by Buyer at Closing, and the proceeds of sale

DocuSign Envelope ID: 9B1EDEFE-C059-4C7A-8912-1C201BE1F924

payable to Seller shall be reduced accordingly. Should the Commitment reveal the presence of mechanic's liens, a transfer to bond of such liens with a surety reasonably acceptable to Buyer shall be deemed to have cured the defect arising because of such lien(s), for purposes of determining the status of title under this Contract.

6. **Surveys Tests and Inspections.** Seller shall, within three (3) days of the Effective Date, furnish Buyer with any existing title policies, surveys and environmental reports and all other items relating to the Property, including but not limited to the items listed on **Exhibit "B"**, in the possession of Seller, if any (collectively, "Seller's Information"). Buyer, at Buyer's expense may obtain a new survey of the Property prior to the expiration of the Inspection Period. Such survey shall be prepared in accordance with the Minimal Technical Standards for Land Surveying in the State of Tennessee and certified to Buyer, Seller and the Title Insurance Company providing the title commitment. Should the legal description of the Property taken from Buyer's survey differ in any material respect from the legal description in the deed by which Seller acquired the Property, then the Deed delivered to Buyer at Closing shall describe the Property as described in said acquisition deed, and Seller shall at Closing also execute and deliver to Buyer a quitclaim deed conveying the Property to Buyer and describing the Property in accordance with such Survey. Buyer agrees to accept title to the Property subject to the state of facts shown upon the survey unless Buyer shall notify the Seller of any objection to the matters shown on the survey prior to expiration of the Inspection Period, at which point such objections shall constitute an objection to title as described in Section 5 above. Seller agrees that it shall quitclaim to Buyer, or its designee, any spike strips, gaps, or gores between the Property and any public right of way which are found prior to closing and post-closing if such occasion arises. Should Buyer fail to obtain a survey of the Property as described herein, all survey related exceptions on the Commitment and Title Policy shall be deemed Permitted Exceptions.

The Inspection Period (the "Inspection Period") shall last from the Effective Date through the date which is **thirty (30) days after the Effective Date**. While this Contract is in effect, Seller grants Buyer reasonable access to the Property for tests, investigations, and inspections, all of which shall be conducted at Buyer's sole cost and expense. Such investigations may include, but not be limited to, any environmental tests and studies, soil tests, boundary as-built and topographical surveys, confirmation of zoning and land use, feasibility studies, and all other reviews, inspections and investigations desired by Buyer.

In the event Buyer is not satisfied, in Buyer's sole discretion, with any matter discovered during said Inspection Period (as may be extended), or for no reason, then Buyer shall have the right to terminate this Contract within the time set forth above whereupon the Escrow Agent shall return to Buyer the Earnest Money and all parties shall be released from further liability hereunder, except with respect to those provisions in this Contract which survive such termination. In the event Buyer terminates this Contract for any reason other than a default by Seller hereunder, Buyer shall provide Seller with copies of all third-party due diligence reports obtained by Buyer; provided, however, Buyer shall have no obligation to provide any proprietary or privileged materials. In the event Buyer does not terminate this Contract pursuant to this paragraph within the time set forth above, all Inspection Period contingencies shall be waived, and the Earnest Money shall be non-refundable, except as expressly provided in the Contract.

7. **Closing Costs and Prorations.** The responsibility for closing costs and prorations of this transaction shall be as follows: Buyer shall pay the intangible taxes and recording fees for any Buyer loan documents, the cost of the title examination and the Title Policy and all costs of a lender's title policy, if any. Seller shall pay the transfer tax, recording fees for documents needed to cure title defects, and any and all brokerage fees owed to Brokers. Any cost or expense not specifically allocated to a party shall be paid by the party who incurred the cost or expense, unless otherwise stated herein. Each party shall pay one half (1/2) of the escrow and closing charges of the Escrow Agent. Each party shall otherwise pay their own attorney's fees. Assessments shall be prorated as to the date of closing using the maximum possible discount. In the event the current year tax bill has not been issued, then the tax bill for the previous year will be used with due allowance being made for improvements and exemptions. Regarding any assessments

against the Property, Seller will pay (i) the full amount of liens that are certified, confirmed, and ratified before Closing for any completed improvements and (ii) the amount of the last estimate of the assessment if an improvement is substantially completed as of the Effective Date but has not resulted in a lien before Closing, and Buyer will pay all other amounts. If assessments may be paid in installments, Seller shall pay installments due after Closing, and such obligation shall survive closing. If the Property is subject to any so-called "rollback" tax or other tax pursuant to which real estate taxes for prior years may be increased as a result of a change of ownership, change of use or change in zoning of the Property, then Seller shall be obligated for the payment of such additional taxes, and such obligation shall survive Closing. The Buyer shall receive a credit at Closing in an amount equal to the aggregate amount of all security deposits then held by the Seller. All Income that have been received by the Seller as of the Closing Date shall be adjusted between the Buyer and the Seller at Closing, with the Buyer receiving a credit against the Purchase Price at the Closing for all portions of such Income allocable to any period from and after the Closing Dae. Seller shall be responsible for and shall promptly pay all utility charges and similar charges with respect to the Property attributable to the period up to and including the Closing Date.

8.     **Buyer's Entry on Property**.   For as long as this Contract is in effect, and provided that the Property is not damaged by Buyer and is left in the same condition as found by Buyer, Seller hereby gives permission to Buyer and/or its agents to enter upon any portion of the Property to make such inspections and to conduct, at the sole expense of Buyer, such tests as Buyer may choose to perform; provided, however, Buyer will give Seller advanced notice of its desire to enter the Property, and Seller shall have the right to accompany Buyer during all such inspections and tests. Buyer agrees that, in exercising its rights set forth in this paragraph, Buyer will not interfere with the operation of the Property. Buyer shall assume all risks involved in entering the Property for the performance of such activities and shall indemnify and hold Seller harmless from and against all loss and expense by reason of any liability due to bodily injury or death to persons or damage to Property sustained by any party arising out of or in connection with the exercise of any of Buyer's rights under this paragraph except those caused by Seller's negligence, any diminution in value in the Property arising from or relating to matters discovered by Buyer during its investigation of the Property, any latent defects in the Property discovered by Buyer or the release or spread of any hazardous materials which are discovered (but not deposited) on or under the Property by Buyer.

9.     **Risk of Loss**.   In the event of substantial fire, casualty, or other loss prior to closing, Buyer shall have the option to rescind this Contract within thirty (30) days following such casualty, upon which event the parties shall be relieved of further obligation under this Contract, with those clauses herein specifically stated as surviving termination continuing in effect. In the event Buyer does not rescind this Contract within thirty (30) days following such casualty, Seller and Buyer shall proceed to close this transaction in which event, Seller shall assign to Buyer any and all insurance proceeds payable for said casualty.

10.    **Condemnation**.   If all or any portion of the Property is taken by exercise of the power of eminent domain after the date hereof, or if Seller receives notification or otherwise has reason to believe that the exercise of such power is contemplated any time prior to Closing, Buyer shall each have the option to terminate this Contract, in which event, all monies held hereunder shall be returned to Buyer and this Contract shall become null and void (subject to surviving clauses); or, Buyer and Seller shall proceed to close this transaction pursuant to the terms hereof and Seller shall, at settlement, assign to Buyer all right and claim to any awards arising therefrom as well as monies previously received by Seller on account thereof, net of any expenses of Seller, including reasonable attorney's fees in collecting the same, which were not reimbursed to Seller by the condemning authority or otherwise.

11.    **Condition of Property**.     Buyer acknowledges that it has not relied upon any representations or warranties of Seller as to the condition of the Property, except those expressly made in this Contract, and that Buyer will have an opportunity to inspect the condition of the Property during the

DocuSign Envelope ID: 9B1EDEFE-C059-4C7A-8912-1C201BE1F924

Inspection Period as herein defined. Except as expressly set forth herein, Buyer shall accept the Property in its existing "as is" condition.

      12.    **Brokerage Commission**. The parties acknowledge that **LEE & ASSOCIATES** represents the Seller and Colliers Nashville represents the Buyer (collectively, the "Brokers"). The Brokers are duly licensed real estate brokers in the State of Tennessee and are fully authorized under applicable Tennessee Statutes to accept a brokerage commission in connection with the transactions consummated pursuant to the terms of this Contract. Seller agrees to pay a brokerage commission through Escrow at Closing to the Brokers pursuant to a separate agreement. Seller and Buyer hereby represent and warrant that, except as specifically set forth herein, neither party has entered into any agreement with or otherwise performed any act which would entitle any real estate broker or salesman to receive a commission as a result of this transaction, and, each party hereby indemnifies and agrees to hold the other harmless from any claims for a real estate commission, except as set forth herein.

      13.    **Failure of Performance**. If Buyer fails to perform this Contract within the time specified, the Earnest Money shall be recovered and retained by and for the account of Seller as agreed upon liquidated damages, consideration for the execution of this Contract and in full settlement of any claims; whereupon, Buyer and Seller shall be relieved of all obligations under this Contract, with the exception of Buyer's indemnity obligations set forth in Section 8 which shall survive, as well as any other surviving clauses. If, for any reason, Seller fails, neglects or refuses to perform under this Contract, Buyer may, in Buyer's sole and absolute discretion, either: 1) seek specific performance to compel Seller's performance under the terms of this Contract or 2) elect to terminate this Contract and receive the return of Buyer's Earnest Money deposit(s), and Seller shall reimburse Buyer for all actual out-of-pocket costs and expenses, not to exceed $50,000.00, incurred by Buyer in negotiating and undertaking the transactions contemplated hereby and investigating the Property, whereupon, Buyer and Seller shall be relieved of all obligations, under this Contract, with the exception of Buyer's indemnity obligations set forth in Section 8 which shall survive, as well as any other surviving clauses. Notwithstanding the foregoing, (a) in the event specific performance is unavailable as a remedy to Buyer as a result of Seller's intentional sale of the Property to a third-party during the term of this Contract, Buyer shall have all rights and remedies at law or in equity, and (b) in the event of a default by Seller of which Buyer is not aware prior to Closing, including, without limitation, a breach of any representation or warranty not discovered until after Closing, Buyer shall be entitled to exercise any and all rights and remedies at law in equity at any time after Buyer becomes aware of such default or breach.

      14.    **Notice of Default**.  No default as to any provision of this Contract, on the part of either Buyer or Seller, shall be claimed or charged by either party against the other until notice thereof has been given to the defaulting party in writing, and such default remains uncured for a period of ten (10) days after the defaulting party's receipt of such notice. Such notice of default and opportunity to cure shall not apply to the obligation of each party to timely close the transaction.

      15.    **Buyer's Representations and Warranties**.  Buyer makes the following covenants, representations and warranties to Seller, all of which shall survive the closing of the transaction:

          (a)    Status. Buyer has full power and authority to enter into and execute all documents required hereunder.

          (b)    Authorization.  The making, execution, delivery and performance of this Contract by Buyer has been duly authorized and approved on behalf of Buyer, and constitutes a valid and binding obligation, enforceable in accordance with its terms.

          (c)    Validity and Binding Nature.  This Contract is, and the documents and agreements mentioned herein are, to be delivered pursuant to the terms hereof, and when duly executed and delivered,

will be legal, valid and binding obligations of Buyer and as set forth herein will be valid and enforceable against Buyer in accordance with their respective terms.

(d) <u>Compliance with Law and Other Instruments</u>. The execution and delivery of this Contract by Buyer will not violate any material provision of law and will not conflict with, result in any material breach of any of the terms, conditions and provisions of, nor constitute a material default under, the organization documentation of Buyer or any other agreement to which the Buyer is or will be a party or bound.

16. <u>**Seller's Representations and Warranties**</u>. Seller makes the following covenants, representations and warranties to Buyer, all of which shall survive the closing of the transaction:

(a) <u>Validity and Binding Nature</u>. This Contract is, and the documents and agreements mentioned herein are, to be delivered pursuant to the terms hereof, and when duly executed and delivered, will be legal, valid and binding obligations of Seller and as set forth herein will be valid and enforceable against Seller in accordance with their respective terms.

(b) <u>No Adverse Actions</u>. There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Seller which, if adversely determined could individually or in the aggregate interfere with the consummation of the transactions contemplated by this Contract.

(c) <u>Compliance with Law and Other Instruments</u>. The execution and delivery of this Contract by Seller will not violate any material provision of law and will not conflict with, result in any material breach of any of the terms, conditions and provisions, nor constitute a material default under, the organization documentation of Seller or any other agreement to which the Seller is or will be a party or bound.

(d) <u>Environmental</u>. No areas on the Property exist where Hazardous Substances or Waste (as hereinafter defined) have been generated, disposed, of, released or found in violation of applicable laws and Seller has no knowledge of the existence of any mold or any areas for the storage or disposal of any Hazardous Substance or Waste on the Property in violation of applicable laws. Seller has received no written notice that any municipality or any governmental or quasi-governmental authority has determined that there are any violations of zoning, health, environmental or other statutes, ordinances or regulations affecting the Property, and Seller has no knowledge of any such violations. In the event Seller receives notice of any such Hazardous Substances or Waste on the Property or any such violations affecting the Property prior to the Closing, Seller shall promptly notify Buyer thereof. "Hazardous Substances or Waste" means petroleum (including gasoline, crude oil or any crude oil fraction), waste, trash, garbage, industrial bi-product, and chemical or hazardous substance of any nature, including, without limitation, radioactive materials, PCB's, asbestos, pesticides, herbicides, pesticide or herbicide containers, untreated sewage, industrial processed sludge and any other substance identified as a hazardous substance or waste, toxic substance or waste, pollutant or contaminant in the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (commonly known as "CERCLA") as amended, the Superfund Amendment and Reauthorization Act (commonly known as "SARA"), the Resource Conservation and Recovery Act (commonly known as "RCRA"), each as amended, or any other federal, state, county or city legislation or ordinances applicable to the Property.

(e) <u>Property Rights</u>. No person or entity, except Buyer, has been granted any options, rights of first refusal or other purchase rights with respect to the Property.

(f) <u>Claim of Action; Violation of Laws</u>. Seller has no knowledge and has received no notice of any pending or threatened condemnation, litigation, claim, demand, damage, action, violation, or

cause of action of any person, entity or governmental agency or instrumentality affecting the Property. To the best of Seller's knowledge, the Property is not in violation of any law, ordinance, code or regulation. To the best of Seller's knowledge, the Property is not in violation or breach of any of the covenants, conditions, restrictions or other agreements affecting the Property.

(g)     Special Assessments.   Seller has no knowledge of and has received no notice concerning any existing or proposed special assessments or similar taxes, charges or assessments against the Property or any utility service moratoriums or other moratoriums affecting the Property.

(h)     Parties in Possession.   There are no parties in possession of any portion of the Property other than the Rent Roll. Seller will not further sell, encumber, convey, assign, pledge, lease or contract to sell, convey, assign, pledge, encumber or lease all or any part of the Property, nor restrict the use of all or any part of the Property, nor take or cause or allow to be taken any action in conflict with this Contract at any time during the term of this Contract.

(i)     Bankruptcy.   Seller has not (i) made a general assignment for the benefit of creditors, (ii) filed any voluntary petition in bankruptcy or suffered the filing of an involuntary petition by Seller's creditors, (iii) suffered the appointment of a receiver to take possession of all or substantially all of Seller's assets, (iv) suffered the attachment or other judicial seizure of all, or substantially all, of Seller's assets, (v) admitted in writing its inability to pay its debts as they come due, or (vi) made an offer of settlement, extension or composition to its creditors generally.

(j)     Utilities. All utilities, including (but not limited to), water, gas, storm sewer, sanitary sewer, telephone and electricity, are located at the property line of the Property, are be available for use, and are sufficient to handle the operation of the Project.

(k)     Access. The Property has legal access to and from all street fronts and adjoining rights-of-way.

(l)     Violations. Seller has received no notice of and has no knowledge of any violations of law, municipal or county ordinances, or other legal requirements with respect to the Property or with respect to the use, occupancy or construction thereon.

(m)     Other than the Rent Roll attached hereto as Exhibit B ("*Rent Roll*"), the Seller has not entered into any written leases or occupancy agreements affecting the Property or any part thereof. The Seller has not delivered written notice to any tenant (which remains outstanding as of the date hereof) to the effect that such tenant is in default under such tenant's lease that would individually or in the aggregate have a material adverse effect on the Rent Roll. The Seller has not received written notice from any tenant to the effect that Seller is in default under any lease. Except as set forth in such leases, the Seller has not granted any concessions, rent-free occupancy, allowances, rebates or refunds to any tenant.

(n)     Other than the agreements described on Exhibit "D" attached hereto (collectively, the "*Service Contracts*"), the Seller has not entered into any service contracts, management agreements or other agreements affecting the use or operation of the Property or any part thereof. The Seller has not received written notice from any party to a Service Contract (which remains outstanding as of the date hereof) to the effect that the Seller is in material default under such Service Contract. Seller has not given any notice of material default under any Service Contract that remains uncured. Seller has not received any notice of material default under any Service Contract that remains uncured.

In addition to all other rights and remedies of set forth herein, Seller shall indemnify, defend (with counsel satisfactory to Buyer), and hold harmless Buyer, its employees, officers, shareholders, attorneys, directors,

agents, contractors, assigns and successors-in-interest, from and against any and all claims, actions, loss, cost, damage and expense (including reasonable attorneys' fees, including fees on appeal) resulting from a breach by Seller of any of the representations, warranties and covenants contained in this Contract, and such indemnity shall survive Closing.

17. **Notice**. All notices required to be served or sent pursuant to the terms hereof may be served either personally or by overnight messenger, or sent by certified mail, return receipt requested, or sent by e-mail; and such mailed notices shall be deemed to have been given when delivered or refused if served personally and when deposited in the United States mail or with an overnight messenger, postage prepaid, addressed to the parties for whom intended and mailed to the addresses set forth below when served by overnight messenger or by certified mail, and such e-mailed notices shall be deemed to have been given when sent:

<table>
<tr><td>BUYER:</td><td>S. BENNETT MAXWELL_<br>7834 HIGHWAY 100<br>NASHVILLE, TN 37221<br>EMAIL: S.BENNETTMAXWELL@GMAIL.COM</td></tr>
<tr><td>WITH A COPY TO:</td><td>NEEL, ROBINSON, & STAFFORD, LLC<br>5555 GLENRIDGE CONNECTOR SUITE 400<br>ATLANTA, GA 30342<br>ATTN: PIERCE LOWREY<br>EMAIL: PIERCE.LOWREY@NRS.LAW;</td></tr>
<tr><td>And, if given to Seller,<br>shall be addressed as follows:</td><td>Ryan Wear<br>Attn: _____<br>2732 Grand Ave Suite 122<br>Everett WA 98201<br>rwear@waterstationtechnology.com</td></tr>
<tr><td><em>With a copy to:</em></td><td></td></tr>
</table>

18. **Governing Law**. The parties hereto expressly agree that the terms and conditions hereof, and the subsequent performance hereunder, shall be construed and controlled in accordance with the laws of the State of Tennessee.

19. **Entire Agreement**. This Contract contains the entire agreement between the parties hereto and no statement or representation of the respective parties hereto, their agents or employees, made outside of this Contract, and not contained herein, shall form any part hereof or be binding upon the other party hereto. This Contract shall not be changed or modified except by written instrument signed by the parties hereto.

20. **No Joint Venture or Partnership**. Seller is not intended to have any ownership interest in Buyer's business and Buyer is not intended to have any interest in Seller's business. The relationship between Seller and Buyer is not intended to be a joint venture or partnership and neither party shall be the

agent of the other for any purpose, unless specifically granted in writing after execution hereof. Neither party shall hold itself out as an agent, partner or joint venturer with the other and each party shall defend and indemnify the other against any claim of liability arising out of an asserted agency or partnership by the other contrary to the provisions of this paragraph.

21. **Attorney's Fees**. In the event any party is required to retain an attorney to interpret or enforce this Contract, the prevailing party shall be entitled to its reasonable paralegal and attorneys' fees and expenses, whether or not litigation is actually commenced, whether incurred with respect to collection of any monies owed, trial, appeal, enforcement of any judgment, or whether incurred determining the reasonableness or amount of the attorney's fees the prevailing party is entitled to, and including attorney's fees incurred in any bankruptcy proceeding.

22. **Captions; Genders**. Captions used in this Contract are for convenience of reference only and shall not affect the construction of any provision of this Contract. Whenever used, the singular shall include the plural, the plural shall include the singular, and gender shall include all genders.

23. **Partial Invalidity**. In case any terms of this Contract shall be held to be invalid, illegal or unenforceable, in whole or in part, neither the validity of the remaining part of such term or the validity of any other term of this Contract shall in any way be affected thereby.

24. **Typewritten Or Handwritten Provisions**. Handwritten provisions initialed by both parties and inserted in this Contract and typewritten provisions initialed by both parties shall control over the typewritten provisions in conflict therewith.

25. **Counterparts**. This Contract may be executed in any number of counterparts, any one and all of which shall constitute the Contract of the parties.

26. **Time**. Time is of the essence under the terms of this Contract. Whenever the last day for the exercise of any right or the discharge of any obligation under this Contract shall fall upon a Saturday, Sunday, or any public or legal holiday, the party having such right or obligation shall have until 5:00 o'clock p.m. on the next succeeding business day to exercise such right or discharge such obligation. For the purposes of this Contract, a "business day" is any day other than a Saturday, Sunday, or any public or legal holiday. Unless otherwise specifically stated, all time periods referenced herein shall be measured in calendar days.

27. **Escrow Agent**. The Escrow Agent separately has executed this Contract to evidence his consent to act as the Escrow Agent pursuant to the terms hereof. The Escrow Agent agrees to deposit the Earnest Money in accordance with the terms of this Contract, and to disburse from the Earnest Money all or the appropriate portion thereof in accordance with the terms of this Contract. The Escrow Agent shall not be responsible for any funds not actually received by the Escrow Agent. If in doubt as to the Escrow Agent's duties or liabilities under the provisions of this Contract, Escrow Agent may, at Escrow Agent's option, continue to hold the subject matter of the escrow until the parties mutually agree to its disbursement or until judgment of a court of competent jurisdiction shall determine the rights of the parties, or Escrow Agent my deposit same with the Clerk of the Superior Court having jurisdiction of the dispute. Upon notifying all parties concerned of such action, all liability on the part of Escrow Agent shall fully terminate, except to the extent of accounting for any items previously delivered out of escrow. Any suit between Buyer and Seller wherein Escrow Agent is made a party because of acting as Escrow Agent hereunder, or in any suit wherein Escrow Agent interpleads the subject matter of the escrow, Escrow Agent shall be entitled to recover its reasonable attorney's fees and costs incurred, with the fees and costs to be paid from and out of the escrowed funds or equivalent and charged and awarded as court costs in favor of the prevailing party. Parties agree that Escrow Agent shall not be liable to any party or person for misdelivery to Buyer or Seller of items subject to this escrow, unless such misdelivery is due to willful breach of this Contract or gross negligence of Escrow Agent.

28. **Assignment of Contract.** Buyer may assign its rights and obligations under this Contract,

in whole or in part, to a related entity or to a 1031 Qualified Intermediary without the consent of Seller, but not otherwise. Any assignment shall be binding on the Buyer's successor in interest, heirs or assign.

29. **Reserved.**

30. **Reserved.**

31. **Marketing.** While this Contract is in effect, Seller shall not market the Property or enter into any other agreement with regard to the Property without the written consent of Buyer. Seller shall not disclose the terms of this Contract to anyone, other than Seller's attorney, accountant, broker, or similar agent, without the written consent of Buyer. Upon Contract execution, Buyer is entitled to install sign(s) marketing its plans for developing the Property, provided such signs comply with any rule or regulation governing outdoor signs.

32. **Reserved.**

33. **No Waiver.** Waiver of performance, satisfaction of timely performance or satisfaction of any condition, covenant or contingency by any party shall be deemed a waiver as to such condition, covenant or contingency only and shall not be deemed a waiver of any other condition, covenant or contingency (or of the same condition, covenant or contingency at a later time) unless such waiver is in writing, signed by the party to be charge therewith.

34. **Non-Recordation.** Neither this Contract nor any notice or memorandum thereof shall be recorded in any public records.

35. **Conditions Precedent to Obligations of Buyer.** The obligation of Buyer to consummate the transaction hereunder shall be subject to the fulfillment on or before the Closing Date of all the following conditions, any or all of which may be waived by Buyer in its sole discretion:

    (a) Seller shall have delivered to Buyer all of the items required to be delivered to Buyer pursuant to the terms of this Contract;

    (b) All of the representations and warranties of Seller contained in this Contract shall be true and correct in all material respects as of the Closing Date (with appropriate modifications permitted under this Contract);

    (c) Seller shall have performed and observed, in all material respects, all covenants and agreements of this Contract to be performed and observed by Seller as of the Closing Date;

    (d) Seller shall have delivered to Buyer tenant estoppel letters related to the Rent Roll in a form approved by Buyer in its sole but reasonable discretion of the Buyer.

Notwithstanding anything to the contrary in this Contract, in the event any of the conditions in this section are not satisfied to the sole satisfaction of Buyer on or before the Closing Date, Buyer may elect to either (i) terminate this Contract and receive a return of the Earnest Money, or (ii) waive such condition in writing and proceed to Closing.

36. **Section 1031 Exchange.** Either Seller or Buyer shall have the right to treat this Property as part of a tax-deferred like-kind exchange under Section 1031 of the Internal Revenue Code and, to that end, shall have the right to assign or otherwise alter this Contract in order to accomplish that objective.

37. **Operating Covenants.** From the date of this Contract until the Closing or earlier termination of this Contract:

    (a) Seller shall continue to operate the Property and pay for all expenses in a manner

similar to its operation prior to the execution of this Contract, including, without limitation, the providing of insurance, management, and maintenance services;

(b)     no leases, service contracts, easements, restrictions, declarations, agreements or options shall be entered into, amended or terminated without Buyer's prior consent;

(c)     Seller shall promptly furnish Buyer copies of all notices of violation by Seller or the Property of federal, state or municipal laws, ordinances, regulations, orders, or requirements of departments of housing, buildings, fire, labor, health, or other Federal, state or municipal departments or other governmental authorities; and

(d)     Seller shall not market the Property for sale or otherwise accept or negotiate any offers for sale or refinancing.


[REST OF PAGE LEFT INTENTIONALLY BLANK]

The parties hereto have executed this Contract the year and date set forth above.

**SELLER:**

**IDEAL PROPERTY INVESTMENTS, LLC,**
a WA limited liability company

By: _Ryan Wear_ (Seal)
Name: Ryan Wear
Title: __Managing Member__

3/18/2024

**BUYER:**

By: _Bennett Maxwell_ (Seal)
**BENNETT MAXWELL**, individually

3/19/2024

DocuSign Envelope ID: 9B1EDEFE-C059-4C7A-8912-1C201BE1F924

# EXHIBIT "A"

## Description of Property

## EXHIBIT "B"

      (a)     Statements of all real estate taxes with respect to the Property or any portion thereof for the two (2) most recent tax years;

      (b)     Copies of any and all permit applications, permits received and documents prepared by Seller pursuant to federal, state and local environmental legislation;

      (c)     Copies of records or reports concerning spills or release of any hazardous substance on the Property that are to the knowledge of Seller;

      (d)     Copies of results of any environmental reports, testing of wastes generated, or any environmental monitoring performed by or on behalf of Seller or any governmental agency and any inspection reports from governmental or in-house environmental inspections concerning the Property;

      (e)     Copies of information concerning any notices of violation, compliance schedules, administrative orders or any other enforcement action or lawsuit taken against Seller and concerning the Property;

      (f)     Copies of records concerning the location and existence of PCBs, asbestos and any other suspected or known carcinogens on the Property that are to the knowledge of Seller;

      (g)     Copies of records of or information concerning any enforcement actions pursuant to federal, state and/or local environmental legislation against neighboring property owners of which Seller has knowledge;

      (h)     All permit applications, permits, site plans, surveys or other related documents prepared or possessed by Seller in connection with the Property,

      (i)     All leases, occupancy agreements, rent roll information related to the Property, and

      (j)     All surveys, title reports, title policies, commitments, and other inspection activity items related to the Property, and

      (k)     Any other document or record with respect to the operation of the Property which may be reasonably requested by Buyer.

DocuSign Envelope ID: 9B1EDEFE-C059-4C7A-8912-1C201BE1F924

**Exhibit "C"**

## Rent Roll (as of February 2024)
### 730 Middle Tennessee Blvd, Units 9-15, 18-20 (30,500 SF total)

| Unit # | Tenant Name | Area (Sqaure Footage) | Starting Rent | Current Rent | Yearly Rent | PSF/Y | *NNN Fees | Security Deposit | Annual Increases | Current Lease Start Date: | Lease Expire Date: |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Recumbent Bicycles of Tennessee | 1,500 | $1,022.02 | $1,291.66 | $15,499.92 | $10.33 | $1.91 | $1,046.83 | 3.00% | 4/1/2022 | 2/28/2026 |
| 9-11 | T.R.U.E. (Tenn 730 Business LLC) | 7,000 | $6,416.67 | $6,416.67 | $77,000.04 | $11.00 | $2.07 | $6,673.33 | Fixed | 9/1/2023 | 8/30/2025 |
| 12 | Guardian MMM, LLC | 4,000 | $4,254.27 | $5,092.50 | $61,110.00 | $15.28 | $1.32 | $3,670.00 | 5.00% | 5/1/2022 | 4/30/2027 |
| 13 | Hexa Partners | 3,000 | $3,750.00 | $3,750.00 | $45,000.00 | $15.00 | $1.65 | $4,000.00 | 4.00% | 1/1/2024 | 1/31/2027 |
| 14-15 | The Warehouse | 6,000 | $2,402.26 | $3,726.69 | $44,720.28 | $7.45 | $1.70 | $1,864.50 | 5.00% | 1/1/2022 | 12/31/2024 |
| 18-20 | Oerlikon Balzers Coating USA, Inc. | 9,000 | $6,180.00 | $7,472.42 | $89,669.04 | $9.96 | $1.66 | $11,250.00 | 2.75% | 6/1/2015 | 5/31/2025 |
| | | 30,500 | | | $332,999.28 Total | $11.50 Average | | $28,504.66 | | | |

| Misc. Notes |
| --- |
| Two (2) five (5) year extensions starting on 4/1/22 | Tenant originally moved in on 3/1/16 |
| 3 year term with 3rd year fixed option at $12.58/NNN, took space "As-IS" and invested over $100k in renovations |
| One (1) five (5) year extension starting on 5/1/27 |
| One (1) three (3) extension option at FMV |
| Two (2) three (3) year extensions starting on 1/1/25 | Tenant originally moved in on 6/1/14 |
| No option to renew - Tenant will most likely want to renew at then prevailing market rates, per conversations with Tenant |
| |
| |

**2024 - NNN/OPEX Breakdown & Budget**

| Unit # | Unit SF | Association Amount (Yearly) | Association Amount (Monthly) | 2023 Taxes | Pass Thru Fees (Annually) | Pass Thru Fees (PSF/Y) |
|---|---|---|---|---|---|---|
| 9 | 1500 | $1,575 | $131 | $1,287 | $2,862 | $1.91 |
| 10 & 11 | 7000 | $8,325 | $694 | $6,198 | $14,523 | $2.07 |
| 12 | 4000 | $2,250 | $188 | $3,034 | $5,284 | $1.32 |
| 13 | 3000 | $2,550 | $213 | $2,398 | $4,948 | $1.65 |
| 14 & 15 | 6000 | $5,100 | $425 | $5,127 | $10,227 | $1.70 |
| 18, 19 & 20 | 9000 | $7,650 | $638 | $7,333 | $14,983 | $1.66 |
| | 30500 | $27,450 | | $25,377 | $52,827 | |

| Pass Thru Fees (PSF/Mo) | Pass Thru Fees (Monthly) |
|---|---|
| $0.16 | $238.50 |
| $0.17 | $1,210.25 |
| $0.11 | $440.33 |
| $0.14 | $412.33 |
| $0.14 | $852.25 |
| $0.14 | $1,248.58 |

| Unit # | Tenant Name |
|---|---|
| 9 | Recumbent Bicycles of Tennessee |
| 10-11 | T.R.U.E. (Tenn 730 Business LLC) |
| 12 | Guardian MMM, LLC |
| 13 | Hexa Partners |
| 14-15 | The Warehouse |
| 18-20 | Oerlikon Balzers Coating USA, Inc. |

| Contant Name | Phone |
|---|---|
| Bobby Hanes | 615-642-1756 |
| Ben Dobbs | 561-735-2474 |
| Matt Maskovyauk | 615-895-1667 |
| Ruben Martinez | 919-744-0345 |
| Rebecca and Steve Lanham | 270-853-9733 |
| Randy McCall | 615-497-8372 |

| Email |
| --- |
| rbot@bellsouth.net |
| benjamindobbs22@gmail.com |
| matt@guadianmma.com |
| rmghexa@gmail.com |
| lanham_steve@hotmail.com |
| beckyintheboro@gmail.com |
| randy.mccall@oerlikon.com |

# Exhibit C

DocuSign Envelope ID: 1C38A7EC-6899-48C0-92DD-A7549BD69DB2

## FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT

THIS **FIRST AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "Amendment") is made as of this 21st day of March, 2024 ("Effective Date"), by and between IDEAL PROPERTY INVESTMENTS, LLC, a Washington limited liability company ("Seller"), IDEAL MURFREESBORO, LLC, a Wyoming limited liability company ("Owner"), and S. BENNETT MAXWELL, individually, or his assignee ("Buyer").

## RECITALS

WHEREAS, Seller and Buyer entered into that certain Contract for Purchase and Sale dated March 19, 2024 ("Agreement") for the purchase and sale of that certain property being approximately 30,500 SF comprised of ten (10) industrial or flex condominium units located at 730 Middle Tennessee Blvd., Murfreesboro, Tennessee, commonly known as Suites 9-15 and 18-20, as more particularly described in the Agreement ("Property"); and

WHEREAS, Owner is the current owner of the Property as the entity vested with record title to the Property, and as such is the party that must sign and deliver conveyance documents at Closing to consummate the transaction contemplated by the Agreement; and

WHEREAS, Seller and Buyer desire to amend the Agreement as more particularly described in this First Amendment.

## AGREEMENT

In consideration of the mutual covenants and provisions of this Amendment and the Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.     Recitals.  The Recitals set forth above are true and correct and are incorporated into this Amendment. Unless otherwise expressly provided herein, all defined terms used in this Amendment shall have the meanings set forth in the Agreement.

2.     Seller.  The Agreement is hereby amended such that all references to Seller in the Agreement shall refer to IDEAL MURFREESBORO, LLC, a Wyoming limited liability company, including the obligation to execute, acknowledge and deliver to Buyer at Closing the documents listed under Section 3(a) of the Agreement.

3.     Entire Agreement.   Except as specifically amended by this Amendment, the Agreement shall remain in full force and effect and is hereby ratified and confirmed.  The Agreement, as amended by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements, written or oral, between Seller and Buyer with respect to the subject matter of the Agreement, as amended by this Amendment.

4.     Counterparts.  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original.  Signatures transmitted by facsimile or e-mail, through scanned or electronically transmitted .pdf, .jpg or .tif files, shall have the same effect as the delivery of original signatures and shall be binding upon and enforceable against the parties hereto as if such facsimile or scanned documents were an original executed counterpart.

5.     <u>Binding Effect</u>.  This Amendment shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and permitted assigns.

**IN WITNESS WHEREOF**, the parties have caused this First Amendment to be signed by their duly authorized representatives as of the date first above written.

**SELLER:**

**IDEAL PROPERTY INVESTMENTS, LLC**, a Washington limited liability company

By: _Ryan Wear_____ (Seal)
Name: Ryan Wear
Title: Managing Member

    3/21/2024

**BUYER:**

By: _Bennett Maxwell_____ (Seal)
**BENNETT MAXWELL**, individually

    3/22/2024

**OWNER:**

**IDEAL MURFREESBORO, LLC**, a Wyoming limited liability company

By: _Ryan Wear_____ (Seal)
Name: Ryan Wear
Title: Managing Member

    3/21/2024

## SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT

THIS **SECOND AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "Amendment") is made as of this 16th day of April, 2024 ("Effective Date"), by and between **IDEAL MURFREESBORO, LLC**, a Wyoming limited liability company ("Seller"), successor-in-interest to Ideal Property Investments, LLC, a Washington limited liability company, and **FILLMORE HOLDINGS, LLC**, a Tennessee limited liability company ("Buyer"), successor-in-interest to S. BENNETT MAXWELL, individually, or his assignee.

## RECITALS

WHEREAS, Seller and Buyer entered into that certain Contract for Purchase and Sale dated March 19, 2024, as amended by that certain First Amendment to Purchase and Sale Agreement dated March 21, 2024, as further amended by that certain Assignment and Assumption of Purchase and Sale Agreement dated April 1, 2024 (collectively, the "Agreement") for the purchase and sale of that certain property being approximately 30,500 SF comprised of ten (10) industrial or flex condominium units located at 730 Middle Tennessee Blvd., Murfreesboro, Tennessee, commonly known as Suites 9-15 and 18-20, as more particularly described in the Agreement ("Property"); and

WHEREAS, Seller and Buyer desire to amend the Agreement as more particularly described in this Amendment.

## AGREEMENT

In consideration of the mutual covenants and provisions of this Amendment and the Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Recitals.  The Recitals set forth above are true and correct and are incorporated into this Amendment. Unless otherwise expressly provided herein, all defined terms used in this Amendment shall have the meanings set forth in the Agreement.

2.      Inspection Period.  Section 6 of the Agreement is hereby amended such that Inspection Period shall last until May 20, 2024.  For purposes of clarification, any time periods in the Agreement which are based on the Inspection Period shall be calculated using the Inspection Period as modified by this Amendment.

3.      Entire Agreement.  Except as specifically amended by this Amendment, the Agreement shall remain in full force and effect and is hereby ratified and confirmed.  The Agreement, as amended by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements, written or oral, between Seller and Buyer with respect to the subject matter of the Agreement, as amended by this Amendment.

4.      Counterparts.  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original.  Signatures transmitted by facsimile or e-mail, through scanned or electronically transmitted .pdf, .jpg or .tif files, shall have the same effect as the delivery of original signatures and shall be binding upon and enforceable against the parties hereto as if such facsimile or scanned documents were an original executed counterpart.

5.     <u>Binding Effect</u>.  This Amendment shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and permitted assigns.

**IN WITNESS WHEREOF**, the parties have caused this Second Amendment to Purchase and Sale Agreement to be signed by their duly authorized representatives as of the date first above written.

**SELLER:**

**IDEAL MURFREESBORO, LLC,**
a Wyoming limited liability company

By: _Ryan Wear_____ (Seal)
Name: Ryan Wear
Title: __Managing Member__

4/16/2024

**BUYER:**

**FILLMORE HOLDINGS, LLC**, a
Tennessee limited liability company

By: _S. Bennett Maxwell_ (SEAL)
Name:  S. Bennett Maxwell
Title:    Member

DocuSign Envelope ID: C6DDD80A-816F-4C03-8152-7EB14D08B7A3

**THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT**

THIS **THIRD AMENDMENT TO PURCHASE AND SALE AGREEMENT** (this "Amendment") is made as of this 20th day of May, 2024 ("Effective Date"), by and between **TURNINGPOINTE, LLC**, a Washington limited liability company, d/b/a Turning Point Strategic Advisors ("Receiver") acting solely in its capacity as General Receiver for **IDEAL MURFREESBORO, LLC**, a Wyoming limited liability company ("Seller"), successor-in-interest to Ideal Property Investments, LLC, a Washington limited liability company, and **FILLMORE HOLDINGS, LLC**, a Tennessee limited liability company ("Buyer"), successor-in-interest to S. BENNETT MAXWELL, individually, or his assignee.

## RECITALS

WHEREAS, Seller and Buyer entered into that certain Contract for Purchase and Sale dated March 19, 2024, as amended by that certain First Amendment to Purchase and Sale Agreement dated March 21, 2024, as amended by that certain Assignment and Assumption of Purchase and Sale Agreement dated April 1, 2024, and as further amended by that certain Second Amendment to Purchase and Sale Agreement dated April 16, 2024 (collectively, the "Agreement") for the purchase and sale of that certain property being approximately 30,500 SF comprised of ten (10) industrial or flex condominium units located at 730 Middle Tennessee Blvd., Murfreesboro, Tennessee, commonly known as Suites 9-15 and 18-20, as more particularly described in the Agreement ("Property");

WHEREAS, on May 3, 2024, the Superior Court of King County, Washington, in the matter of *First Fed Bank v. Ideal Property Investments LLC*, Case No. 24-2-08418-5 SEA, entered an order appointing Receiver as a general receiver for Ideal Property Investments LLC ("Seller Manager") and all of Seller Manager's assets and granting Receiver sole authority to act as the manager of Seller Manager;

WHEREAS, on May 16, 2024, the Superior Court of Snohomish County, Washington, in the matter of *In re Ideal Murfreesboro LLC*, Case No. 24-2-03751-31, entered an order appointing Receiver as a general receiver for Seller and all of Seller's assets, including without limitation the Property, with authority to market and sell the same for the benefit of creditors ("Appointing Order").

WHEREAS, in light of the commencement of receiverships over Seller and Seller Manager, Receiver, Seller, and Buyer desire to amend the Agreement as more particularly described in this Amendment.

## AGREEMENT

In consideration of the mutual covenants and provisions of this Amendment and the Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Recitals. The Recitals set forth above are true and correct and are incorporated into this Amendment. Unless otherwise expressly provided herein, all defined terms used in this Amendment shall have the meanings set forth in the Agreement.

2.  <u>Inspection Period</u>.  Section 6 of the Agreement is hereby amended such that Inspection Period shall last until June 14, 2024.  For purposes of clarification, any time periods in the Agreement which are based on the Inspection Period shall be calculated using the Inspection Period as modified by this Amendment.

3.  <u>Receiver's Addendum</u>. Concurrent with the execution of this Third Amendment, Seller, Receiver, and Buyer will execute the Receiver's Addendum attached hereto and incorporated herein by reference.

4.  <u>Entire Agreement</u>.  Except as specifically amended by this Amendment, the Agreement shall remain in full force and effect and is hereby ratified and confirmed.  The Agreement, as amended by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements, written or oral, between Seller and Buyer with respect to the subject matter of the Agreement, as amended by this Amendment.

5.  <u>Counterparts</u>.  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original.  Signatures transmitted by facsimile or e-mail, through scanned or electronically transmitted .pdf, .jpg or .tif files, shall have the same effect as the delivery of original signatures and shall be binding upon and enforceable against the parties hereto as if such facsimile or scanned documents were an original executed counterpart.

6.  <u>Binding Effect</u>.  This Amendment shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and permitted assigns.

**IN WITNESS WHEREOF**, the parties have caused this Second Amendment to Purchase and Sale Agreement to be signed by their duly authorized representatives as of the date first above written.

**SELLER:**

**IDEAL MURFREESBORO, LLC**,
a Wyoming limited liability company

By: **Ideal Property Investments, LLC**, a)
Washington limited liability company,
Manager

By: TurningPointe, LLC, in its capacity as
general receiver and court-authorized Manager
for Ideal Property Investments, LLC

By: _Eric Camm_____ (Seal)
Name: Eric J. Camm
Title: Director

**BUYER:**

**FILLMORE HOLDINGS, LLC**, a
Tennessee limited liability company

By: _S. Bennett Maxwell_____ (SEAL)
Name:  S. Bennett Maxwell
Title:  Member

By: _Reese Abee_____ (SEAL)
Name:  Reese Abee
Title:  Member

**RECEIVER:**
**TURNINGPOINTE, LLC**, a Washington
limited liability company

By: _Eric Camm_____ (Seal)
Name: Eric J. Camm
Title: Director

DocuSign Envelope ID: C6DDD80A-816F-4C03-8152-7EB14D08B7A3

# RECEIVER'S ADDENDUM

This Receiver's Addendum ("**Addendum**") is entered into by and between TurningPointe, LLC d/b/a Turning Point Strategic Advisors, ("**Receiver**") acting solely in its capacity as General Receiver for Ideal Murfreesboro, LLC ("**Debtor**", and together with Receiver, ("**Seller**"), and Fillmore Holdings, LLC ("**Buyer**"). This Addendum modifies, amends, and supersedes where conflicts arise between that certain Contract for Purchase and Sale, dated March 19, 2024, as amended by that certain Assignment and Assumption of Purchase and Sale Agreement dated April 1, 2024, and as further amended by that certain Second Amendment to Purchase and Sale Agreement dated April 16, 2024 ("**Purchase Agreement**"). Unless otherwise specifically defined herein, each defined term used herein that is defined in the Purchase Agreement shall have the meaning assigned to such term in the Purchase Agreement.

Pursuant to that certain Order Appointing General Receiver entered on May 16, 2024, in the matter of *In re Ideal Murfreesboro LLC*, Snohomish County, Washington, Superior Court Case No. 24-2-03751-31, in the Superior Court of King County, Washington ("**Court**") has appointed TurningPointe, LLC d/b/a Turning Point Strategic Advisors as the general receiver to take exclusive possession and control of Debtor and all assets of Debtor, including the real property that is the subject of the Purchase Agreement ("**Property**"), with authority to sell the Property. In its capacity as general receiver, Receiver has authority to seek the Court's approval of a sale pursuant to the Purchase Agreement, subject to the modifications and amendments set forth in this Addendum.

1.      Buyer hereby acknowledges that the Court has appointed Receiver to control the affairs of Debtor and to control, market, and sell the assets of Debtor, including the Property. Buyer further acknowledges and agrees that Receiver is acting solely in its capacity as receiver for Debtor. Receiver does not have access to all information regarding the Property, including the condition of the improvements, if any, potential code violations, prior projects developed by Debtor, and litigation involving Debtor or its affiliates. Any disclosures are limited to the actual knowledge of Receiver, and Receiver has no duty to investigate further. The sale of the Property by Receiver is being made pursuant to court orders appointing the Receiver and authorizing this sale. Buyer is receiving the Property "AS-IS, WHERE-IS, WITH ALL FAULTS," and without any warranties, express or implied. Buyer is encouraged to consult with an independent attorney before signing a binding agreement to purchase the Property.

2.      Buyer on behalf of itself, and any person or entity claiming by, through, or under Buyer ("**Releasing Parties**"), hereby waives all right to recover from and fully and irrevocably releases and holds harmless Seller and its respective employees, officers, directors, members, shareholders, representatives, agents, servants, attorneys, affiliates, parents, subsidiaries, successors and assigns ("**Released Parties**") from any and all claims of any kind whatsoever that Releasing Parties may now have or hereafter acquire against any of the Released Parties, including, without limitation for any costs, loss,

1

DocuSign Envelope ID: C6DDD80A-816F-4C03-8152-7EB14D08B7A3

liability, damage, expenses (including attorney fees and costs), demand, action or cause of action arising from or related to the Property, documents associated therewith, any latent or patent construction defects or physical conditions, presence or release of hazardous substances, violation of laws, errors, omissions or other conditions, latent or otherwise, including any improvements made by or on behalf of Seller. This release includes claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist which, if known by Buyer, would materially affect Buyer's release of the Released Parties.

3. **AS-IS SALE; NO WARRANTIES OR REPRESENTATIONS**. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER WILL PURCHASE AND TAKE TITLE TO THE PROPERTY "AS -IS," WITH ALL FAULTS," AND WITHOUT ANY WARRANTIES, EXPRESS OR IMPLIED. SELLER MAKES NO REPRESENTATIONS OR WARRANTIES AND SHALL NOT IN ANY WAY BE LIABLE FOR OR WITH RESPECT TO: (1) THE CONDITION OF THE PROPERTY OR ANY BUILDINGS, STRUCTURES OR IMPROVEMENTS THEREON, (II) ANY INCOMPLETE OR DEFECTIVE CONSTRUCTION, WHETHER LATENT OR PATENT, AND THE CONFORMANCE OF THE IMPROVEMENTS WITH ANY PLANS OR SPECIFICATION FOR THE PROPERTY; (III) THE SUITABILITY OF THE PROPERTY FOR HABITATION OR FOR BUYER'S INTENDED USE OR FOR ANY USE WHATSOEVER; (IV) ANY APPLICABLE LAWS, ORDINANCES, REGULATIONS, OR ORDERS OF ANY GOVERNMENTAL, QUASI-GOVERNMENTAL, OR OTHER AUTHORITY HAVING JURISDICTION OVER THE PROPERTY; BUILDING, ZONING, OR FIRE LAWS OR REGULATIONS; ANY CONDITIONS OF APPROVAL OR ANY ENTITLEMENTS OR PERMITS OR LACK THEREOF FOR BUYER'S INTENDED USE; OR WITH RESPECT TO THE COMPLIANCE OF THE PROPERTY WITH ANY OF THE FOREGOING; (V) THE EXISTENCE OF SOIL INSTABILITY, SOIL REPAIRS, AND ANY OTHER SOIL CONDITIONS, SUFFICIENCY OF UNDERSHORING AND DRAINAGE, THE EXISTENCE OF ANY FLOOD PLAINS, WETLANDS OR FLOOD HAZARDS OR SIMILAR CONDITIONS, AND EVERY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE PROPERTY AND PROJECT, SOILS, WATER, GEOLOGY, OR THE ENVIRONMENTAL CONDITION OF THE PROPERTY; (VI) THE AVAILABILITY OR EXISTENCE OF ANY WATER, SEWER, GAS, OR OTHER UTILITIES; (VII) THE STATE OF TITLE TO THE PROPERTY, INCLUDING ACCESS TO THE PROPERTY; (VIII) THE VALUE OF THE PROPERTY; (IX) THE PRESENCE OF HAZARDOUS MATERIALS IN, ON, UNDER, OR ABOUT THE PROPERTY; (IX) COMPLIANCE WITH LAWS; AND (X) TRUTH, ACCURACY, OR COMPLETENESS OF ANY OFFERING MEMORANDUM, PROPERTY INFORMATION, OR OF ANY INFORMATION CONTAINED IN THE PROPERTY INFORMATION OR ANY FUTURE OR SUPPLEMENTAL INFORMATION RELATED TO THE PROPERTY INFORMATION OR ANY WORK DONE IN CONNECTION THEREWITH. BUYER ASSUMES THE RESPONSIBILITY AND RISKS OF ALL DEFECTS AND CONDITIONS, INCLUDING SUCH DEFECTS AND CONDITIONS, IF ANY, THAT CANNOT BE OBSERVED BY CASUAL INSPECTION. IN PARTICULAR, BUT WITHOUT LIMITATION, BUYER SHALL BE RESPONSIBLE FOR ANY AND ALL COSTS, LIABILITIES, AND OBLIGATIONS ASSOCIATED WITH HAZARDOUS SUBSTANCES ON OR ABOUT THE PROPERTY. BUYER ACKNOWLEDGES THAT BUYER WILL HAVE THE OPPORTUNITY TO INSPECT THE

PROPERTY AND WILL BE RELYING ENTIRELY THEREON AND ON ANY CONSULTANT OR CONSULTANTS BUYER MAY RETAIN. BUYER ACKNOWLEDGES THAT BUYER HAS PERFORMED BUYER'S INVESTIGATIONS OF THE PROPERTY, THAT ANY INFORMATION PROVIDED OR MADE AVAILABLE OR TO BE PROVIDED OR MADE AVAILABLE TO BUYER BY SELLER OR ITS AGENTS, BROKERS, REPRESENTATIVES, OR OTHERS WAS PROVIDED OR MADE AVAILABLE SOLELY AS A COURTESY, AND THAT BUYER HAS THE SOLE RESPONSIBILITY FOR DETERMINING THE EXISTENCE OR NONEXISTENCE OF ANY FACT MATERIAL TO BUYER'S DECISION TO PURCHASE THE PROPERTY.

4.     Buyer acknowledges that, as a condition to either party incurring any obligation to close the sale of the Property, the Court must enter an Order approving the sale of the Property to Buyer. The Closing Date is hereby extended and may occur any time that is 10 days after Court approval. Buyer further acknowledges and agrees that the Purchase Agreement and the transaction(s) contemplated thereby may be subject to objections by interested parties who may request that the Court not approve such transaction. If the Court declines to enter an Order approving a sale of the Property to Buyer, this transaction shall automatically terminate, and, other than with regard to Buyer's surviving indemnification obligations, if any, Seller and Buyer shall be relieved of any liability or obligation under the Purchase Agreement.

5.     Buyer acknowledges that the Court may require the sale of the Property to be subject to higher and better offers, and that the Court may authorize bidding in excess of Buyer's proposed purchase price. In the event of any such overbid scenario, Buyer shall have the right, but not the obligation, to participate in any further bid proceeding. In the event that the Court-ordered bidding procedures result in award of the sale to a party other than Buyer, Seller shall return the Earnest Money to Buyer and may thereafter terminate the Purchase Agreement with written notice to Buyer. In the event of such termination, Seller shall not be deemed in default, and Buyer shall have no claim or cause of action against Seller other than for return of the Earnest Money.

6.     Buyer hereby acknowledges that neither it nor any of its members are related to nor does Buyer or any of its members have any interest in Seller or Receiver or any of their respective employees, officers, directors, member, shareholders, representative, agents, servants, attorneys, affiliates, parents, subsidiaries, successors and assigns.

7.     Notwithstanding anything in the Purchase Agreement to the contrary, Seller shall convey title to the Property by Receiver's Deed.

8.     Except to the extent amended hereby, all terms, provisions, and conditions of the Purchase Agreement and all documents executed in connection therewith, shall continue in full force and effect and shall remain enforceable and binding in accordance with their respective terms.

[SIGNATURES ON FOLLOWING PAGE]

**TurningPointe, LLC** in its capacity as general receiver for Ideal Property Investments, LLC

**Fillmore Holdings, LLC**

_ERIC CAMM_

Eric Camm, Director

Date: 5/20/2024 _____

_S. Bennett Maxwell_

S. Bennett Maxwell

Date: 5/20/2024 _____

_Reese Abee_

Reese Abee

Date: 5/20/2024 _____

4

DocuSign Envelope ID: C6DDD80A-816F-4C03-8152-7EB14D08B7A3

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

**EXHIBIT A**

Land in Rutherford County, Tennessee, being Unit Nos. 9, 10, 12, 13, 14, 15, 18, 19 and 20 of Revision Plat of Middle Tennessee Business Center Condominiums, Phase I, of record in Plat Book 29, Page 90, and as corrected by Surveyors Certificate of Correction, Revised Plat, Middle Tennessee Business Center Condominiums, Phase I, in record Book 948, Page 1308, in the Register's Office for Rutherford County, Tennessee, to which Plan reference is hereby made for a more complete description of the property.

Being the same property conveyed to Ideal Murfreesboro, LLC, a Wyoming limited liability company, by the Special Warranty Deed of record in Record Book 2222, Page 1340, and the Special Warranty Deed of record in Record Book 2222, Page 1706, in the Register's Office for Rutherford County, Tennessee.

DocuSign Envelope ID: 48E16D1A-D5E6-4FD9-90EC-92B15344A476

## FOURTH AMENDMENT TO CONTRACT FOR PURCHASE AND SALE

THIS **FOURTH AMENDMENT TO CONTRACT FOR PURCHASE AND SALE** (this "Amendment") is made as of this 31st day of May, 2024 ("Effective Date"), by and between **TURNINGPOINTE, LLC**, a Washington limited liability company, d/b/a Turning Point Strategic Advisors ("Receiver") acting solely in its capacity as General Receiver for **IDEAL MURFREESBORO, LLC**, a Wyoming limited liability company ("Seller"), successor-in-interest to Ideal Property Investments, LLC, a Washington limited liability company, **FILLMORE HOLDINGS, LLC**, a Tennessee limited liability company ("Buyer"), successor-in-interest to S. BENNETT MAXWELL, individually, or his assignee, and **LEE & ASSOCIATES**, a Tennessee corporation ("Broker").

## RECITALS

WHEREAS, Seller and Buyer entered into that certain Contract for Purchase and Sale dated March 19, 2024, as amended by that certain First Amendment to Purchase and Sale Agreement dated March 21, 2024, as amended by that certain Assignment and Assumption of Purchase and Sale Agreement dated April 1, 2024, as further amended by that certain Second Amendment to Purchase and Sale Agreement dated April 16, 2024, as further amended by that certain Third Amendment to Purchase and Sale Agreement dated May 20, 2024, and as further amended by that certain Receiver's Addendum dated May 20, 2024 by and between Buyer and TurningPointe, LLC in its capacity as general receiver for Seller Manager (collectively, the "Agreement") for the purchase and sale of that certain property being approximately 30,500 SF comprised of ten (10) industrial or flex condominium units located at 730 Middle Tennessee Blvd., Murfreesboro, Tennessee, commonly known as Suites 9-15 and 18-20, as more particularly described in the Agreement ("Property");

WHEREAS, on May 3, 2024, the Superior Court of King County, Washington, in the matter of *First Fed Bank v. Ideal Property Investments LLC*, Case No. 24-2-08418-5 SEA, entered an order appointing Receiver as a general receiver for Ideal Property Investments LLC ("Seller Manager") and all of Seller Manager's assets and granting Receiver sole authority to act as the manager of Seller Manager;

WHEREAS, on May 16, 2024, the Superior Court of Snohomish County, Washington, in the matter of *In re Ideal Murfreesboro LLC*, Case No. 24-2-03751-31, entered an order appointing Receiver as a general receiver for Seller and all of Seller's assets, including without limitation the Property, with authority to market and sell the same for the benefit of creditors ("Appointing Order").

WHEREAS, in light of the commencement of receiverships over Seller and Seller Manager, Receiver, Seller, and Buyer desire to amend the Agreement as more particularly described in this Amendment.

## AGREEMENT

In consideration of the mutual covenants and provisions of this Amendment and the Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Recitals</u>. The Recitals set forth above are true and correct and are incorporated into this Amendment. Unless otherwise expressly provided herein, all defined terms used in this Amendment shall have the meanings set forth in the Agreement.

2. <u>Purchase Price</u>. Section 2(a) of the Agreement is hereby amended to include a Purchase Price of Three Million Six Hundred Fifty Thousand and No/100 Dollars ($3,650,000.00).

3. <u>Broker's Commission</u>. Broker agrees that sales commission for the transaction contemplated by this Agreement, as amended, shall not exceed $70,000.

4. <u>Entire Agreement</u>. Except as specifically amended by this Amendment, the Agreement shall remain in full force and effect and is hereby ratified and confirmed. The Agreement, as amended by this Amendment, constitutes the entire agreement between the parties with respect to the subject matter hereof, and there are no other representations, warranties or agreements, written or oral, between Seller and Buyer with respect to the subject matter of the Agreement, as amended by this Amendment.

5. <u>Counterparts</u>. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original. Signatures transmitted by facsimile or e-mail, through scanned or electronically transmitted .pdf, .jpg or .tif files, shall have the same effect as the delivery of original signatures and shall be binding upon and enforceable against the parties hereto as if such facsimile or scanned documents were an original executed counterpart.

6. <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and permitted assigns.

[*This space is intentionally left blank; signatures on following page*.]

**IN WITNESS WHEREOF**, the parties have caused this Second Amendment to Purchase and Sale Agreement to be signed by their duly authorized representatives as of the date first above written.

**SELLER:**

**IDEAL MURFREESBORO, LLC**,
a Wyoming limited liability company

By: **Ideal Property Investments, LLC**, a
Washington limited liability company,
Manager

By: TurningPointe, LLC, in its capacity as
general receiver and court-authorized Manager
for Ideal Property Investments, LLC

ERIC CAMM _____ (Seal)
Name: Eric J. Camm
Title: Director

**SELLING BROKER:**

**LEE & ASSOCIATES**, a Tennessee corporation

William Sisk _____ (Seal)
Name: William Sisk
Title: Partner

**BUYER:**

**FILLMORE HOLDINGS, LLC**, a
Tennessee limited liability company

Bennett Maxwell _____ (Seal)
Name: B. Bennett Maxwell
Title: Member

**RECEIVER:**
**TURNINGPOINTE, LLC**, a Washington
limited liability company

ERIC CAMM _____ (Seal)
Name: Eric J. Camm
Title: Director

# Exhibit D

# NOTICE OF FORECLOSURE

WHEREAS, IDEAL MURFREESBORO, LLC, a Wyoming limited liability company (the "**Borrower**"), made that certain Secured Note dated March 9, 2022 (the "**Note**"), in favor of AVATAR REIT I LLC, a Delaware limited liability company (hereinafter referred to as the "**Lender**"), in the original principal amount of Two Million Five Hundred Sixty-Two Thousand and No/100 Dollars ($2,562,000.00); and

WHEREAS, to secure the Note, Borrower conveyed certain real property to Fidelity National Title Insurance Company, as Trustee, by a Deed of Trust, Assignment of Leases and Rents, Fixture Filing, and Security Agreement dated March 9, 2022, and recorded on March 22, 2022, in Book 2222, Page 1711, in the Register's Office for Rutherford County, Tennessee (the "**Deed of Trust**"); and

WHEREAS, by instrument titled Appointment of Substitute Trustee dated April 3, 2024, and recorded April 9, 2024, in Book 2426, Page 2696, in the Register's Office for Rutherford County, Tennessee, Bradley H. Hodge was appointed by Lender as substitute trustee (the "**Substitute Trustee**") under the Deed of Trust in the place and stead of Fidelity National Title Insurance Company; and

WHEREAS, Borrower is in default in the performance of the covenants, terms, and conditions of the Note, and Lender has declared the Note and all other indebtedness related thereto immediately due and payable.

NOW, THEREFORE, as a result of such default and Lender's instruction to foreclose the Deed of Trust in accordance with its terms and conditions, notice is hereby given that Bradley H. Hodge, the above named Substitute Trustee, by virtue of the power, duty, and authority vested in him, or his agent appointed pursuant to Tennessee Code Annotated § 35-5-114, will on May 21, 2024, commencing at 10:00 AM central time, on the front steps of the Old Rutherford County Courthouse, where foreclosure sales are customarily held, South Public Square, Murfreesboro, Tennessee 37130, offer for sale and sell at public auction, AS IS and WHERE IS, with no representations or warranties of any nature, the following described real property of Borrower therein to the highest bidder for cash free from the right and equity of redemption and all other rights of redemption, statutory or otherwise, homestead, dower, and all other exemptions and marital rights, all of which are hereby expressly waived and conveyed in the Deed of Trust, said

real property being situated in Rutherford County, Tennessee, and being more particularly described as follows, as well as all easements serving or benefitting the said real property:

TRACT I:
Land in Rutherford County, Tennessee, being Unit No. 9 of Revision Plat of Middle Tennessee Business Center Condominiums, Phase I, according to survey and plat of same of record in Plat Book 29, Page 90, as corrected by Surveyors Certificate of Correction, Revision Plat, Middle Tennessee Business Center Condominiums, Phase I, ln Record Book 948, Page 1308, Register's Office of Rutherford County, Tennessee, to which plat reference is hereby made for a more complete details of location and description.

TRACT II:
Land in Rutherford County, Tennessee, being Unit No. 12 of Revision Plat of Middle Tennessee Business Center Condominiums, Phase I, according to plat and survey of record in Plat Book 29, Page 90, and as corrected by Surveyors Certificate of Correction, Revision Plat, Middle Tennessee Business Center Condominiums, Phase I, in Record Book 948, Page 1308, Register's Office of Rutherford County, Tennessee, to which plat reference is hereby made for a more complete details of location and description.

TRACT III:
Land in Rutherford County, Tennessee, being Unit Nos. 13, 14, 15, 18, 19 and 20 of Revision Plat of Middle Tennessee Business Center Condominiums, Phase I, according to plat and survey of record in Plat Book 29, page 90, and as corrected by Surveyors Certificate of Correction, Revision Plat, Middle Tennessee Business Center Condominiums, Phase I, in Record Book 948, Page 1308, in the Register's Office of Rutherford County, Tennessee, to which plat reference is hereby made for a more complete details of location and description.

TRACT IV:
Land in Rutherford County, Tennessee, being Unit No. 10 of Revision Plat of Middle Tennessee Business Center Condominiums, Phase I, according to survey and plat of same of record in Plat Book 29, Page 90, as corrected by Surveyors Certificate of Correction, Revision Plat, Middle Tennessee Business Center Condominiums, Phase I, in Record Book 948, Page 1308, Register's Office of Rutherford County, Tennessee, to which plat reference is hereby made for a more complete details of location and description.

Being the same property conveyed to Ideal Murfreesboro, LLC, a Wyoming limited liability company, by the Special Warranty Deed of record in Record Book 2222, Page 1706, and the Special Warranty Deed of record in Record Book 2222, Page 1340, in the Register's Office for Rutherford County, Tennessee.

For convenience, the Rutherford County Property Assessor's references for the above-described properties are ID Nos. 102-045.13 (C) 009, 102-045.13 (C) 010; 102-045.13 (C) 012, 102-045.13 (C) 013, 102-045.13 (C) 014, 102-045.13 (C) 015, 102-045.13 (C) 018, 102-045.13 (C) 019, and 102-045.13 (C) 020, but the above legal description shall control.

2

This sale is subject to *ad valorem* taxes (whether delinquent, for the current year, or for subsequent years), any liens or encumbrances which have priority over the lien created by the Deed of Trust, and any statutory rights of redemption of any governmental entity or agency. This sale is also subject to the following, but only to the extent they may have priority over the lien created by the Deed of Trust: all matters shown on any applicable recorded plat; any other taxes of any nature, whether current or delinquent; any delinquent, current, or future assessments, reservations, easements, conditions, covenants, rights-of-way, setback lines, restrictions, and restrictive covenants; any matter that an accurate survey of the above-described real property might disclose; and any other matter disclosed in the public records having priority over the Deed of Trust.

The high bidder shall pay a non-refundable deposit on the day of the sale in the amount of 10% of the high bidder's bid price and shall pay the balance of the sales price within ten (10) business days following the day of the sale. All such amounts shall be paid in cash or other immediately available funds in U.S. Dollars. Title to the above-described real property shall be transferred by a substitute trustee's deed, AS IS and WHERE IS, with no representations or warranties of any nature.

The failure of any high bidder to pay the purchase price and close the sale shall, at the option of the Lender, be cause for rejection of the bid, and if the bid is rejected, the Lender shall have the option of making the sale to the next highest bidder who is able, capable, and willing to comply with the terms hereof. The proceeds of the sale will be applied in accordance with the terms of the Deed of Trust and are made a part hereof as if set forth verbatim herein.

The sale held pursuant to this Notice may be rescinded at the Substitute Trustee's option at any time. The Substitute Trustee may, from time to time, adjourn the day of the sale to another day, time, and place certain without further publication upon announcement at the time and place for the sale as set forth above or at any date and time fixed by a preceding postponement. Alternatively, at his option, the Substitute Trustee may give a new notice of sale.

Other parties "interested" in the sale of the above-described property as set forth herein, as may be defined by Tennessee statutes, and to whom the Substitute Trustee has given notice of this sale, include the following: Rutherford County Trustee, Teb Batey; Ideal Murfreesboro, LLC; Creative Technologies, LLC; First Fed Bank; Ryan Wear, individually, and Richard F. Wear, individually.

3

Notice of the sale of the real property as set forth herein has been given pursuant to the provisions of 26 U.S.C. § 7425(c) and Reg. § 301.7425-1, Tennessee Code Annotated §§ 50-7-404(i)(2)(B) and 67-1-1433(b)(2), and Tennessee Department of Revenue Rule 1320-2-1-.35, if applicable.

Notice of the right to foreclose was given in accordance with § 35-5-117 of the Tennessee Code.

This Notice has been published in accordance with § 35-5-101 *et seq.* of the Tennessee Code and any provisions of the Deed of Trust affecting same beginning the 23rd day, April, 2024.

According to information provided by the Rutherford County Property Assessor, the street address of the above-described property is believed to be 730 Middle Tennessee Boulevard, Murfreesboro, Tennessee 37129, but such address is not part of the legal description of the above-described property, and in the event of any discrepancy, the legal description for the above-described property shall control.

This 16th day of April, 2024.

Bradley H. Hodge
Substitute Trustee
900 S. Gay Street, Suite 2100
Knoxville, Tennessee 37902
(865) 525-7313

Hagood Moody Hodge PLC
900 S. Gay Street, Suite 2100
Knoxville, Tennessee 37902

Publication Dates in *Murfreesboro Post*:
April 23, 2024, April 30, 2024, and May 7, 2024

4

# Exhibit E

| | | | | |
|---|---|---|---|---|
| **Borrower:** | Ideal Murfreesboro, LLC | | | |
| **Lender:** | Avatar REIT I LLC | | | |
| **Loan:** | IV282 | | | |
| **Property:** | 730 Middle Tennessee Blvd, Murfreesboro, TN 37129 | | | |
| **Loan Servicer:** | Avatar Capital Finance LLC | | | |

| | | | | | |
|---|---|---|---|---|---|
| Principal Balance | | | | $ | 2,562,000.00 |
| Interest | 1/1/2024 to 6/20/2024 | 171 | | $ | 109,403.81 |
| Default Interest | 2/1/2024 to 6/20/2024 | 140 | | $ | 99,633.33 |
| Due in Full Fee | | | | $ | 256,200.00 |
| Late Fees | | | | $ | 5,876.00 |
| Extension Fees | | | | $ | 153,720.00 |
| Legal | | | | $ | 11,843.50 |
| Service Fees | | | | $ | 1,000.00 |
| Recording Fee | | | | $ | 400.00 |
| Wire Fee | | | | $ | 40.00 |
| T&I Reserve | | | | $ | (26,369.85) |
| **Amount Due 6/20/2024** | | | | **$** | **3,173,746.79** |

**Subject to Corrections, Errors and Omissions**

Avatar will release its lien upon receipt of payoff by wired funds only. Wire must be received by 1:00 pm Pacific time for same day credit. This payoff demand expires 6/20/2024.

Carla Stadler
Chief Financial Officer
carla@avatarfinancial.com
206 508-5545