# Exhibit J

SUPERIOR COURT OF WASHINGTON FOR SNOHOMISH COUNTY

In re:                                     Case No. 24-2-04013-31

IDEAL GREENLEAF, LLC,                      **PROOF OF CLAIM**

                          Debtor.

ALTHOUGH THIS FORM IS PROVIDED AS A COURTESY, THE INFORMATION REQUESTED UNDER THIS PROOF OF CLAIM FORM MUST PROVIDED ACCORDING TO THE INSTRUCTIONS SET OUT IN THE ATTACHED NOTICE OF RECEIVERSHIP ("THE INSTRUCTIONS"). PROOFS OF CLAIM MUST BE RECEIVED BY THE RECEIVER VIA A METHOD DESCRIBED IN THE INSTRUCTIONS ON OR BEFORE THE CLAIMS BAR DATE. IF YOU FAIL TO FOLLOW THE INSTRUCTIONS OR TIMELY SUBMIT A PROOF OF CLAIM, YOUR CLAIM SHALL BE DISALLOWED AND YOU WILL BE BARRED FROM PARTICIPATING IN ANY DISTRIBUTION FROM THE RECEIVERSHIP CASE. DO <u>NOT</u> FILE PROOFS OF CLAIM WITH THE SUPERIOR COURT.

| **Name of Claimant** (The person or other entity to whom Ideal Greenleaf, LLC owes money or property):<br><br>First Fed Bank<br>P.O. Box 351<br>Port Angeles, WA 98362 | **Attorney's Name and Address if represented:**<br><br>Gregory R. Fox, WSBA No. 30559<br>Lane Powell PC<br>1420 Fifth Avenue, Suite 4200<br>Seattle, WA 98101 |
| --- | --- |
| **Address of Claimant for purposes of this Proof of Claim:**<br><br>First Fed Bank<br>c/o Lane Powell PC<br>1420 Fifth Avenue, Suite 4200<br>Seattle, WA 98101<br>Attn: Gregory R. Fox | **Your Telephone Number:**<br><br>(206) 223-7129<br><br>**Your Email Address:**<br><br>FoxG@lanepowell.com |

PROOF OF CLAIM - 1

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

134777.0002/9815714.1

24-01421-FPC11    Doc 151-10    Filed 10/09/24    Entered 10/09/24 17:19:38    Pg 2 of 85

**1. Basis for Claim:** Briefly describe the type of debt for which the Proof of Claim is being filed. If you were an employee of Ideal Greenleaf, LLC, include <u>only the last four digits</u> of your social security number, your employment position, and the dates of work for which you were not paid.

Real and personal collateral pledged by Ideal Greenleaf, LLC to First Fed Bank as security for certain loan obligations of Creative Technologies, L.L.C. (Loan x0613), Ideal Property Investments, LLC (Loan x0678 and Loan x0858), and 8825 LLC (Loan x0759), and certain contingent unliquidated obligations of Water Station Management, LLC.

**2. Total Amount of Claim incurred on or before May 24, 2024, net of any payments received after May 24, 2024:** $24,039,698.96.[1] *See,* Pre-Petition Claim Itemization.

**3. Total Amount of Claim incurred on or after May 24, 2024, net of any payments received:** Provided Upon Request.[2]

**4. Date(s) Claim was incurred:** December 10, 2020 (Creative Technologies, L.L.C. Loan x0613); March 12, 2021 (Ideal Property Investments, LLC Loan x0678); May 24, 2021 (8825 LLC Loan x0759); August 30, 2021 (Water Station Management, LLC); September 7, 2021 (Ideal Property Investments, LLC Loan x0858); and February 16, 2023 (Mortgage, Assignment of Leases and Rents, and Security Agreement).

**5. If you contend your Claim is either secured or involves a specific claim to property owned or held by Ideal Greenleaf, LLC or the Receiver then provide the following (using an addendum if necessary):**

    a. Description of the property: Real and personal property located in Cook County, Illinois, commonly known as 1400 Greenleaf Avenue, Elk Grove Village, IL 6007, and legally described in that certain Mortgage, Assignment of Leases and Rents, and Security Agreement dated as of February 16, 2023, and recorded on February 21, 2023, in the Official Records of Cook County, Illinois under instrument number 2305215032.

    b. The property's last known location: 1400 Greenleaf Avenue, Elk Grove Village, IL 6007.

    c. Date the property was delivered, and a copy of any signed proof of delivery: n/a.

    d. Value of the property: Unknown.

**6. State what equity interest, if any, you have, in Ideal Greenleaf, LLC:** None.

---

[1] In addition the amounts listed in the prepetition claim itemization, First Fed Bank holds a contingent and unliquidated claim against Water Station Management, LLC.

[2] Receiver to contact First Fed Bank for claim amount or release price upon a closing of a sale of First Fed Bank's collateral.

PROOF OF CLAIM - 2

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

134777.0002/9815714.1

1
2
3
4
5

**Supporting Documents**: Copies of supporting documents, such as promissory notes, purchase orders, invoices, or an itemized statement of account and any documents evidencing the granting of security and/or the perfection of a lien(s), must be attached to the Proof of Claim Form. If appropriate, a written summary of the basis of the claim may be helpful. **DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain:

6
7

**You must sign and print the name and title, if any, of the claimant or other person authorized to file this claim (attached copy of power of attorney, if any):**

8     Date: July 19, 2024

9                                         FIRST FED BANK

10

11    By _____

      Name: Brian Feller

12    Title: First Vice President

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

PROOF OF CLAIM - 3

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WASHINGTON 98111-9402
206.223.7000 FAX: 206.223.7107

134777.0002/9815714.1

**FIRST FED BANK**
**PRE-PETITION CLAIM ITEMIZATION**
**May 24, 2024**

| Obligation | Principal Balance | Accrued and Unpaid Interest through May 24, 2024 | Late Charges and Third-Party Expenses[1] | Total |
|---|---|---|---|---|
| Creative Technologies, L.L.C. Loan x0613 | $13,737,188.49 | $993,302.16 | $170,872.28 | $14,901,362.93 |
| Ideal Property Investments, LLC Loan x0678 | $1,430,351.81 | $92,835.31 | $5,623.00 | $1,528,810.12 |
| 8825 LLC Loan x0759) | $2,903,351.34 | $186,499.78 | $10,296.09 | $3,100,147.21 |
| Ideal Property Investments, LLC Loan x0858 | $4,223,809.32 | $271,330.65 | $14,238.73 | $4,509,378.70 |
| Water Station Management, LLC[2] | Unknown | Unknown | Unknown | Unknown |

| | |
|---|---|
| Principal as of May 24, 2024 | $22,294,700.96 |
| Interest through the May 24, 2024 | $1,543,967.90 |
| Late Charges and Third-Party Expenses as of May 24, 2024 | $201,030.10 |

**TOTAL PRE-PETITION CLAIM AMOUNT**          **$24,039,698.96[3]**

---

[1] Excluding attorneys' fees, costs and expenses.

[2] The portion of the secured claim relating to Water Station Management, LLC is unliquidated and contingent.

[3] The Total Pre-Petition Claim Amount stated herein does not include attorneys' fees, costs and expenses incurred to date, to which First Fed is entitled. The Total Pre-Petition Claim Amount continues to accrue interest, attorneys' fees, costs, and expenses pursuant to the terms of the loan documents. Attorneys' fees and costs shall be provided upon request in connection with any claim allowance process.

134777.0002/9815759.1

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $21,000,000.00 | 12-10-2020 | 12-10-2025 | ▇▇0613 | 1763 / 33 | ▇▇85-01 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**    Creative Technologies, L.L.C.
PO Box 3226
Everett, WA  98213

**Lender:**    First Federal Savings & Loan Association of Port
Angeles
First Federal - Eastside
1603 E 1st St
Port Angeles, WA  98362

---

**THIS BUSINESS LOAN AGREEMENT** dated December 10, 2020, is made and executed between Creative Technologies, L.L.C. ("Borrower") and First Federal Savings & Loan Association of Port Angeles  ("Lender") on the following terms and conditions.  Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement.  Borrower understands and agrees that:  (A)  in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement;  (B)  the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and  (C)  all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.**  This Agreement shall be effective as of December 10, 2020, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.**  Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

    **Loan Documents.**  Borrower shall provide to Lender the following documents for the Loan:  (1)  the Note;  (2)  Security Agreements granting to Lender security interests in the Collateral;  (3)  financing statements and all other documents perfecting Lender's Security Interests;  (4)  evidence of insurance as required below;  (5)  guaranties;  (6)  together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

    **Borrower's Authorization.**  Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents.  In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

    **Payment of Fees and Expenses.**  Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

    **Representations and Warranties.**  The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

    **No Event of Default.**  There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

    **Conditional Funding.**  Lender shall have received a commitment letter from MS Facilities LLC that it will purchase a participation interest in $19,950,000.00 aggregate principal amount of the initial Principal amount.

**REPRESENTATIONS AND WARRANTIES.**  Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

    **Organization.**  Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Washington.  Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business.  Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition.  Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage.  Borrower maintains an office at 2732 Grand Ave. #122, Everett, WA  98201.  Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral.  Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name.  Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

    **Assumed Business Names.**  Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower.  Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business:

| Borrower | Assumed Business Name | Filing Location | Date |
|---|---|---|---|
| Creative Technologies, L.L.C. | ECOS Water USA, Inc | WA | 05-01-2013 |
| Creative Technologies, L.L.C. | Water Station Technology LLC | WA | 06-07-2014 |

    **Authorization.**  Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under  (1)  any provision of  (a)  Borrower's articles of organization or membership agreements, or  (b)  any agreement or other instrument binding upon Borrower or  (2)  any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

    **Financial Information.**  Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender.  Borrower has no material contingent obligations except as disclosed in such financial statements.

    **Legal Effect.**  This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective

terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Tax Returns.** As soon as available, but in no event later than sixty (60) days after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**

**Reporting Covenant.** As soon as is available, but in any event within sixty (60) days after the end of each fiscal quarter of Borrower, the Borrower shall deliver to Lender financial reporting in a form and substance reasonably acceptable to Lender setting forth the financial information, and where applicable reasonably detailed calculations of the required data, set forth in **Appendix C** attached hereto, as at the end of such fiscal quarter of the Borrower, which financial reporting and calculations, in each case, shall be true and accurate in all material respects and, where applicable, present fairly in all material respects the financial condition of Borrower for the period covered thereby in accordance with GAAP, consistently applied.

**Appendix C.** An exhibit titled "Appendix C", is attached to this Agreement and by this reference is made a part of this Agreement just as if all the provisions, terms and conditions of the Exhibit had been fully set forth in this Agreement.

**Annual Statements:** Starting with the 2020 year end, statements at a minimum must be Reviewed Financial Statements and shall be due beginning September 30, 2021. Audited financials to be provided for Creative Technologies within one hundred twenty (120) days of year end starting in 2022. Reviewed financials for Summit Management and WaterStation Management will be required within one hundred twenty (120) days of each year end; however, once they reach $25 million per year in gross sales, Audits will be required in that fiscal year (within 120 days of the following year).

Quarterly statements to be Combined & Combining (both separate and consolidated) for all three companies on a best effort bases by the Borrower (Creative Technologies LLC, WaterStation Management LLC, & Summit Management LLC). Quarterly financial statements will be provided within sixty (60) days of each quarter end

Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as

Lender may request from time to time.

Copies of extensions of tax returns along with all IRS forms, W-2(s), and K-1(s) (if applicable), shall be provided within thirty (30) days of filing.

Bank, retirement or other statements shall be provided within thirty (30) days upon request.

Determination of compliance to be at the sole and absolute discretion of First Federal.

Borrower understands and agrees that the guarantor is required to provide annual financial information. If the Guarantor fails to provide the required information within the times stated in the Guaranty, such failure will be treated the same as the Borrower's failure to provide financial information as provided above.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**

**Borrower DSCR before Distribution:** Annual debt service coverage ratio (DSCR) for Borrower to be no less than 1.50 to 1.00, defined as Borrower earnings before interest, taxes, depreciation, and amortization (EBITDA) less distributions, divided by their annual debt payments. DSCR is to be measured annually beginning December 31, 2021.

**Current Ratio:** Borrower shall maintain a Current Ratio in excess of 1.50 : 1.00. The term "Current Ratio" means Borrower's total Current Assets divided by Borrower's total Current Liabilities. This liquidity ratio will be evaluated annually beginning December 31, 2021.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Ryan Wear | Unlimited |
| Richard Wear | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party,

Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Late Financial Information Fee.** In the event Borrower fails to timely deliver to Lender such statements, schedules, documents, items and reports described within the Affirmative Covenants section of the Business Loan Agreement (including any required items related to any Guarantor or any other party for which financial information is required under the Loan Documents) (the "**Financial Information**"), then such failure shall constitute an Event of Default and, in addition to any other remedies which may be available to Lender as a result of such Event of Default, Borrower shall pay a late charge equal to 25 basis points (.25%) times the then outstanding balance of the Loan (the "**Late Financial Information Fee**") to compensate Lender (or its servicer) for the additional administrative and legal expense caused by such failure regardless of whether Borrower is entitled to any notice and opportunity to cure such failure prior to the exercise of any other remedies by Lender. The Late Financial Information Fee shall be charged each month that any Financial Information remains delinquent and shall be immediately payable from Borrower upon demand by Lender and, until paid, shall be added to and constitute a part of the Indebtedness. The Late Financial Information Fee shall be in addition to any other remedies available to Lender as a result of Borrower's default. In no event shall the Late Financial Information Fee constitute a cure of Borrower's default in failure to provide the Financial Information, nor limit Lender's remedies as a result of such default. In addition and without waiving or otherwise limiting any of Lender's rights hereunder, if Borrower fails to provide the Financial Information in a timely manner, then Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such Financial Information, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Additional Financial Restrictions.**

**Main Street Lending Program Required Negative Covenant.** The Borrower will not, nor will it permit any subsidiary to, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, securing any debt for borrowed money or any obligations evidenced by a bond, debenture, note, loan agreement or other similar instrument, or any guarantee of the foregoing, other than the following:

(a) Liens securing obligations under the loan;
(b) Liens on real property in connection with loans with respect to which substantially all of the proceeds were used for acquisition, construction, fit-out, and/or renovation of the property;
(c) Junior Liens securing permitted Indebtedness; or
(d) Liens on receivables assets and related assets incurred in connection with a receivables facility, provided that such debt is secured only by the newly acquired property.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no

Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding one (1) month, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**Cross-Acceleration Provision.** If Borrower or any Subsidiary shall fail to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness under the Loan Documents) owing to the Lender or any commonly controlled Affiliate of the Lender, in each case beyond the applicable grace period with respect thereto, if any; or (ii) the Borrower or any Subsidiary shall fail to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which failure to make a payment, default or other event described in cause (i) or (ii) is to cause such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that clause (ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such Indebtedness; provided that, as used in this clause, the term "Indebtedness" shall mean all debt for borrowed money and any obligations evidenced by a bond, debenture, note, loan agreement or other similar instrument, and any guarantee of any of the foregoing.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**ORAL AGREEMENTS. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON STATE LAW.**

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties

DocuSign Envelope ID: A7B9042A-92F9-4517-AD78-9A30EB535BD3

as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Clallam County, State of Washington.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Subject to applicable law, and except for notice required or allowed by law to be given in another manner, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Subject to applicable law, and except for notice required or allowed by law to be given in another manner, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury. All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in

effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Creative Technologies, L.L.C. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means First Federal Savings & Loan Association of Port Angeles, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated December 10, 2020 and executed by Creative Technologies, L.L.C. in the principal amount of $21,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

DocuSign Envelope ID: A7B9042A-92F9-4517-AD78-9A30EB535BD3

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS.  THIS BUSINESS LOAN AGREEMENT IS DATED DECEMBER 10, 2020.

BORROWER:

CREATIVE TECHNOLOGIES, L.L.C.

By: _____          By: _____
    **Ryan Wear, Member of Creative Technologies,**              **Richard Wear, Member of Creative Technologies,**
    **L.L.C.**              **L.L.C.**

LENDER:

FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF PORT ANGELES

By: _____
    **Authorized Officer**

LaserPro, Ver. 19.4.10.036  Copr. Finastra USA Corporation 1997, 2020.  All Rights Reserved.  - WA  J:\CFI\LPL\C40.FC  TR-100613  PR-5

*Effective: November 25, 2020*

## Appendix C: Required Financial Reporting

Each Main Street loan should contain a financial reporting covenant requiring the regular delivery of certain financial information and calculations. The items listed in Table I below must be provided by each Main Street borrower to their Eligible Lender at least annually. The items listed in Table II must be provided by each Main Street borrower to their Eligible Lender at least quarterly; the quarterly requirements vary based on the Main Street facility in which the borrower is participating. Eligible Lenders will specify the required reporting standards and forms for each Eligible Borrower.[41]

| Table I: Data Required <u>Annually</u> from All Main Street Borrowers | |
|---|---|
| **Required Data** | **Definition** |
| Total Assets | The sum of current assets, fixed assets, and other non-current assets (including, but not limited to, intangible assets, deferred items, investments, and advances). |
| Current Assets | Cash, accounts receivable, inventory, and other short-term assets that are likely to be converted into cash, used, sold, exchanged, or otherwise expensed in the normal course of business within one year. |
| Cash & Marketable Securities | Cash, depository accounts, and marketable securities that can be easily sold and readily converted into cash. |
| Tangible Assets | Assets having a physical existence, measured as total assets less intangible assets. Tangible assets are distinguished from intangible assets, such as trademarks, copyrights, and goodwill. |
| Total Liabilities | The total amount of all outstanding obligations, both current and noncurrent. |
| Current Liabilities | Short term debt, accounts payable, and other current liabilities that are due within one year. |
| Total Debt (Incl. Undrawn Available Lines of Credit) | Existing outstanding and committed debt (including any undrawn available amounts). |
| Total Equity | Measured as total assets minus total liabilities. |
| Total Revenue | Total income generated by the sale of goods or services from ongoing operations. Total Revenue excludes any non-recurring sales or gains. |
| Net Income | The income (or loss) after expenses and losses have been subtracted from all revenues and gains for the fiscal period, including discontinued operations. |
| Unadjusted EBITDA | Earnings before interest expense, income tax expense, depreciation expense, and amortization expense. The starting point is net income. |
| Adjusted EBITDA | Unadjusted EBITDA adjusted for any non-recurring, one-time, or irregular items. The Adjusted EBITDA measurement should align with the relevant facility's term sheet. |

---

[41] Under the Servicing Agreement, in the case of multi-borrower loans, this information must be entered into the Portal "on a consolidated basis" (otherwise referred to in this document as an "aggregated basis"). Eligible Lenders may elect to require reporting from the co-borrowers on an aggregated basis, or may aggregate such information after requiring individual co-borrower financial statements. If an Eligible Lender permits co-borrowers to submit aggregated financial statements, the Eligible Lender should instruct the co-borrowers to use the Eligible Lender's typical practices to aggregate such information in a manner that accounts for transactions between the co-borrowers and accurately reflects the financial position of the co-borrowers and their ability to repay the loan (e.g., in a manner that avoids double counting of revenues, assets, or liabilities).

DocuSign Envelope ID: A7B9042A-92F9-4517-AD78-9A30EB535BD3

*Effective: November 25, 2020*

| Table I: Data Required <u>Annually</u> from All Main Street Borrowers | |
|---|---|
| **Required Data** | **Definition** |
| Depreciation Expense | Non-cash expense measured based on the use of fixed assets, recognized over the useful life of the fixed assets. |
| Amortization Expense | Non-cash expense measured based on the use of intangible assets, recognized over the life of the intangible asset. |
| Interest Expense | The periodic finance expense of short term and long term debt. |
| Tax Expense | Federal, state and local income tax expenses. |
| Rent Expense | The contractual costs of occupying leased real estate. |
| Dividends / Equity Distributions | Distributions to equity owners. |
| Accounts Receivable (net of allowances) | Amounts owed to the borrower resulting from providing goods and/or services. Accounts receivable will be net of any allowances for uncollectible amounts. |
| Inventory (net of reserves) | Value of the raw materials, work in process, supplies used in operations, finished goods, and merchandise bought which are intended to be sold in the ordinary course of business. Inventory should be net of reserves. |
| Fixed Assets, Gross | Tangible property used in the business and not for resale, including buildings, furniture, fixtures, equipment, and land. Report fixed assets gross of depreciation. |
| Accumulated Depreciation | Cumulative depreciation of all fixed assets up to the Date of Financial Information. |
| Accounts Payable (A/P) | The obligations owed to the borrower's creditors arising from the entity's ongoing operations, including the purchase of goods, materials, supplies, and services. Accounts payable excludes short term and long term debt. |
| Short Term Debt | Debt obligations of the borrower due with a term of less than one year, including the current portion of any Long Term Debt. |
| Long Term Debt | Debt obligations of the borrower that are due in one year or more, excluding the current portion that is otherwise captured in Short Term Debt. |
| Description of EBITDA Adjustments | Description of items that are added to Unadjusted EBITDA to determine Adjusted EBITDA. |
| Total Expenses | All money spent and costs incurred, both recurring and non-recurring, to generate revenue. Expenses exclude items capital in nature (i.e., expenses that are allowed to be capitalized and included in the cost basis of a fixed asset). |
| Operating Expenses | Money spent and costs incurred related to normal business operations including selling, general & administrative expenses, depreciation, and amortization (i.e., total expenses less non-recurring expenses). Exclude capital expenditures. |
| Operating Income | Profit (or loss) realized from continuing operations (i.e., revenue less operating expenses). |
| Fixed Charges | Expenses that recur on a regular basis, regardless of the volume of business (i.e., lease payments, rental payments, loan interest payments, or insurance payments). |
| Capitalized Expenditures | Non-operating expenditures capitalized to fixed assets. |
| Guarantor Net Assets | Total assets less total liabilities of the guarantor (also referred to as net worth). |
| Sr. Debt Balance | Debt amount ranking senior to the Main Street loan. |
| Additional Pari Passu Debt Balance | Debt amount ranking pari passu to the Main Street loan. |
| Collateral Type (Non-Real Estate) | If the loan is secured by collateral that is not predominantly real estate, including if the collateral provided is different types, report the predominant type of collateral (e.g., inventory, receivables, securities, etc.) by aggregate value. |

24-01421-FPC11    Doc 151-10    Filed 10/09/24    Entered 10/09/24 17:19:38    Pg 15 of 85

DocuSign Envelope ID: A7B9042A-92F9-4517-AD78-9A30EB535BD3

*Effective: November 25, 2020*

| Table I: Data Required <u>Annually</u> from All Main Street Borrowers | |
|---|---|
| **Required Data** | **Definition** |
| Collateral Type (Real Estate) | If the loan is secured by real estate collateral, indicate the property type (e.g., hotel, multifamily, residential, industrial, etc.). If the loan is secured by multiple real estate property types, report the predominant property type by aggregate value. |
| Collateral Value Reporting | For loans that require ongoing or periodic valuation of the collateral, report the market value of the collateral as of the reporting date. |
| Collateral Value Date | Define the as-of date that corresponds with the Collateral Value Reporting field. |
| Covenant Status (Pass / Fail) | Yes/no, indicating if the facility has satisfied covenant tests. |
| Date of Covenant Default | If applicable, report the date when borrower defaulted covenants. |
| Nature of Covenant Default | If applicable, describe the covenant default (i.e., missing financial statements, ratio trigger). |
| Date of Covenant Cure | If applicable, report the date when borrower cured previous defaults. |

| Table II: Data Required <u>Quarterly</u> from Main Street Borrowers by Main Street Facility | | | | |
|---|---|---|---|---|
| **Required Data** | **MSELF** | **MSNLF** | **MSPLF** | **Definition** |
| Total Assets | Yes | Yes | Yes | The sum of current assets, fixed assets, and other non-current assets (including, but not limited to, intangible assets, deferred items, investments, and advances). |
| Current Assets | Yes | Yes | Yes | Cash, accounts receivable, inventory, and other short term assets that are likely to be converted into cash, used, sold, exchanged, or otherwise expensed in the normal course of business within one year. |
| Cash & Marketable Securities | Yes | Yes | Yes | Cash, depository accounts, and marketable securities that can be easily sold and readily converted into cash. |
| Tangible Assets | Yes | No | No | Assets having a physical existence measured as total assets less intangible assets. Tangible assets are distinguished from intangible assets, such as trademarks, copyrights, and goodwill. |
| Total Liabilities | Yes | Yes | Yes | The total amount of all outstanding obligations, both current and noncurrent. |
| Current Liabilities | Yes | Yes | Yes | Short term debt, accounts payable, and other current liabilities that are due within one year. |
| Total Debt (Incl. Undrawn Available Lines of Credit) | Yes | Yes | Yes | Existing outstanding and committed debt (including any undrawn available amounts). |
| Total Equity | Yes | Yes | Yes | Measured as total assets minus total liabilities. |
| Total Revenue | Yes | Yes | Yes | Total income generated by the sale of goods or services from ongoing operations. Total Revenue excludes any non-recurring sales or gains. |
| Net Income | Yes | Yes | Yes | The income (or loss) after expenses and losses have been subtracted from all revenues and gains for the fiscal period, including discontinued operations. |
| Unadjusted EBITDA | Yes | Yes | Yes | Earnings before interest expense, income tax expense, depreciation expense and amortization expense. The starting point is net income. |

24-01421-FPC11    Doc 151-10    Filed 10/09/24    Entered 10/09/24 17:19:38    Pg 16 of 85

*Effective: November 25, 2020*

| Table II: Data Required <u>Quarterly</u> from Main Street Borrowers by Main Street Facility | | | | |
|---|---|---|---|---|
| **Required Data** | **MSELF** | **MSNLF** | **MSPLF** | **Definition** |
| Adjusted EBITDA | Yes | Yes | Yes | Unadjusted EBITDA adjusted for any non-recurring, one-time or irregular items. The Adjusted EBITDA measurement should align with the relevant facility's term sheet. |
| Depreciation Expense | Yes | No | No | Non-cash expense measured based on the use of fixed assets, recognized over the useful life of the fixed assets. |
| Amortization Expense | Yes | No | No | Non-cash expense measured based on the use of intangible assets, recognized over the life of the intangible asset. |
| Interest Expense | Yes | Yes | Yes | The periodic finance expense of short term and long term debt. |
| Tax Expense | Yes | No | No | Federal, state and local income tax expenses. |
| Rent Expense | Yes | No | No | The contractual costs of occupying leased real estate. |
| Dividends / Equity Distributions | Yes | Yes | Yes | Distributions to equity owners. |
| Accounts Receivable (net of allowances) | Yes | No | No | Amounts owed to the borrower resulting from providing goods and/or services. Accounts receivable will be net of any allowances for uncollectible amounts. |
| Inventory (net of reserves) | Yes | No | No | Value of the raw materials, work in process, supplies used in operations, finished goods, and merchandise bought which are intended to be sold in the ordinary course of business. Inventory should be net of reserves. |
| Fixed Assets, Gross | Yes | No | No | Tangible property used in the business and not for resale, including buildings, furniture, fixtures, equipment, and land. Report fixed assets gross of depreciation. |
| Accumulated Depreciation | Yes | No | No | Cumulative depreciation of all fixed assets up to the Date of Financial Information. |
| Accounts Payable (A/P) | Yes | No | No | The obligations owed to the borrower's creditors arising from the entity's ongoing operations, including the purchase of goods, materials, supplies, and services. Accounts payable excludes short term and long term debt. |
| Short Term Debt | Yes | No | No | Debt obligations of the borrower due with a term of less than one year, including the current portion of any Long Term Debt. |
| Long Term Debt | Yes | No | No | Debt obligations of the borrower that are due in one year or more, excluding the current portion that is otherwise captured in Short Term Debt. |
| Description of EBITDA Adjustments | Yes | No | No | Description of items that are added to Unadjusted EBITDA to determine Adjusted EBITDA. |
| Total Expenses | Yes | No | No | All money spent and costs incurred, both recurring and non-recurring, to generate revenue. Expenses exclude items capital in nature (i.e., expenses that are allowed to be capitalized and included in the cost basis of a fixed asset). |
| Operating Expenses | Yes | Yes | Yes | Money spent and costs incurred related to normal business operations, including selling, general & administrative expenses, depreciation, and amortization (i.e. total expenses less non-recurring expenses). Exclude capital expenditures. |

99

*Effective: November 25, 2020*

| Table II: Data Required Quarterly from Main Street Borrowers by Main Street Facility | | | | |
|---|---|---|---|---|
| **Required Data** | **MSELF** | **MSNLF** | **MSPLF** | **Definition** |
| Operating Income | Yes | Yes | Yes | Profit (or loss) realized from continuing operations (i.e., revenue less operating expenses). |
| Fixed Charges | Yes | No | No | Expenses that recur on a regular basis, regardless of the volume of business (i.e., lease payments, rental payments, loan interest payments, or insurance payments). |
| Capitalized Expenditures | Yes | Yes | Yes | Non-operating expenditures capitalized to fixed assets. |
| Guarantor Net Assets | Yes | No | No | Total assets less total liabilities of the guarantor (also referred to as net worth). |
| Sr. Debt Balance | Yes | Yes | Yes | Debt amount ranking senior to the Main Street loan. |
| Additional Pari Passu Debt Balance | Yes | Yes | Yes | Debt amount ranking pari passu to the Main Street loan. |
| Collateral Type (Non-Real Estate) | Yes | No | No | If the loan is secured by collateral that is not predominantly real estate, including if the collateral provided is different types, report the predominant type of collateral (e.g., inventory, receivables, securities, etc.) by aggregate value. |
| Collateral Type (Real Estate) | Yes | No | No | If the loan is secured by real estate collateral, indicate the property type (e.g., hotel, multifamily, residential, industrial, etc.). If the loan is secured by multiple real estate property types, report the predominant property type by aggregate value. |
| Collateral Value Reporting | Yes | No | No | For loans that require ongoing or periodic valuation of the collateral, report the market value of the collateral as of the reporting date. |
| Collateral Value Date | Yes | No | No | Define the as-of date that corresponds with the Collateral Value Reporting field. |
| Covenant Status (Pass / Fail) | Yes | Yes | Yes | Yes/no, indicating if the facility has satisfied covenant tests. |
| Date of Covenant Default | Yes | Yes | Yes | If applicable, report the date when borrower defaulted covenants. |
| Nature of Covenant Default | Yes | Yes | Yes | If applicable, describe the covenant default (i.e., missing financial statements, ratio trigger). |
| Date of Covenant Cure | Yes | Yes | Yes | If applicable, report the date when borrower cured previous defaults. |

BORROWER:

CREATIVE TECHNOLOGIES, L.L.C.

By: _____

Ryan Wear, Member of Creative Technologies, L.L.C.

By: _____

Richard Wear, Member of Creative Technologies, L.L.C.

DocuSign Envelope ID: A7B9042A-92F9-4517-AD78-9A30EB535BD3

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $21,000,000.00 | 12-10-2020 | 12-10-2025 | ███████0613 | 1763 / 33 | ██████85-01 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Creative Technologies, L.L.C.
PO Box 3226
Everett, WA 98213

**Lender:** First Federal Savings & Loan Association of Port Angeles
First Federal - Eastside
1603 E 1st St
Port Angeles, WA 98362

**Principal Amount: $21,000,000.00**          **Date of Note: December 10, 2020**

**PROMISE TO PAY.** Creative Technologies, L.L.C. ("Borrower") promises to pay to First Federal Savings & Loan Association of Port Angeles ("Lender"), or order, in lawful money of the United States of America, the principal amount of Twenty-one Million & 00/100 Dollars ($21,000,000.00), together with interest on the unpaid principal balance from December 10, 2020, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule:

Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph:

Interest on the unpaid principal balance shall be deferred for one year from the Loan Date (the "Interest Deferment Period"), and all interest accrued during the Interest Deferment Period shall be capitalized and added to the principal balance due hereunder.

Any interest payments owing under this Note shall be paid on or before the 10th day of each month that each such payment is due. 47 monthly consecutive interest payments, beginning January 10, 2022, with interest calculated on the unpaid principal balances; one principal payment equal to 15% of the then balance on December 10, 2023, during which interest continues to accrue on the unpaid principal balances; one principal payment equal to 15% of the then balance on December 10, 2024, during which interest continues to accrue on the unpaid principal balances; and one principal and interest payment on December 10, 2025. The actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note.

Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to any late charges; and then to any unpaid collection costs.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the 3 Month LIBOR as published in the Wall Street Journal. When a range of rates has been published, the higher of the rates will be used. (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each three months. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 0.230% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 3.000 percentage points over the Index (the "Margin"), resulting in an initial rate of 3.230%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

First Federal Savings & Loan Association of Port Angeles
First Federal - Eastside
1603 E 1st St
Port Angeles, WA 98362

All payments must be received by Lender consistent with any written payment instructions provided by Lender.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve

DocuSign Envelope ID: A7B9042A-92F9-4517-AD78-9A30EB535BD3

Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: First Federal Savings & Loan Association of Port Angeles, ATTN: Loan Servicing, 105 W 8th St/PO Box 351 Port Angeles, WA 98362-0055.**

**MANDATORY PREPAYMENT.** If, on any date (such date, a "Trigger Date"), the Board of Governors of the Federal Reserve System or a designee thereof has, after consultation with Lender, notified Lender in writing that the Borrower has materially breached, made a material misrepresentation with respect to or otherwise failed to comply with certifications in Section 2 (CARES Act Borrower Eligibility Certifications and Covenants) or Section 3 (FRA and Regulation A Borrower Eligibility Certifications) of the Borrower Certifications and Covenants in any material respect or that any such certification has failed to be true and correct in any material respect, then Lender shall promptly so notify the Borrower and the Borrower shall, no later than two (2) Business Days after such Trigger Date, prepay the Loan in full, along with any accrued and unpaid interest thereon.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $5.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 10.000% ("Default Rate"). If judgment is entered in connection with this Note, interest will continue to accrue after the date of judgment at the Default Rate. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding one (1) month, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**CROSS-ACCELERATION PROVISION.** If Borrower or any Subsidiary shall fail to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness under the Loan Documents) owing to the Lender or any commonly controlled Affiliate of the Lender, in each case beyond the applicable grace period with respect thereto, if any; or (ii) the Borrower or any Subsidiary shall fail to observe or perform any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which failure to make a payment, default or other event described in cause (i) or (ii) is to cause such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that clause (ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such Indebtedness; provided that, as used in this clause, the term "Indebtedness" shall mean all debt for borrowed money and any obligations evidenced by a bond, debenture, note, loan agreement or other similar instrument, and any guarantee of any of the foregoing.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately

DocuSign Envelope ID: A7B9042A-92F9-4517-AD78-9A30EB535BD3

due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Washington.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Clallam County, State of Washington.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $32.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instrument listed herein:

    (A) a Commercial Security Agreement dated December 10, 2020 made and executed between Creative Technologies, L.L.C. and Lender on collateral described as: inventory, chattel paper, accounts and equipment.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

CREATIVE TECHNOLOGIES, L.L.C.

By: _____
Ryan Wear, Member of Creative Technologies, L.L.C.

By: _____
Richard Wear, Member of Creative Technologies, L.L.C.

LaserPro, Ver. 19.4.10.036  Copr. Finastra USA Corporation 1997, 2020.  All Rights Reserved.  - WA  J:\CF\LPL\D20\FC  TR-100613  PR-5 (M)

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,062,500.00 | 03-12-2021 | 03-12-2031 | [redacted]0678 | 0160 / 9 | [redacted]76-01 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Ideal Property Investments, LLC
2732 Grand Ave Ste 122
Everett, WA 98201

**Lender:** First Federal Savings & Loan Association of Port Angeles
First Federal - Sequim Village Marketplace
1203 W Washington
Sequim, WA 98382

---

**THIS BUSINESS LOAN AGREEMENT dated March 12, 2021, is made and executed between Ideal Property Investments, LLC ("Borrower") and First Federal Savings & Loan Association of Port Angeles ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

**TERM.** This Agreement shall be effective as of March 12, 2021, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Washington. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 2732 Grand Ave Ste 122, Everett, WA 98201. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

# BUSINESS LOAN AGREEMENT
## (Continued)

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Tax Returns.** As soon as available, but in no event later than sixty (60) days after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**

Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

Copies of extensions of tax returns along with all IRS forms, W-2(s), and K-1(s) (if applicable), shall be provided within thirty (30) days of filing.

Bank, retirement or other statements shall be provided within thirty (30) days upon request.

When applicable, annual rent roll statements for subject property certified by Borrower and/or Guarantor as true and correct shall be provided within thirty (30) days of request.

When applicable, copies of all updated, amended, and new lease agreements for subject property shall be provided within thirty (30) days of request.

Determination of compliance to be at the sole and absolute discretion of First Federal.

Borrower understands and agrees that the guarantor is required to provide annual financial information. If the Guarantor fails to provide the required information within the times stated in the Guaranty, such failure will be treated the same as the Borrower's failure to provide financial information as provided above.

**INDIVIDUAL GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one hundred twenty (120) days after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**BUSINESS GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Interim Statements.** As soon as available, but in no event later than thirty (30) days after the end of each quarter, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor.

**Annual Statements.** As soon as available, but in no event later than one hundred twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, audited by a certified public accountant satisfactory to Lender.

**Tax Returns.** As soon as available, but in no event later than sixty (60) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**

**Borrower DSCR pre-Distribution:** Annual debt service coverage ratio (DSCR) for Borrower to be no less than 1.00 to 1.00, defined as Borrower earnings before interest, taxes, depreciation, and amortization (EBITDA), divided by their annual debt payments. DSCR is to be measured annually beginning December 31, 2021.

**Corporate Guarantor (Creative Technologies):** Minimum Current Ratio of 1.50 to 1.00. Current Ratio is defined as total tangible current assets divided by total current liabilities. This covenant will be tested quarterly.

**Corporate Guarantor (Creative Technologies):** DSCR pre-Distribution: Quarterly debt service coverage ratio (DSCR) for Borrower to be no less than 1.50 to 1.00, defined as Borrower earnings before interest, taxes, depreciation, and amortization (EBITDA), divided by the corresponding period's debt payments. DSCR is to be measured QUARTERLY beginning with June 30, 2021 financial statements.

**Corporate Guarantor (Creative Technologies):** Maximum Total Debt to Tangible Net Worth Ratio of 2.50 to 1.00. Tangible net worth is

# BUSINESS LOAN AGREEMENT
## (Continued)

defined as net worth (Total Assets less Total Liabilities) less goodwill & any other intangible assets (including related party notes and receivables). This covenant will be tested quarterly.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Ryan R. Wear | Unlimited |
| Richard F. Wear | Unlimited |
| Creative Technologies, L.L.C. | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all covenants, terms, conditions and provisions set forth in the Hazardous Substances Certificate and Indemnity Agreement executed in connection with the Loan.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Late Financial Information Fee.** In the event Borrower fails to timely deliver to Lender such statements, schedules, documents, items and reports described within the Affirmative Covenants section of the Business Loan Agreement (including any required items related to any Guarantor or any other party for which financial information is required under the Loan Documents) (the "Financial Information"), then such failure shall constitute an Event of Default and, in addition to any other remedies which may be available to Lender as a result of such Event of Default, Borrower shall pay a late charge equal to 25 basis points (.25%) times the then outstanding balance of the Loan (the "Late Financial Information Fee") to compensate Lender (or its servicer) for the additional administrative and legal expense caused by such failure regardless of whether Borrower is entitled to any notice and opportunity to cure such failure prior to the exercise of any other remedies by Lender. The Late Financial Information Fee shall be charged each month that any Financial Information remains delinquent and shall be immediately payable from Borrower upon demand by Lender and, until paid, shall be added to and constitute a part of the Indebtedness. The Late Financial Information Fee shall be in addition to any other remedies available to Lender as a result of Borrower's default. In no event shall the Late Financial Information Fee constitute a cure of Borrower's default in failure to provide the Financial Information, nor limit

# BUSINESS LOAN AGREEMENT

## (Continued)

Lender's remedies as a result of such default. In addition and without waiving or otherwise limiting any of Lender's rights hereunder, if Borrower fails to provide the Financial Information in a timely manner, then Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such Financial Information, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower,

# BUSINESS LOAN AGREEMENT
## (Continued)

the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding one (1) month, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Clallam County, State of Washington.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Subject to applicable law, and except for notice required or allowed by law to be given in another manner, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by

# BUSINESS LOAN AGREEMENT
(Continued)

telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Subject to applicable law, and except for notice required or allowed by law to be given in another manner, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** ·Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Oral Agreements. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON STATE LAW.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Ideal Property Investments, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means First Federal Savings & Loan Association of Port Angeles, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated March 12, 2021 and executed by Ideal Property Investments, LLC in the principal amount of $2,062,500.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender;

# BUSINESS LOAN AGREEMENT
## (Continued)

(2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED MARCH 12, 2021.

BORROWER:

IDEAL PROPERTY INVESTMENTS, LLC

By: _____
 Ryan R. Wear, Manager of Ideal Property
 Investments, LLC

LENDER:

FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF PORT ANGELES

By: _____
 Authorized Officer

LaserPro, Ver. 19.4.10.036 Copr. Finastra USA Corporation 1997, 2021. All Rights Reserved. WA J:\CFI\LPL\C40.FC TR-100618 PR-1

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $2,062,500.00 | 03-12-2021 | 03-12-2031 | ████0678 | 0160 / 9 | ████76-01 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Ideal Property Investments, LLC
2732 Grand Ave Ste 122
Everett, WA 98201

**Lender:** First Federal Savings & Loan Association of Port Angeles
First Federal - Sequim Village Marketplace
1203 W Washington
Sequim, WA 98382

---

**Principal Amount: $2,062,500.00**  Date of Note: **March 12, 2021**

**PROMISE TO PAY.** Ideal Property Investments, LLC ("Borrower") promises to pay to First Federal Savings & Loan Association of Port Angeles ("Lender"), or order, in lawful money of the United States of America, the principal amount of Two Million Sixty-two Thousand Five Hundred & 00/100 Dollars ($2,062,500.00), together with interest on the unpaid principal balance from March 12, 2021, until paid in full.

**PAYMENT.** Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 60 monthly consecutive principal and interest payments in the initial amount of $11,246.10 each, beginning April 12, 2021, with interest calculated on the unpaid principal balances using an initial discounted interest rate of 4.250%; 59 monthly consecutive principal and interest payments in the initial amount of $11,562.40 each, beginning April 12, 2026, with interest calculated on the unpaid principal balances using an interest rate based on the Federal Home Loan Bank of Des Moines Five (5) Year Long Term Advance Rate (currently 1.160%), plus a margin of 3.410%, resulting in an initial interest rate of 4.570%; and one principal and interest payment of $1,509,045.85 on March 12, 2031, with interest calculated on the unpaid principal balances using an interest rate based on the Federal Home Loan Bank of Des Moines Five (5) Year Long Term Advance Rate (currently 1.160%), plus a margin of 3.410%, resulting in an initial interest rate of 4.570%. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled and that the Index does not change; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to any late charges; and then to any unpaid collection costs.

**VARIABLE INTEREST RATE.** For the first 60 payments, the interest rate on this loan will be 4.250%. Thereafter, the interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Federal Home Loan Bank of Des Moines Five (5) Year Long Term Advance Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If Lender determines, in its sole discretion, that the Index for this Note has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust any margin corresponding to the Index being substituted to accompany the substitute index. Margins corresponding to the Index are described in the "Payments" section. The change to the margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each five years. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 1.160% per annum. The interest rate or rates to be applied to the unpaid principal balance during this Note will be the rate or rates set forth herein in the "Payment" section. Notwithstanding any other provision of this Note, after the first payment stream, the interest rate for each subsequent payment stream will be effective as of the due date of the last payment in the just-ending payment stream. NOTICE: Under no circumstances will the interest rate on this Note be less than 4.250% per annum or more than (except for any higher default rate shown below) the lesser of 6.250% per annum or the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rates stated in this Note.

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

First Federal Savings & Loan Association of Port Angeles
First Federal - Sequim Village Marketplace
1203 W Washington
Sequim, WA 98382

All payments must be received by Lender consistent with any written payment instructions provided by Lender.

**PREPAYMENT PENALTY.** Upon prepayment of this Note, Lender is entitled to the following prepayment penalty: Borrower shall pay the Bank a prepayment premium equal to three (3%) percent of the principal amount prepaid prior to the first anniversary of the date of this Note, which premium shall decline one (1%) percent each year thereafter until the third anniversary of the date of this Note, at or after which time there shall be no prepayment premium. Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: First Federal Savings & Loan Association of Port Angeles, ATTN: Loan Servicing, 105 W 8th Suite Box 351 Port Angeles, WA 98362-0055.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment or $5.00, whichever is greater.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to

# PROMISSORY NOTE
## (Continued)

12.000% ("Default Rate"). If judgment is entered in connection with this Note, interest will continue to accrue after the date of judgment at the Default Rate. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding one (1) month, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Washington.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Clallam County, State of Washington.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $32.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Deed of Trust dated March 12, 2021, to a trustee in favor of Lender on real property located in Washington County, State of Oregon.

(B) an Assignment of All Rents to Lender on real property located in Washington County, State of Oregon.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this

## PROMISSORY NOTE
### (Continued)

Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

IDEAL PROPERTY INVESTMENTS, LLC

By: _____
Ryan R. Wear, Manager of Ideal Property
Investments, LLC

LaserPro, Ver. 19.4.10.036 Copr. Finastra USA Corporation 1997, 2021. All Rights Reserved. - WA J:\CFI\LPL\D20.FC 1R-10678 PR-1

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $4,980,000.00 | 09-07-2021 | 09-07-2031 | ▌▌▌0858 | 0160 / 9 | ▌▌76-01 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  Ideal Property Investments, LLC
2732 Grand Ave Ste 122
Everett, WA  98201

**Lender:**  First Federal Savings & Loan Association of Port Angeles
First Federal - Sequim Village Marketplace
1203 W Washington
Sequim, WA  98382

---

**THIS BUSINESS LOAN AGREEMENT** dated September 7, 2021, is made and executed between Ideal Property Investments, LLC ("Borrower") and First Federal Savings & Loan Association of Port Angeles  ("Lender") on the following terms and conditions.  Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement.  Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.**  This Agreement shall be effective as of September 7, 2021, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.**  Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.**  Borrower shall provide to Lender the following documents for the Loan:  (1) the Note;  (2) Security Agreements granting to Lender security interests in the Collateral;  (3) financing statements and all other documents perfecting Lender's Security Interests;  (4) evidence of insurance as required below;  (5) guaranties;  (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.**  Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents.  In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.**  Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.**  The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.**  There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.**  Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.**  Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Washington.  Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business.  Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition.  Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 2732 Grand Ave Ste 122, Everett, WA  98201.  Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral.  Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name.  Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.**  Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower.  Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business:  **None.**

**Authorization.**  Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under  (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.**  Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender.  Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.**  This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.**  Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties.  All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Tax Returns.** As soon as available, but in no event later than sixty (60) days after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**

Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.

Copies of extensions of tax returns along with all IRS forms, W-2(s), and K-1(s) (if applicable), shall be provided within thirty (30) days of filing.

Bank, retirement or other statements shall be provided within thirty (30) days upon request.

When applicable, annual rent roll statements for subject property certified by Borrower and/or Guarantor as true and correct shall be provided within thirty (30) days of request.

When applicable, copies of all updated, amended, and new lease agreements for subject property shall be provided within thirty (30) days of request.

Determination of compliance to be at the sole and absolute discretion of First Federal.

Borrower understands and agrees that the guarantor is required to provide annual financial information. If the Guarantor fails to provide the required information within the times stated in the Guaranty, such failure will be treated the same as the Borrower's failure to provide financial information as provided above.

**INDIVIDUAL GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one hundred twenty (120) days after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**BUSINESS GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than forty five (45) days after the end of each quarter, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor.

**Annual Statements.** As soon as available, but in no event later than one hundred-twenty (120) days after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, audited by a certified public accountant satisfactory to Lender.

**Tax Returns.** As soon as available, but in no event later than sixty (60) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**

**Borrower DSCR pre Distribution:** Annual debt service coverage ratio (DSCR) for Borrower to be no less than 1.00 to 1.00, defined as Borrower earnings before interest, taxes, depreciation, and amortization (EBITDA), divided by their annual debt payments. DSCR is to be measured annually beginning December 31, 2021.

**Business Guarantor DSCR pre Distribution:** Quarterly debt service coverage ratio (DSCR) for Guarantor to be no less than 1.50 to 1.00, defined as Guarantor earnings before interest, taxes, depreciation, and amortization (EBITDA), divided by the corresponding period's debt payments. DSCR is to be measured quarterly beginning December 31, 2021 financial statements.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon

request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Water Station Management, LLC | Unlimited |
| Ryan R. Wear | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all covenants, terms, conditions and provisions set forth in the Hazardous Substances Agreement executed in connection with the Loan.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Late Financial Information Fee.** In the event Borrower fails to timely deliver to Lender such statements, schedules, documents, items and reports described within the Affirmative Covenants section of the Business Loan Agreement (including any required items related to any Guarantor or any other party for which financial information is required under the Loan Documents) (the "**Financial Information**"), then such failure shall constitute an Event of Default and, in addition to any other remedies which may be available to Lender as a result of such Event of Default, Borrower shall pay a late charge equal to 25 basis points (.25%) times the then outstanding balance of the Loan (the "**Late Financial Information Fee**") to compensate Lender (or its servicer) for the additional administrative and legal expense caused by such failure regardless of whether Borrower is entitled to any notice and opportunity to cure such failure prior to the exercise of any other remedies by Lender. The Late Financial Information Fee shall be charged each month that any Financial Information remains delinquent and shall be immediately payable from Borrower upon demand by Lender and, until paid, shall be added to and constitute a part of the Indebtedness. The Late Financial Information Fee shall be in addition to any other remedies available to Lender as a result of Borrower's default. In no event shall the Late Financial Information Fee constitute a cure of Borrower's default in failure to provide the Financial Information, nor limit Lender's remedies as a result of such default. In addition and without waiving or otherwise limiting any of Lender's rights hereunder, if Borrower fails to provide the Financial Information in a timely manner, then Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such Financial Information, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

> **Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

> **Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

> **Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

> **Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

> **Payment Default.** Borrower fails to make any payment when due under the Loan.

> **Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

> **Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

> **Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

> **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

> **Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

> **Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

> **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help,

repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding one (1) month, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington.

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Clallam County, State of Washington.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Subject to applicable law, and except for notice required or allowed by law to be given in another manner, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Subject to applicable law, and except for notice required or allowed by law to be given in another manner, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to

all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Oral Agreements. ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON STATE LAW.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means Ideal Property Investments, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means First Federal Savings & Loan Association of Port Angeles, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated September 7, 2021 and executed by Ideal Property Investments, LLC in the principal amount of $4,980,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute

an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED SEPTEMBER 7, 2021.**

**BORROWER:**

**IDEAL PROPERTY INVESTMENTS, LLC**

By: _____

    Ryan   R.   Wear,   Manager   of   Ideal   Property
    Investments, LLC

**LENDER:**

**FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF PORT ANGELES**

By: _____

    **Authorized Officer**

LaserPro, Ver. 21.1.0.322  Copr. Finastra USA Corporation 1997, 2021.  All Rights Reserved.  - WA  J:\CFI\LPL\C40.FC  TR-100858  PR-1

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $4,980,000.00 | 09-07-2021 | 09-07-2031 | [redacted]0858 | 0160 / 9 | [redacted]76-01 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Ideal Property Investments, LLC
2732 Grand Ave Ste 122
Everett, WA 98201

**Lender:** First Federal Savings & Loan Association of Port Angeles
First Federal - Sequim Village Marketplace
1203 W Washington
Sequim, WA 98382

**Principal Amount: $4,980,000.00** **Date of Note: September 7, 2021**

**PROMISE TO PAY. Ideal Property Investments, LLC ("Borrower") promises to pay to First Federal Savings & Loan Association of Port Angeles ("Lender"), or order, in lawful money of the United States of America, the principal amount of Four Million Nine Hundred Eighty Thousand & 00/100 Dollars ($4,980,000.00), together with interest on the unpaid principal balance from September 7, 2021, until paid in full.**

**PAYMENT. Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in 119 regular payments of $25,888.76 each and one irregular last payment estimated at $3,560,387.42. Borrower's first payment is due October 7, 2021, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on September 7, 2031, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to any late charges; and then to any unpaid collection costs.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Federal Home Loan Bank of Des Moines Five (5) Year Long Term Advance Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each five years. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 1.110% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 2.630 percentage points over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 3.800%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be less than 3.800% per annum or more than (except for any higher default rate shown below) the lesser of 5.800% per annum or the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

First Federal Savings & Loan Association of Port Angeles
First Federal - Sequim Village Marketplace
1203 W Washington
Sequim, WA 98382

All payments must be received by Lender consistent with any written payment instructions provided by Lender.

**PREPAYMENT PENALTY. Upon prepayment of this Note, Lender is entitled to the following prepayment penalty: Borrower shall pay the Bank a prepayment premium equal to three (3%) percent of the principal amount prepaid prior to the first anniversary of the date of this Note, which premium shall decline one (1%) percent each year thereafter until the third anniversary of the date of this Note, at or after which time there shall be no prepayment premium.**
**The Prepayment penalty will be waived if a.) The property is sold and the sale is financed with a loan from Lender or b.) The Borrower repays the loan with its separate cash and not the proceeds of a loan with a different lender. Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due.** Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: First Federal Savings & Loan Association of Port Angeles, ATTN: Loan Servicing, 105 W 8th St/PO Box 351 Port Angeles, WA 98362-0055.**

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $5.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 12.000% ("Default Rate"). If judgment is entered in connection with this Note, interest will continue to accrue after the date of judgment at the Default Rate. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding one (1) month, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Washington.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Clallam County, State of Washington.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $35.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

   (A)  a Deed of Trust dated September 7, 2021, to a trustee in favor of Lender on real property located in Snohomish County, State of Washington.

   (B)  an Assignment of All Rents to Lender on real property located in Snohomish County, State of Washington.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note

are joint and several.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

**IDEAL PROPERTY INVESTMENTS, LLC**

By:_____
    Ryan   R.   Wear,   Manager   of   Ideal   Property
    Investments, LLC

LaserPro, Ver. 21.1.0.222  Copr. Finastra USA Corporation 1997, 2021.  All Rights Reserved.  - WA  J:\CFIN\PL\C20.FC  TR-100858  PR-1

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,675,000.00 | 05-24-2021 | 05-24-2031 | ▮▮▮0759 | 0160 / 9 | ▮▮▮48-01 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** 8825, LLC
PO Box 3226
Everett, WA 98213-8226

**Lender:** First Federal Savings & Loan Association of Port Angeles
First Federal - Sequim Village Marketplace
1203 W Washington
Sequim, WA 98382

---

**THIS BUSINESS LOAN AGREEMENT** dated May 24, 2021, is made and executed between 8825, LLC ("Borrower") and First Federal Savings & Loan Association of Port Angeles ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.** This Agreement shall be effective as of May 24, 2021, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance and each subsequent Advance under this Agreement shall be subject to the fulfillment to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents.** Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance satisfactory to Lender and Lender's counsel.

**Borrower's Authorization.** Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and the Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses.** Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties.** The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default.** There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Washington. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 2732 Grand Ave #122, Everett, WA 98201-3416. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of organization or membership agreements, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Tax Returns.** As soon as available, but in no event later than sixty (60) days after the applicable filing date for the tax reporting period ended, Borrower's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**Additional Requirements.**

Furnish such additional information and statements, lists of assets and liabilities, agings of receivables and payables, inventory schedules, budgets, forecasts, tax returns, and other reports with respect to Borrower's financial condition and business operations as Lender may request from time to time.
Copies of extensions of tax returns along with all IRS forms, W-2(s), and K-1(s) (if applicable), shall be provided within thirty (30) days of filing.
Bank, retirement or other statements shall be provided within thirty (30) days upon request.
When applicable, annual rent roll statements for subject property certified by Borrower and/or Guarantor as true and correct shall be provided within thirty (30) days of request.
When applicable, copies of all updated, amended, and new lease agreements for subject property shall be provided within thirty (30) days of request.
Determination of compliance to be at the sole and absolute discretion of First Federal.
Borrower understands and agrees that the guarantor is required to provide annual financial information. If the Guarantor fails to provide the required information within the times stated in the Guaranty, such failure will be treated the same as the Borrower's failure to provide financial information as provided above.

**INDIVIDUAL GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one hundred twenty (120) days after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

**BUSINESS GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than forty-five (45) days after the end of each quarter, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor.

**Tax Returns.** As soon as available, but in no event later than sixty (60) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Additional Requirements.**

**Corporate Guarantor (Creative Technologies LLC) DSCR pre Distribution:** Quarterly debt service coverage ratio (DSCR) for Borrower to be no less than 1.50 to 1.00, defined as Borrower earnings before interest, taxes, depreciation, and amortization (EBITDA), divided by the corresponding period's debt payments. DSCR is to be measured QUARTERLY beginning with June 30, 2021 financial statements.

Corporate Guarantor (Creative Technologies LLC) Maximum Total Debt to Tangible Net Worth Ratio of 2.50 to 1.00. Tangible net worth is defined as net worth (Total Assets less Total Liabilities) less goodwill & any other intangible assets (including related party receivables). This covenant is to be measured quarterly beginning June 30, 2021.

Corporate Guarantor (Creative Technologies LLC) Minimum Current Ratio of 1.50 to 1.00. Current Ratio is defined as total tangible current assets divided by total current liabilities. This covenant is to be measured quarterly beginning June 30, 2021.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
| --- | --- |
| Creative Technologies LLC | Unlimited |
| Ryan R. Wear | Unlimited |
| Richard F. Wear | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all covenants, terms, conditions and provisions set forth in the Hazardous Substances Agreement executed in connection with the Loan.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Late Financial Information Fee.** In the event Borrower fails to timely deliver to Lender such statements, schedules, documents, items and reports described within the Affirmative Covenants section of the Business Loan Agreement (including any required items related to any Guarantor or any other party for which financial information is required under the Loan Documents) (the "Financial Information"), then such failure shall constitute an Event of Default and, in addition to any other remedies which may be available to Lender as a result of such Event of Default, Borrower shall pay a late charge equal to 25 basis points (.25%) times the then outstanding balance of the Loan (the "Late Financial Information Fee") to compensate Lender (or its servicer) for the additional administrative and legal expense caused by such failure regardless of whether Borrower is entitled to any notice and opportunity to cure such failure prior to the exercise of any other remedies by Lender. The Late Financial Information Fee shall be charged each month that any Financial Information remains delinquent and shall be immediately payable from Borrower upon demand by Lender and, until paid, shall be added to and constitute a part of the Indebtedness. The Late Financial Information Fee shall be in addition to any other remedies available to Lender as a result of Borrower's default. In no event shall the Late Financial Information Fee constitute a cure of Borrower's default in failure to provide the Financial Information, nor limit Lender's remedies as a result of such default. In addition and without waiving or otherwise limiting any of Lender's rights hereunder, if Borrower fails to provide the Financial Information in a timely manner, then Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such Financial Information, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Indebtedness.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the

amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any Loan.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate

reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding one (1) month, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within fifteen (15) days; or (2) If the cure requires more than fifteen (15) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more buyers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Washington.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Clallam County, State of Washington.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Subject to applicable law, and except for notice required or allowed by law to be given in another manner, any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Subject to applicable law, and except for notice required or allowed by law to be given in another manner, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability

of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in making the Loan, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the making of the Loan and delivery to Lender of the Related Documents, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Oral Agreements.** ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON STATE LAW.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means 8825, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means First Federal Savings & Loan Association of Port Angeles, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated May 24, 2021 and executed by 8825, LLC in the principal amount of $3,675,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants,

arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT IS DATED MAY 24, 2021.

BORROWER:

8825, LLC

By: _____
Ryan R Wear, Manager, Member of 8825, LLC

By: _____
Richard F. Wear, Manager, Member of 8825, LLC

LENDER:

FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF PORT ANGELES

By: _____
Authorized Officer

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,675,000.00 | 05-24-2021 | 05-24-2031 | [redacted]0759 | 0160 / 9 | [redacted]48-01 | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** 8825, LLC
PO Box 3226
Everett, WA 98213-8226

**Lender:** First Federal Savings & Loan Association of Port Angeles
First Federal - Sequim Village Marketplace
1203 W Washington
Sequim, WA 98382

**Principal Amount: $3,675,000.00** **Date of Note: May 24, 2021**

**PROMISE TO PAY. 8825, LLC ("Borrower") promises to pay to First Federal Savings & Loan Association of Port Angeles ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Million Six Hundred Seventy-five Thousand & 00/100 Dollars ($3,675,000.00), together with interest on the unpaid principal balance from May 24, 2021, until paid in full.**

**PAYMENT. Subject to any payment changes resulting from changes in the Index, Borrower will pay this loan in 119 regular payments of $22,880.34 each and one irregular last payment estimated at $2,249,704.26. Borrower's first payment is due June 24, 2021, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on May 24, 2031, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any escrow or reserve account payments as required under any mortgage, deed of trust, or other security instrument or security agreement securing this Note; then to any late charges; and then to any unpaid collection costs.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Federal Home Loan Bank of Des Moines Five (5) Year Long Term Advance Rate (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each five years. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 1.170% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 3.410 percentage points over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 4.250%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be less than 4.250% per annum or more than (except for any higher default rate shown below) the lesser of 2.000% per annum or the maximum rate allowed by applicable law. Whenever increases occur in the interest rate, Lender, at its option, may do one or more of the following: (A) increase Borrower's payments to ensure Borrower's loan will pay off by its original final maturity date, (B) increase Borrower's payments to cover accruing interest, (C) increase the number of Borrower's payments, and (D) continue Borrower's payments at the same amount and increase Borrower's final payment.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**RECEIPT OF PAYMENTS.** All payments must be made in U.S. dollars and must be received by Lender at:

First Federal Savings & Loan Association of Port Angeles
First Federal - Sequim Village Marketplace
1203 W Washington
Sequim, WA 98382

All payments must be received by Lender consistent with any written payment instructions provided by Lender.

**PREPAYMENT PENALTY. Upon prepayment of this Note, Lender is entitled to the following prepayment penalty: Borrower shall pay the Bank a prepayment premium equal to three (3%) percent of the principal amount prepaid prior to the first anniversary of the date of this Note, which premium shall decline one (1%) percent each year thereafter until the third anniversary of the date of this Note, at or after which time there shall be no prepayment premium. Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due.** Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: First Federal Savings & Loan Association of Port Angeles, ATTN: Loan Servicing, 105 W 8th St/PO Box 351 Port Angeles, WA 98362-0055.**

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $5.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 12.000% ("Default Rate"). If judgment is entered in connection with this Note, interest will continue to accrue after the date of judgment at the Default Rate. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement

Loan No: ████0759                                                       **Page 2**

between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding one (1) month, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**JURY WAIVER. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.**

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Washington without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Washington.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Clallam County, State of Washington.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $35.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

    (A)  a Deed of Trust dated May 24, 2021, to a trustee in favor of Lender on real property located in King County, State of Washington.

    (B)  an Assignment of All Rents to Lender on real property located in King County, State of Washington.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

**PROMISSORY NOTE**

Loan No: ████0759

**(Continued)**

Page 3

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

8825, LLC

By: _____
    Ryan R Wear, Manager, Member of 8825, LLC

By: _____
    Richard F. Wear, Manager, Member of 8825, LLC

LaserPro, Ver. 21.1.0.222  Copr. Finastra USA Corporation 1997, 2021.  All Rights Reserved.  - WA  J:\CFN\PL\D20.FC  TR-100758  PR-1

CCHI 2208061 IT Scores

# Illinois Anti-Predatory Lending Database Program

## Certificate of Exemption



**Report Mortgage Fraud
844-768-1713**



Doc# 2305215032 Fee $88.00

RHSP FEE:$9.00 RPRF FEE: $1.00

KAREN A. YARBROUGH

COOK COUNTY CLERK

DATE: 02/21/2023 01:48 PM PG: 1 OF 34

---

The property identified as:     **PIN:** 08-34-205-018-0000

**Address:**
**Street:** 1400 Greenleaf Ave.
**Street line 2:**
**City:** Elk Grove Village        **State:** IL        **ZIP Code:** 60007

**Lender:** FIRST FED BANK

**Borrower:** IDEAL GREENLEAF, LLC, A WYOMING LIMITED LIABILITY COMPANY

**Loan / Mortgage Amount:** $31,717,500.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is commercial property.

**Certificate number:** 1D389EB6-AF03-4DD5-9149-A05118185820        **Execution date:** 2/16/2023

*34*

This Instrument Prepared by and
**After Recording Return to:**
Lane Powell PC
1420 Fifth Avenue, Suite 4200
Seattle, WA 98101
Attn: Gregory R. Fox

(For Recorder's Use Only)

# MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, AND SECURITY AGREEMENT

This Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing (as amended, amended and restated, supplemented, renewed, or otherwise modified from time to time, this "**Mortgage**"), dated as of the 16th day of February, 2023, is made by IDEAL GREENLEAF, LLC, a Wyoming limited liability company, having an address at 2732 Grand Ave, Ste 122, Everett, WA 98201 ("**Mortgagor**"), in favor of FIRST FED BANK, a Washington bank corporation, having an address at 105 W. 8th Street, P.O. Box 351, Port Angeles, WA 98362 (together with its successors and assigns, "**Mortgagee**").

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the due and punctual payment and performance of all of the Obligations (defined below) as and when the same becomes due and payable, Mortgagor hereby represents, warrants, covenants, and agrees for the benefit of Mortgagee as follows:

1

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

1.   Definitions.  As used in this instrument the following terms shall mean:

1.1.   "*Attorneys' Fees*," "*Attorneys' Fees and Costs*," "attorneys' fees" and "attorneys' fees and costs" means the fees and expenses of counsel to the Mortgagee, which may include, without limitation, printing, copying, duplicating and other expenses, air freight/courier/messenger charges, and fees billed for paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney.  The terms "attorneys' fees" or "attorneys' fees and costs" shall also include, without limitation, all such reasonable fees and expenses incurred with respect to any default, modification, workout, enforcement action, appeals, arbitrations, bankruptcy proceedings and any post-judgment proceedings to collect any judgment, and whether or not any action or proceeding is brought with respect to the matter for which such fees and expenses were incurred.  The provisions allowing for the recovery of post-judgment fees, costs and expenses are separate and several and shall survive the merger of this Mortgage into any judgment.

1.2.   "*Collateral*" shall mean the collateral identified in Paragraph 2 hereof.

1.3.   "*Credit Documents*" shall mean the x0613 Note, x0678 Note, x0759 Note, x0858 Note, and WSM Agreement, as amended from time to time, and any other documents, instruments, amendments, modifications, and agreements executed in connection therewith or otherwise related thereto; provided, however, that this Mortgage shall not secure any environmental indemnity or guaranty executed in connection with the obligations secured hereby.

1.4.   "*Obligations*" shall mean the indebtedness and obligations identified in Paragraph 3 hereof.

1.5.   "*Obligor*" or "*Obligors*" shall mean Creative, Mortgagor, 8825 and WSM, individually and collectively, each as defined in Paragraph 3 hereof.

1.6.   "*Property*" shall have the meaning ascribed to it in Section 2.1 below.

2.   Collateral.  Mortgagor does hereby irrevocably grant, mortgage, pledge, bargain, sell, assign, transfer, warrant and convey unto Mortgagee all of Mortgagor's estate, right, title, interest, claim and demand, now owned or hereafter acquired, in and to the real property located in Cook County, Illinois, and described on Exhibit A attached hereto and incorporated by this reference (the "*Land*"), together with the following described estate, property and rights of Mortgagor (collectively, the "*Collateral*"), whether the same is now owned or hereafter created, acquired or arising, all as security for the performance of each covenant and agreement of Mortgagor contained herein and the payment and performance of the Obligations and all other sums of money secured hereby:

2.1.   Improvements.  All buildings, structures, improvements, fixtures and property now or hereafter attached to or used in the operation of the Land and any buildings, structures

2

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

and/or improvements now or hereafter existing thereon (collectively, the "***Property***"). All property mentioned in this Paragraph 2.1 shall be deemed part of the realty and not severable wholly or in part without material injury to the Property.

2.2.    Access.    All land lying in streets and roads now or hereafter adjoining the Property, all access rights and easements pertaining to the Property and any and all sidewalks, alleys and strips of land adjacent to or used in connection with the Property.

2.3.    Water, Air and Mineral Rights.    All of the lands, tenements, privileges, reversions, remainders, irrigation and water rights and stock, air rights, oil and gas rights, royalties, minerals and mineral rights, hereditaments and appurtenances belonging or in any way pertaining to the Property, including without limitation, all wells, canals, ditches and reservoirs of any nature and all rights thereto, appurtenant to or associated with the Land, whether decreed or undecreed, tributary or non-tributary, surface or underground, appropriated or unappropriated, together with all water stock relating to the Property, all shares of stock or other evidence of ownership of any part of the Property that is owned by Mortgagor in common with others, all documents of membership in any owners' or members' association or similar group having responsibility for managing or operating any part of the Property, and all rights as declarant under any such documents, and all well permits, water service contracts, drainage rights and other evidences of any such rights.

2.4.    Leases and Rents.    All rents, issues and profits of the Collateral, all existing and future leases of the Collateral (including extensions, renewals and subleases) all agreements for use and occupancy of the Property or other Collateral (all such leases and agreements whether written or oral, are hereafter referred to as the "***Leases***"), and all guaranties of lessees' performance under the Leases, together with the immediate and continuing right to collect and receive all of the rents, income, receipts, revenues, issues, profits and other income of any nature now or hereafter due (including any income of any nature coming due during any redemption period) under the Leases or from or arising out of the Property or other Collateral including minimum rents, additional rents, percentage rents, parking or common area maintenance contributions, tax and insurance contributions, deficiency rents, liquidated damages following default in any Lease, all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability caused by destruction or damage to the Property or other Collateral, all proceeds payable as a result of a lessee's exercise of an option to purchase the Property or other Collateral, all proceeds derived from the termination or rejection of any Lease in a bankruptcy or other insolvency proceeding, and all proceeds from any rights and claims of any kind which Mortgagor may have against any lessee under the Leases or any occupants of the Property (all of the above are hereafter collectively referred to as the "***Rents***").

2.5.    Rights and Proceeds.    All compensation, awards, damages, rights of action, warranties, and proceeds (including insurance proceeds and any interest on any of the foregoing) arising out of or relating to a taking or damaging of the Collateral by reason of any public or

3

24-01421-FPC11    Doc 151-10    Filed 10/09/24    Entered 10/09/24 17:19:38    Pg 55 of 85

private improvement, condemnation proceeding (including change of grade), fire, earthquake or other casualty, injury or decrease in the value of the Collateral.

2.6.   <u>Insurance; Taxes</u>.   All insurance policies and returned premiums or other payments on any insurance policies pertaining to the Collateral and any refunds or rebates of taxes or assessments on the Collateral.

2.7.   <u>Plans, Specifications and Contracts; Construction Materials</u>.   All plans, specifications, contracts, agreements and purchase orders pertaining or incidental to the design or construction of any improvements on the Property, Mortgagor's rights under any payment, performance, or other bond in connection with construction of improvements on the Property, including but not limited to all site plans, plats, architectural plans, specifications, work drawings, surveys engineering reports, test borings, market surveys, and other similar work products; and all construction materials, supplies, and equipment delivered to the Property or intended to be used in connection with the construction of improvements on the Property wherever actually located.

2.8.   <u>Other Contracts</u>.   All contracts and agreements pertaining to or affecting the Collateral, including management, operating and franchise agreements and licenses.

2.9.   <u>Development Rights</u>.   All general intangibles, licenses, permits or approvals, zoning rights and other similar rights or interests which relate to the development, use or operation of, or that benefit or are appurtenant to the Property or any improvements thereon, including but not limited to (i) all assignable privately-created or governmentally-created development rights in and to the Property, (ii) all assignable rights, as a result of any governmental decision involving the Property, to transfer "development rights" in the Property to other real property, any "density transfer" entitlements, or similar land use entitlement related directly to the Property, and (iii) all assignable government licenses, permits or approvals relating to construction on the Property.

2.10.   <u>Declarant Rights</u>.   All rights as declarant (including, but not limited to, any reservation of development rights by declarant) under any declaration of covenants, conditions and restrictions or condominium or planned unit development declaration (or similar instrument, whether recorded or unrecorded) which may now or hereafter encumber or purport to affect use of the Property or improvements or the conduct of owners of any of the Property or improvements with respect to said use.

2.11.   <u>Names</u>.   All names under or by which the Property or any of the improvements may at any time be operated or known and all rights to carry on business under any such names or any variant thereof, and all trademarks and good will in any way relating to the Property or improvements.

4

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

2.12.   Reserves, Deposits and Unadvanced Funds.   All reserves, deferred payments, deposits, unadvanced loan funds, refunds, cost savings and payments of any kind relating to the construction of any improvements on the Land, together with all bank or securities accounts or other repositories of any such amounts and all funds contained therein.

2.13.   Additions and Replacements.   All additions, accessions, replacements, substitutions, proceeds and products of the property described in this Paragraph 2 and of any of the Collateral which is personal property.

For the avoidance of doubt, and notwithstanding anything to the contrary contained herein, the term, "Collateral," shall not include any of Mortgagor's right, title and interest in tangible personal property.

3.   Obligations Secured.   This Mortgage is for the purpose of securing the following obligations (the "*Obligations*"):

3.1.   x0613 Note.   Payment to Mortgagee of all sums at any time owing and performance of all other obligations arising under or in connection with that certain Promissory Note dated as of December 10, 2020 (as amended, restated or otherwise modified from time to time, the "*x0613 Note*"), executed by Creative Technologies, L.L.C., a Washington limited liability company ("*Creative*"), and payable to Mortgagee or its order, in the stated principal amount of Twenty-One Million Dollars ($21,000,000.00), with interest as provided therein, together with the payment and performance of any other indebtedness or obligations incurred in connection with the loan evidenced by the x0613 Note, whether or not specifically referenced therein and whenever arising.

3.2.   x0678 Note.   Payment to Mortgagee of all sums at any time owing and performance of all other obligations arising under or in connection with that certain Promissory Note dated as of March 12, 2021 (as amended, restated or otherwise modified from time to time, the "*x0678 Note*"), executed by Ideal Property Investments, LLC, a Washington limited liability company ("*Ideal*"), and payable to Mortgagee or its order, in the stated principal amount of Two Million Sixty-Two Thousand Five Hundred Dollars ($2,062,500.00), with interest as provided therein, together with the payment and performance of any other indebtedness or obligations incurred in connection with the loan evidenced by the x0678 Note, whether or not specifically referenced therein and whenever arising.

3.3.   x0759 Note.   Payment to Mortgagee of all sums at any time owing and performance of all other obligations arising under or in connection with that certain Promissory Note dated as of May 24, 2021 (as amended, restated or otherwise modified from time to time, the "*x0759 Note*"), executed by 8825, LLC, a Wyoming limited liability company ("*8825*"), and payable to Mortgagee or its order, in the stated principal amount of Three Million Six Hundred Seventy-Five Thousand Dollars ($3,675,000.00), with interest as provided therein, together with the payment and performance of any other indebtedness or obligations incurred in connection

5

with the loan evidenced by the x0759 Note, whether or not specifically referenced therein and whenever arising.

3.4. <u>x0858 Note</u>. Payment to Mortgagee of all sums at any time owing and performance of all other obligations arising under or in connection with that certain Promissory Note dated as of September 7, 2021 (as amended, restated or otherwise modified from time to time, the "***x0858 Note***"), executed by Ideal and payable to Mortgagee or its order, in the stated principal amount of Four Million Nine Hundred Eighty Thousand Dollars ($4,980,000.00), with interest as provided therein, together with the payment and performance of any other indebtedness or obligations incurred in connection with the loan evidenced by the x0858 Note, whether or not specifically referenced therein and whenever arising.

3.5. <u>WSM Agreement</u>. Any obligation (including any indemnity obligation), or liability, whether liquidated or unliquidated, defined, contingent, conditional or of any other nature whatsoever, and performance of all other obligations, arising under or in connection with that certain Credit Enhancement and Referral Agreement dated as of August 30, 2021 (as amended, restated or otherwise modified from time to time, the "***WSM Agreement***"), by and between Water Station Management, LLC a Washington limited lability company ("***WSM***"), and Mortgagee, together with the payment and performance of any other indebtedness or obligations incurred in connection with the WSM Agreement, whether or not specifically referenced therein and whenever arising.

3.6. <u>Mortgagor's Obligations under Mortgage</u>. Payment and performance of all obligations of Mortgagor under this Mortgage, together with all advances, payments or other expenditures made by Mortgagee as or for the payment or performance of any such obligations of Mortgagor.

3.7. <u>Additional Sums</u>. Payment of any further sums advanced or loaned by Mortgagee to or on behalf of any Obligor or Mortgagor, or any of its successors or assigns, if (i) the Credit Documents or other writing evidencing the future advance or loan specifically states that it is secured by this Mortgage, or (ii) the advance, including costs and expenses incurred by Mortgagee or sums advanced in protection of the Collateral or Mortgagee's lien on such Collateral, is made pursuant to this Mortgage or any other documents executed by any Obligor evidencing, securing, or relating to the Credit Documents, any indebtedness secured hereby and/or the Collateral, whether executed prior to, contemporaneously with, or subsequent to this Mortgage, together with interest thereon at the rate set forth in the Credit Documents or agreed to in writing.

3.8. <u>Performance</u>. Payment and performance of each agreement, term and condition set forth or incorporated by reference in the Credit Documents, which are incorporated herein by reference or contained herein and payment of all amounts payable thereunder.

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

24-01421-FPC11    Doc 151-10    Filed 10/09/24    Entered 10/09/24 17:19:38    Pg 58 of 85

3.9.     Related Agreements.  Any obligation or indebtedness owing under any formal forbearance agreement, credit accommodation and enhancement agreement, or similar agreements executed by Mortgagee in connection with the foregoing ("***Related Agreements***").

3.10.    Modifications and Extensions.  All modifications, extensions and renewals of any of the foregoing including, without limitation, modifications, amendments and restatements, extensions or renewals, however evidenced, whether or not any such modification, restatement, extension or renewal is evidenced by a new or additional promissory note or notes.

4.     Performance of Obligations; Payments.  Obligors shall promptly and timely pay all Obligations or sums advanced by or owing to Mortgagee and due pursuant to the Credit Documents or Related Agreements, and Obligors shall strictly comply with all the terms and conditions of the Credit Documents and Related Agreements.  If Mortgagee commences the enforcement of any right, power, or remedy, whether afforded under this Mortgage or otherwise, and including without limitation foreclosure or entry upon the Property, and such enforcement is then discontinued or abandoned for any reason, or is determined adversely to Mortgagee, then and in every such case Mortgagor and Mortgagee shall be restored to their former positions and rights hereunder, without waiver of any Event of Default and without novation, and all rights, powers, and remedies of Mortgagee shall continue as if no such enforcement had been commenced, and Mortgagor and Obligors each promises to pay Mortgagee all costs incurred by Mortgagee, including without limitation the cost of title and attorney's fees and costs, in the course of said proceedings to the date of curing said defaults, and the parties agree that payment thereof by Obligors or Mortgagor shall be a condition precedent to the discontinuance of said enforcement of any right, power, or remedy.

Without limiting the generality of the foregoing, unless payments are made in the required amount in immediately available funds at the place where the Obligations are payable, remittances in payment of all or any part of the Obligations shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Mortgagee in funds immediately available at the place where the Obligations are payable (or any other place as Mortgagee, in Mortgagee's sole discretion, may have established by delivery of written notice thereof to Obligors) and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks.  Acceptance by Mortgagee of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to an Event of Default (defined below).

5.     Security Agreement.

5.1.     Grant of Security Interest.  With respect to any portion of the Collateral which constitutes personal property governed by the Uniform Commercial Code of the state in which the Collateral is located (the "***Code***"), this Mortgage shall constitute a security agreement between Mortgagor as Debtor and Mortgagee as Secured Party, and Mortgagor hereby grants to

7

Mortgagee a security interest in such portion of the Collateral. Cumulative with all other rights of Mortgagee hereunder, Mortgagee shall have all of the rights conferred upon secured parties by the Code.

5.2. <u>Rights of Mortgagee</u>. Mortgagee may exercise any or all of the remedies of a secured party available to it under the Code with respect to personal property Collateral, and it is expressly agreed that if upon default Mortgagee shall proceed to dispose of such Collateral in accordance with the provisions of the Code, ten (10) days' written notice by Mortgagee to Mortgagor shall be deemed to be reasonable notice under any provision of the Code requiring such notice; provided, however, that Mortgagee may at its option dispose of such property in accordance with Mortgagee's rights and remedies with respect to the real property pursuant to the provision of this Mortgage in lieu of proceeding under the Code.

5.3. <u>Change in Mortgagor's Name</u>. Mortgagor shall give advance notice in writing to Mortgagee of any proposed change in Mortgagor's name, identity, corporate structure or place of formation, and shall execute and deliver to Mortgagee, prior to or concurrently with the occurrence of any such change, all additional financing statements that Mortgagee may require to establish and maintain the validity and priority of Mortgagee's security interest with respect to any Collateral described or referred to herein.

6. <u>Warranties</u>.

6.1. <u>Title</u>. Mortgagor warrants good and marketable title to an indefeasible fee simple estate in the Property and other real property Collateral and good marketable title to all personal property Collateral identified in Paragraph 2 above, in each case free and clear of liens, encumbrances, security interests, claims or defects of any kind, except those listed on <u>Exhibit B</u> attached hereto and incorporated by this reference as Schedule "B" (the "***Permitted Liens***") and real estate taxes for the current year. The Permitted Liens and the real estate taxes are not delinquent or in default. Mortgagor warrants the right to convey the Property and other real property Collateral to and for the benefit of Mortgagee, and the right to grant a security interest for the benefit of Mortgagee in any of the Collateral. Mortgagor will warrant and defend title to the Collateral and will defend the validity and priority of the lien of this Mortgage and the security interest granted herein against any claims or demands.

6.2. <u>Use of Property</u>. The Property is not used principally, or at all, for agricultural purposes.

6.3. <u>Commercial Purpose</u>. The Obligations secured by this Mortgage are primarily for commercial, industrial or business purposes and are not primarily for personal, family or household purposes.

8

6.4. <u>No Defect</u>. The Collateral is free from damage and no matter has come to Mortgagor's attention (including, but not limited to, knowledge of any construction defects or nonconforming work) that would materially impair the value of the Collateral as security.

6.5. <u>No Prior Work</u>. No work of any nature whatsoever has or will be commenced on the Property or materials delivered to the site prior to the recordation of this Mortgage unless each person or entity performing such work or providing such materials has provided to Mortgagee unconditional lien releases effective through the time of recordation of the Mortgage for such work or materials, such releases to be in form and substance satisfactory to Mortgagee in its sole discretion.

7. <u>Liens; Payments</u>.

7.1. <u>Prohibited Liens</u>. Mortgagor will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property, and shall not permit (or shall promptly discharge) any governmental or statutory liens (including tax and mechanics' and materialmen's liens) to be filed against the Collateral except for real estate taxes and assessments not yet due and liens permitted by the Credit Documents or approved by Mortgagee in writing.

7.2. <u>Payment of Taxes and Other Encumbrances</u>. Mortgagor shall pay the real estate taxes and any assessments, water rates, sewer rents, governmental impositions, ground rents, maintenance charges and similar charges, now or hereafter levied or assessed or imposed against the Property or any part thereof at least seven (7) days prior to delinquency unless otherwise provided for in a reserve account held by Mortgagee for such purpose. All other encumbrances, charges and liens affecting the Collateral, including mortgages and deeds of trust, whether prior to or subordinate to the lien of this Mortgage, shall be paid when due and shall not be in default. On request, Mortgagor shall furnish evidence of payment of these items.

8. <u>Maintenance; No Waste</u>. Mortgagor shall protect and preserve the Collateral and maintain it in a good and safe condition and repair. Mortgagor shall do all acts and take all precautions which, from the character and use of the Collateral, are reasonable, proper or necessary. Mortgagor shall not commit or permit any waste of the Collateral or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any insurance policy, or do or permit to be done thereon anything that may in any way impair the value of the Collateral or the security of this Mortgage. Mortgagor will not, without the prior written consent of Mortgagee, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

9

9.     <u>Alterations, Removal and Demolition</u>. Mortgagor shall not structurally alter, remove or demolish any building or improvement on the Land without Mortgagee's prior written consent. Mortgagor shall not remove any fixture or other item or property which is part of the Collateral without Mortgagee's prior written consent unless the fixture or item of property is replaced by an article of equal suitability owned by Mortgagor free and clear of any lien or security interest.

10.    <u>Completion, Repair and Restoration</u>. Mortgagor shall promptly repair, replace, restore or rebuild in good workmanlike manner any part of the Collateral which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Paragraph 18 hereof, and shall complete and pay for any structure at any time in the process of construction or repair on the Land. Prior to commencement of any construction Mortgagor shall submit the plans and specifications for Mortgagee's approval and furnish evidence of sufficient funds to complete the work.

11.    <u>Compliance with Laws</u>. Mortgagor shall comply with all laws, ordinances, regulations, covenants, conditions, and restrictions affecting the Collateral ("***Applicable Laws***") and shall not commit or permit any act upon or concerning the Collateral in violation of any such Applicable Laws. Mortgagor shall give prompt notice to Mortgagee of the receipt by Mortgagor of any notice related to a violation of any Applicable Laws and of the commencement of any proceedings or investigations which relate to compliance with Applicable Laws.

12.    <u>Impairment of Collateral</u>. Mortgagor shall not, without Mortgagee's prior written consent, change the general nature of the occupancy of the Property, initiate, acquire or permit any change in any public or private restrictions (including a zoning reclassification) limiting or defining the uses which may be made of the Property or any part thereof which may have a material adverse effect on the use, operation or value of the Property, or take or permit any action which would impair the Collateral or Mortgagee's lien or security interest in the Collateral. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Mortgagor will not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Mortgagee.

13.    <u>Inspection of Collateral</u>. Mortgagee and/or its representative may inspect the Collateral at reasonable times after reasonable notice.

14.    <u>Protection of Collateral.</u>

    14.1.   <u>Mortgagor's Defense of Collateral</u>. Mortgagor shall appear in and defend any action or proceeding which may affect the Collateral or the rights of powers of Mortgagee.

    14.2.   <u>Mortgagee's Right to Protect Collateral.</u> Mortgagee may commence, appear in, and defend any action or proceeding which may affect the Collateral or the rights or powers of Mortgagee. Mortgagee may pay, purchase, or compromise any encumbrance, charge or lien which in its judgment appears to be prior to or superior to the lien of this Mortgage. If any

10

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

Obligor fails to make any payment or do any act required under the Credit Documents, Mortgagee, without any obligation to do so, without notice to or demand upon Obligors and without releasing Obligors from any obligations under the Credit Documents, may make the payment or cause the act to be performed in such manner and to such extent as Mortgagee may deem necessary to protect the Collateral. Mortgagee is authorized to enter upon the Property for such purposes. In exercising any of these powers, Mortgagee may incur such expenses, in its absolute discretion, it deems necessary. Mortgagee shall be empowered under this paragraph to make advances to incur costs and expenses for inspecting the premises periodically, keeping the premises in good repair and protecting the premises from loss, waste, damage or injury. Mortgagee, shall be the sole and conclusive judge of the need for any advances made or expenses incurred under the terms of this paragraph. The amount of any advances made or expenses incurred hereunder shall be added to the indebtedness secured hereby and may be recovered in full, together with interest thereon at the maximum legal rate, by Mortgagee.

15. <u>Repayment of Mortgagee's Expenditures</u>. Mortgagor shall pay within ten (10) days after written notice from Mortgagee all sums expended by Mortgagee and all costs and expenses incurred by Mortgagee in taking any actions pursuant to this Mortgage and the other Credit Documents, including Attorneys' Fees and Costs, accountants' fees, appraisal and inspection fees, and the costs for title reports. Expenditures by Mortgagee shall bear interest from the date of such advance or expenditure at the default rate set out in any of the Credit Documents until paid, shall constitute advances made under this Mortgage, and shall be secured by and have the same priority as the lien of this Mortgage. If Mortgagor fails to pay any such expenditures, costs and expenses and interest thereon, Mortgagee may, at its option, without foreclosing the lien of this Mortgage, commence an independent action against Mortgagor for the recovery of the expenditures and/or advance any undisbursed loan proceeds to pay the expenditures.

16. <u>Due on Sale or Transfer</u>. If the Property or any part thereof is sold, conveyed, transferred, encumbered, or full possessory rights therein transferred, or if more than a 25% interest in Mortgagor (if a corporation, limited liability company or a limited liability partnership), a general partner's interest in Mortgagor (whether a general partnership or a limited partnership) or a majority interest of the total of limited partners' interests in a limited partnership, is sold, conveyed, transferred or encumbered, without the prior written consent of Mortgagee, then Mortgagee may declare all sums secured by this Mortgage immediately due and payable. This provision shall apply to each and every sale, transfer, conveyance or encumbrance regardless of whether or not Mortgagee has consented or waived its rights, whether by action or non-action, in connection with any previous sale, transfer, conveyance or encumbrance, whether one or more.

17. <u>Insurance</u>.

17.1. <u>General</u>. Mortgagor shall maintain insurance on the Property (with premiums prepaid) providing replacement cost coverage and insuring against loss by fire and such other risks covered by extended coverage insurance, flood, and such other perils and risks, including

11

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

earthquake, loss of rents and business interruption. Mortgagor shall also maintain comprehensive general public liability insurance. All insurance shall be with companies satisfactory to Mortgagee and in such amounts as required by Mortgagee with lender's loss payable clauses and endorsements and additional insured endorsements in favor of and in form satisfactory to Mortgagee. At least thirty (30) days prior to the expiration of the term of any insurance policy, Mortgagor shall furnish Mortgagee with written evidence of renewal or issuance of a satisfactory replacement policy. If requested, Mortgagor shall deliver copies of all policies to Mortgagee.

17.2. <u>Effect of Foreclosure</u>. In the event of foreclosure of this Mortgage, all interest of Mortgagor in any insurance policies pertaining to the Collateral and in any claims against the policies and in any proceeds due under the policies shall pass to Mortgagee.

17.3. <u>Effect of Lease</u>. If under the terms of any Lease (as defined herein), the lessee is required to maintain insurance of the type required by the Credit Documents and if the insurance is maintained for the benefit of both the lessor and Mortgagee, then Mortgagee will accept such policies provided all of the requirements of Mortgagee and the Credit Documents are met. In the event the lessee fails to maintain such insurance, Mortgagor shall promptly obtain such policies as are required by the Credit Documents.

18. <u>Condemnation and Insurance Proceeds</u>. Mortgagor shall give immediate notice to Mortgagee of any condemnation proceeding (including change of grade), or loss or damage to the Collateral or any right therein, and shall deliver to Mortgagee copies of any and all papers served in connection with such proceedings or documenting such loss or damage. Mortgagor authorizes Mortgagee, at Mortgagee's option, to make a claim for and to enter into a compromise or settlement with respect to any proceeds payable as a result of condemnation, loss or damage. Subject to the rights of any holder of a senior Permitted Lien, all proceeds payable as a result of a condemnation, loss or damage shall be paid to Mortgagee to pay down principal of the Obligations secured hereby in such order and amounts as Mortgagee in its sole discretion may choose.

19. <u>Reserve Account</u>.

19.1. <u>Nature of Reserve</u>. At Mortgagee's request after an Event of Default, and only if Mortgagor has not funded a reserve with any holder of a senior Permitted Lien, Mortgagor shall pay to Mortgagee monthly, together with and in addition to any payments due under the Credit Documents, a sum, as estimated by Mortgagee, equal to the real estate taxes and assessments next due on the Property and the premiums next due on insurance policies required under the Credit Documents, less all sums already paid therefor, divided by the number of months to elapse before two (2) months prior to the date when the real estate taxes, assessments and insurance premiums will become delinquent. The monthly reserve account payments and any payments due under the Credit Documents shall be paid in a single payment and applied by Mortgagee in the following order: (i) real estate taxes, assessments and insurance premiums;

12

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

(ii) expenditures made pursuant to this Mortgage and interest thereon; (iii) late charges or service charges, if any, as provided for in the Credit Documents; (iv) interest accruing pursuant to the Credit Documents; and (v) principal due under the Credit Documents. Without limiting the foregoing and whether or not such reserve account is required, Mortgagor shall promptly deliver to Mortgagee all bills and notices pertaining to the ground rents, taxes, assessments and insurance premiums; provided, however, Mortgagee may apply the reserve to the Obligations following an Event of Default.

19.2.  <u>Effect of Reserve</u>.  The reserve account is solely for the protection of Mortgagee. Mortgagee shall have no responsibility except to credit properly the sums actually received by it. No interest will be paid on the funds in the reserve account and Mortgagee shall have no obligation to deposit the funds in an interest-bearing account. Upon assignment of this Mortgage by Mortgagee, any funds in the reserve account shall be turned over to the assignee and any responsibility of Mortgagee with respect thereto shall terminate. Each transfer of the Property shall automatically transfer to the grantee all rights to any funds in the reserve account.

19.3.  <u>Excess or Insufficient Reserve</u>.  If the total of the payments to the reserve account exceeds the amount of payments actually made by Mortgagee, plus such amounts as have been reasonably accumulated in the reserve account toward payments to become due, such excess may be (i) credited by Mortgagee against sums then due and payable under the Credit Documents or (ii) refunded to Mortgagor as appears on the records of Mortgagee. If, however, the reserve account does not have sufficient funds to make the payments when they become due, Mortgagor shall pay to Mortgagee the amount necessary to make up the deficiency within fifteen (15) days after written notice to Mortgagor. If this Mortgage is foreclosed or if Mortgagee otherwise acquires the Property, Mortgagee shall, at the time of commencement of the proceedings or at the time the Property is otherwise acquired, apply the remaining funds in the reserve account, less such sums as will become due during the pendency of the proceedings, against the sums due under the Credit Documents and/or to make payments required under the Credit Documents.

20.  <u>Assignment of Leases and Rents</u>.  Mortgagor hereby absolutely and unconditionally assigns to Mortgagee all of Mortgagor's right, title and interest in and to all current and future Leases and Rents, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only; provided that the assignment hereunder shall be subject and subordinate to any senior Permitted Lien. This assignment to Mortgagee shall not be construed to bind Mortgagee to the performance of any of the covenants, conditions or provisions contained in any such Lease or otherwise impose any obligation upon Mortgagee. Mortgagor agrees to execute and deliver to Mortgagee such additional instruments, in form and substance satisfactory to Mortgagee, as may hereafter be requested by Mortgagee to further evidence and confirm such assignment.

20.1.  <u>Collection of Rents</u>.  Notwithstanding the foregoing, subject to the terms of this Paragraph 20, Mortgagee grants to Mortgagor a revocable license to operate and manage the Property and to collect the Rents, subject to the rights of any holder of a senior Permitted Lien.

13

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

Upon an Event of Default, without the need for notice or demand, the license granted to Mortgagor herein shall automatically be revoked, and Mortgagee shall immediately be entitled to possession of all Rents, whether or not Mortgagee enters upon or takes control of the Property, subject to the rights of any holder of a senior Permitted Lien. Mortgagee is hereby granted and assigned by Mortgagor the right, at its option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of the license may be applied toward payment of the Obligations in such priority and proportions as Mortgagee in its sole discretion shall deem proper, subject to the rights of any holder of a senior Permitted Lien. Mortgagor's right to collect the Rents shall not constitute Mortgagee's consent to the use of cash collateral in any bankruptcy proceeding.

20.2.  <u>Compliance with Leases</u>.  Mortgagor shall fully comply with all of the terms, conditions and provisions of the Leases so that the same shall not become in default and do all that is necessary to preserve all said Leases in force. With respect to any Lease as to all or any part of the Property involving an initial term of three years or more, Mortgagor shall not, without the prior written consent of Mortgagee, (a) permit assignment or subletting of all or part of the lessee's rights under the Lease unless the right to assign or sublet is expressly reserved by the lessee under the Lease, (b) modify or amend the Lease for a lesser rental or term, (c) accept surrender of the Lease or terminate the Lease except in accordance with the terms of the Lease providing for termination in the event of a default, (d) collect any of the Rents more than one (1) month in advance, and (e) convey or transfer or suffer or permit a conveyance or transfer of the Property or of any interest therein so as to effect a merger of the estates and rights, or a termination or diminution of the obligations of, tenants under the Leases. Any proceeds or damages resulting from a lessee's default under any such Lease, at Mortgagee's option, shall be paid to Mortgagee and applied against sums owed under the Credit Documents even though such sums may not be due and payable. Except for real estate taxes and assessments not yet due, Mortgagor shall not permit any lien to be created against the Property which may be or may become prior to any Lease. If the Property is partially condemned or suffers a casualty, Mortgagor shall promptly repair and restore the Property in order to comply with the Leases.

20.3.  <u>Ownership of Leases and Rents</u>.  As an ongoing representation, Mortgagor represents to Mortgagee that (a) except as otherwise provided herein, Mortgagor is the sole owner of the entire lessor's interest in the Leases; (b) the Leases are valid and enforceable; (c) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated, except to any holder of a senior Permitted Lien; (d) none of the Rents have been collected for more than one (1) month in advance; (e) there exist no offsets or defenses to the payment of any portion of the Rents.

20.4.  <u>Mortgagee's Right to Collect Rents</u>.  If any Obligor is in default under the Credit Documents, and such default is not subject to forbearance under the Related Agreements, without notice to Mortgagor, Mortgagee or its agents, or a court appointed receiver, may collect the Rents and Leases, subject to the rights of any holder of a senior Permitted Lien. In doing so,

14

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

Mortgagee may (a) evict lessees for nonpayment of rent, (b) terminate in any lawful manner any tenancy or occupancy, (c) lease the Property in the name of the then owner on such terms as it may deem best and (d) institute proceedings against any lessee for past due rent. The Rents and Leases received shall be applied to payment of the costs and expenses of collecting the Rents and Leases, including a reasonable fee to Mortgagee, a receiver or an agent, operating expenses for the Property and any sums due or payments required under the Credit Documents, in such order as anticipated to become due which exceed the anticipated future Rents and Leases, subject to the rights of any holder of a senior Permitted Lien. Mortgagee's failure to collect or discontinuing collection at any time shall not in any manner affect the subsequent enforcement by Mortgagee of its rights to collect the Rents and Leases. The collection of the Rents and Leases shall not cure or waive any default under the Credit Documents. Mortgagee or a receiver shall have no obligation to perform any of Mortgagor's obligations under the Leases. In exercising its rights under this section Mortgagee shall be liable only for the proper application of and accounting for the Rents and Leases collected by Mortgagee or its agents. Any Rents and Leases paid to Mortgagee or a receiver shall be credited against the amount due from the lessee under the Lease.

21. No Mortgagee Obligations; Reliance.

    21.1. No Undertaking. Notwithstanding any of the provisions of this Mortgage, Mortgagee is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents related to the Collateral.

    21.2. No Mortgagee Representation. By accepting or approving anything required to be observed, performed or fulfilled or to be given to Mortgagee pursuant to this Mortgage or the Credit Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Mortgagee shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Mortgagee.

22. Additional Security Documents. Mortgagor shall within fifteen (15) days after request by Mortgagee execute and deliver any financing statement, renewal, affidavit, certificate, continuation statement, or other document Mortgagee may request in order to perfect, preserve, continue, extend, or maintain security interests or liens previously granted and the priority of the security interests or liens. Mortgagor shall pay all costs and expenses incurred by Mortgagee in connection with the preparation, execution, recording, filing, and refiling of any such document.

23. Tenants' Estoppel Certificates. Upon Mortgagee's request, Mortgagor shall use best efforts to deliver to Mortgagee, promptly upon request, duly executed estoppel certificates from any one or more commercial lessees as required by Mortgagee attesting to such facts regarding the Lease as Mortgagee may require, including but not limited to attestations that each Lease

<div align="center">15</div>

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

covered thereby is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, and that the lessee claims no defense or offset against the full and timely performance of its obligations under the Lease.

24. Default; Remedies.

24.1. Default. Any Mortgagor's or Obligor's failure to comply with any term or condition of this Mortgage, the other Credit Documents, or the Related Agreements, including payments due under the Credit Documents, shall constitute an "***Event of Default***" hereunder, subject to any forbearance provided in the Related Agreements, including but not limited to each of the following:

(a) Mortgagor, Obligors, or any other person or entity liable therefor shall fail to pay when due any indebtedness secured hereby;

(b) Mortgagor or any other signatory thereto shall default in the performance of any covenant or agreement contained in this Mortgage, the Credit Documents (subject to any forbearance provided in the Related Agreements), the Related Agreements, or any other agreement evidencing or securing the Obligations;

(c) Obligors, or any other person or entity liable for the repayment of the Obligations, shall become unable or admit in writing its inability to pay its debts as they mature, or file, or have filed against it, a voluntary or involuntary petition in bankruptcy or receivership, or make a general assignment for the benefit of creditors, or be adjudicated bankrupt or insolvent;

(d) Any other Event of Default under the Credit Documents (that is not subject to forbearance under any Related Agreement) or Related Agreements; or

(e) Any default under any Permitted Lien or obligation secured thereby.

Without limiting the generality of the foregoing, any express cure provisions or deferrals of the same Event of Default contained in any such Credit Documents or Related Agreements shall apply herein; provided that nothing contained herein shall allow multiple cure periods or deferrals of the same Event of Default.

24.2. Mortgagee's Right to Perform. Upon the occurrence of any Event of Default, Mortgagee, but without the obligation so to do and without notice to or demand upon Mortgagor and without releasing Mortgagor from any obligations hereunder, may: (i) make any payments or do any acts required of Mortgagor hereunder in such manner and to such extent as either may deem necessary to protect the security hereof, Mortgagee being authorized to enter upon the Property for such purposes; (ii) commence, appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Mortgagee; (iii) pay, purchase,

16

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

contest or compromise any encumbrance, charge or lien in accordance with the following paragraph; and (iv) in exercising any such powers, pay necessary expenses, employ counsel and pay a reasonable fee therefor. All sums so expended shall be payable on demand by Mortgagor, and be secured hereby, except that advances may not be made under this Mortgage to cure any default under any environmental indemnity, and bear interest at the default rate specified in the Credit Documents from the date advanced or expended until repaid.

Mortgagee in making any payment herein and hereby authorized, in the place and stead of Mortgagor, in the case of a payment of taxes, assessments, water rates, sewer rentals and other governmental or municipal charges, fines, impositions or liens asserted against the Property, may make such payment in reliance on any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of the bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof; in the case of any apparent or threatened adverse claim of title, lien, statement of lien, encumbrance, mortgage, claim or charge Mortgagee shall be the sole judge of the legality or validity of same; and in the case of a payment for any other purpose herein and hereby authorized, but not enumerated in this paragraph, such payment may be made whenever, in the sole judgment and discretion of Mortgagee, such advance or advances shall seem necessary or desirable to protect the full security intended to be created by this instrument; provided further, that in connection with any such advance, Mortgagee at its option may and is hereby authorized to obtain a continuation report of title prepared by a title insurance company, the cost and expenses of which shall be repayable by Mortgagor without demand and shall be secured hereby.

24.3.   <u>Remedies</u>.  If an Event of Default occurs, Mortgagee may exercise its rights and remedies under the Credit Documents, Related Agreements and applicable law at such time and in such order as Mortgagee may determine, in its sole discretion, including but not limited to the following:   (a) declare the entire unpaid Obligations to be immediately due and payable; (b) institute proceedings, judicial or otherwise, for the foreclosure of this Mortgage under any applicable provision of law, in which case the Collateral or any part thereof or interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner, or take any other action as may be allowed, at law or in equity, for the enforcement of the Obligations and realization on the Property (or such part or parts thereof as Mortgagee may from time to time elect to foreclose upon) or any other security afforded by the Credit Documents. Mortgagee may proceed to final judgment and execution for the amount of the indebtedness owed as of the date of the judgment, together with all costs of suit, reasonable Attorneys' Fees, and interest on the judgment at the maximum rate permitted by law from the date of the judgment until paid. If Mortgagee is the purchaser at the foreclosure sale of the Property, in lieu of paying cash Mortgagee may make settlement for all or a portion of the purchase price by crediting the net sale proceeds (after deducting costs expenses including reasonable Attorneys' Fees and expenses) against the Obligations; (c) sell for cash or upon credit the Collateral or any part thereof and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to all applicable law or otherwise, at one or more sales, as an entity or in parcels, at such time and place, upon such terms and after

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

24-01421-FPC11    Doc 151-10    Filed 10/09/24    Entered 10/09/24 17:19:38    Pg 69 of 85

such notice thereof as may be required or permitted by law; (d) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein or in the Credit Documents; (e) recover judgment on the Obligations either before, during or after any proceedings for the enforcement of this Mortgage or the Credit Documents; (f) apply for the appointment of a receiver, trustee, liquidator or conservator of the Collateral or any part thereof, without notice and without regard for the adequacy of the security for the Obligations and without regard for the solvency of Mortgagor or of any person, firm or other entity liable for the payment of the Obligations; (g) subject to any applicable law and the rights of any holder of a senior Permitted Lien, the license granted to Mortgagor under Paragraph 20 shall automatically be revoked and Mortgagee may enter into or upon and take possession of the Property, with or without the appointment of a receiver, or an application therefore, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Mortgagor and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Mortgagor agrees to surrender possession of the Property and of such books, records and accounts to Mortgagee upon demand, and thereupon Mortgagee may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property or improvements thereon and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Mortgagee deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Mortgagor with respect to the Property or any improvements, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents and improvements and every part thereof; (v) require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property and improvements or Collateral as may be occupied by Mortgagor; (vi) require Mortgagor to vacate and surrender possession of the Property to Mortgagee or to such receiver and, in default thereof, Mortgagor may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property and improvements and Collateral to the payment of the Obligations, in such order, priority and proportions as Mortgagee shall deem appropriate in its sole discretion after deducting therefrom all expenses (including Attorneys' Fees and Costs) incurred in connection with the aforesaid operations and all amounts necessary to pay the taxes, other charges, insurance and other expenses in connection with the Collateral, as well as just and reasonable compensation for the services of Mortgagee, its counsel, agents and employees; (h) exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (1) the right to take possession of the personal property Collateral or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of such Collateral, and (2) request Mortgagor, at its expense, to assemble the personal property Collateral and make it available to Mortgagee at a convenient place acceptable to Mortgagee; (i) surrender the insurance policies maintained pursuant to the Credit Documents, collect the unearned insurance premiums and apply such sums as a credit on the Obligations in such priority and

18

proportion as Mortgagee in its discretion shall deem proper, and in connection therewith, Mortgagor hereby appoints Mortgagee as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Mortgagor to collect such insurance premiums; (j) pursue such other remedies as Mortgagee may have under applicable law; and/or (k) under applicable law, Mortgagee shall have the discretionary right to cause some or all of the Collateral, including any personal property, to be sold or otherwise disposed of in any combination and in any manner permitted by applicable law.

Without limiting the generality of the foregoing, Mortgagee shall have the right, at its option, to foreclose this Mortgage subject to the rights of any lessees of the Property. Mortgagee's failure to foreclose against any lessee shall not be asserted as a claim against Mortgagee or as a defense against any claim by Mortgagee in any action or proceeding. Mortgagee at any time may subordinate this Mortgage to any and all of the Leases, except that Mortgagee shall retain its priority claim to any condemnation or insurance proceeds.

24.4.  No Waiver.  Mortgagee's exercise of any of its rights and remedies shall not constitute a waiver or cure of a default.  Mortgagee's failure to enforce any default shall not constitute a waiver of the Event of Default or any subsequent Event of Default.

24.5.  Fees and Costs.  In the event the Credit Documents are referred to an attorney for enforcement of Mortgagee's rights or remedies, whether or not suit is filed or any proceedings are commenced, Mortgagor shall pay all Mortgagee's costs and expenses (including Attorneys' Fees and Costs), accountants' fees, appraisal and inspection fees and cost of a title report.

25.  Cumulative Remedies.  All Mortgagee's rights and remedies specified in the Credit Documents are cumulative, not mutually exclusive and not in substitution for any rights or remedies available in law or equity.  In order to obtain performance of Obligors' obligations under the Credit Documents, without waiving its rights in the Collateral, Mortgagee may proceed against Mortgagor or may proceed against any other security or guaranty for the Obligations, in such order and manner as Mortgagee may elect.  The commencement of proceedings to enforce a particular remedy shall not preclude the discontinuance of the proceedings and the commencement of proceedings to enforce a different remedy.

26.  Release After Payment.  Upon Mortgagor's written request of Mortgagee stating that all obligations secured by this Mortgage have been paid and Mortgagee's confirmation of the same, Mortgagee shall release the Property then subject to the lien of this Mortgage.  The recitals in any release of any matters of fact shall be conclusive proof of the truthfulness thereof. Mortgagor shall pay any Mortgagee's fees or recording fees associated with the release.

27.  Release of Parties or Collateral.  Without affecting the obligations of any party due under the Credit Documents and without affecting the lien of this Mortgage and Mortgagee's security interest in the Collateral, Mortgagee may, without notice (a) release all or any Obligor and/or any other party now or hereafter liable for any sums due under the Credit Documents (including

19

24-01421-FPC11    Doc 151-10    Filed 10/09/24    Entered 10/09/24 17:19:38    Pg 71 of 85

guarantors, indemnitors or sureties), (b) release all or any part of the Collateral, (c) subordinate the lien of this Mortgage or Mortgagee's security interest in the Collateral, (d) take and/or release any other security or guarantees for sums due under the Credit Documents, (e) grant an extension of time or accelerate the time for performance of the obligations owed under the Credit Documents, including payment of the Obligations, (f) modify, waive, forbear, delay or fail to enforce any obligations owed under the Credit Documents, (g) sell or otherwise realize on any other security or guaranty prior to, contemporaneously with or subsequent to a sale of all or any part of the Collateral, (h) make advances pursuant to the Credit Documents, including advances in excess of the Obligations, (i) consent to the making of any map or plat of the Property, and (j) join in the grant of the subordinate lienholder. Mortgagor shall pay any attorneys' fees, title insurance or recording fees in connection with release of the Collateral, the making of a map or plat or the grant or reservation of an easement or boundary adjustment.

28.     Nonwaiver of Terms and Conditions. Time is of the essence with respect to performance of the obligations due under this Mortgage. Mortgagee's failure to require prompt enforcement of any required obligation shall not constitute a waiver of the obligation due or any subsequent required performance of the obligation. No term or condition of this Mortgage may be waived, modified or amended except by a written agreement signed by Mortgagor and Mortgagee. Any waiver of any term or condition of this Mortgage shall apply only to the time and occasion specified in the waiver and shall not constitute a waiver of the term or condition at any subsequent time or occasion.

29.     Right of Subrogation. Mortgagee is subrogated to the rights, whether legal or equitable, of all beneficiaries, mortgagees, lienholders and owners directly or indirectly paid off or satisfied in whole or in part by any proceeds advanced by Mortgagee under the Credit Documents, regardless of whether these parties assigned or released of record their rights or liens upon payment.

30.     Joint and Several Liability. If there is more than one Mortgagor of this Mortgage (i.e., more than one Mortgagor), their obligations shall be joint and several.

31.     Operating and Financial Statements. Mortgagee may require Mortgagor to deliver Mortgagor's financial statements and operating statements (in a form satisfactory to Mortgagee) covering the Property, including tenant lists and current rent schedule (if any) and the certified financial statements of each guarantor (in a form satisfactory to Mortgagee) as more fully set out in the Credit Documents. Mortgagor shall keep adequate books and records of account in accordance with methods acceptable to Mortgagee in its sole discretion, consistently applied. Without limiting the foregoing, Mortgagee or its authorized representative shall have access to the books and records of Mortgagor and obtain such statements at Mortgagor's expense if Mortgagor fails to provide them as herein set forth, or at any time at Mortgagee's option if Mortgagor is in default. Mortgagee shall have the option, within 60 days following receipt of the financial and operating statements from Mortgagor, to order a confirmatory examination of Mortgagor's books and records pertaining to the Property. Said examination shall be at

20

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

Mortgagee's expense unless Mortgagor's statements are found to contain significant discrepancies, in which case the confirmatory audit will be at Mortgagor's expense. In default thereof Mortgagee shall, in addition to all other remedies, have the option of maturing the indebtedness hereby secured.

32. <u>Payment of New Taxes</u>. If Mortgagee is required to pay any tax because of this Mortgage or the sums due under the Credit Documents, then Mortgagor shall pay to Mortgagee on demand any such taxes.

33. <u>Reserved</u>.

34. <u>Hazardous Waste</u>.

34.1. <u>Representations and Warranties; Covenant</u>. Mortgagor represents and warrants to Mortgagee that to the best of Mortgagor's knowledge after due and diligent inquiry, no hazardous or toxic waste or substances are being stored on the Property or any adjacent property nor have any such waste or substances been stored or used on the Property or any adjacent property prior to Mortgagor's ownership, possession or control of the Property. Mortgagor agrees to provide written notice to Mortgagee immediately upon Mortgagor becoming aware that the Property or any adjacent property is being or has been contaminated with hazardous or toxic waste or substances. Mortgagor will not cause nor permit any activities on the Property which directly or indirectly could result in the Property or any other property becoming contaminated with hazardous or toxic waste or substances. For purposes of this Mortgage, the term "hazardous or toxic waste or substances" means any substance or material defined or designated as hazardous or toxic wastes, hazardous or toxic material, a hazardous, toxic or radioactive substance or other similar term by any applicable federal, state or local statute, regulation or ordinance now or hereafter in effect.

34.2. <u>Compliance with Law and Orders</u>. Mortgagor shall promptly comply with all statutes, regulations and ordinances which apply to Mortgagor or the Property, and with all orders, decrees or judgments of governmental authorities or courts having jurisdiction which Mortgagor is bound by, relating to the use, collection, storage, treatment, control, removal or cleanup of hazardous or toxic substances in, on or under the Property or in, on or under any adjacent property that becomes contaminated with hazardous or toxic substances as a result of construction, operations or other activities on, or the contamination of, the Property, at Mortgagor's expense. Mortgagee may, but is not obligated to, enter upon the Property and take such actions and incur such costs and expenses to effect such compliance as it deems advisable to protect its interest as Mortgagee; and whether or not Mortgagor has actual knowledge of the existence of hazardous or toxic substances in, on or under the Property through foreclosure or deed in lieu of foreclosure, in connection with such compliance activities. If such reimbursement is not made within ten (10) days of Mortgagee's demand therefor, Mortgagee may bring a separate action against Mortgagor for reimbursement of such costs or may add them to the Obligations at Mortgagee's option.

21

35.  Notices.  Any notice given by Mortgagor or Mortgagee shall be in writing and shall be effective upon the earliest of (a) actual receipt, (b) the next business day after the date when sent by recognized overnight courier for next business day delivery, or (c) if sent by mail, upon the earlier of the date of receipt or three (3) days after deposit in the U.S. mail, first class and postage prepaid with return receipt requested, addressed to the affected party at the party's known address, or with respect to Mortgagor, to the address of Mortgagor set forth above or at which Mortgagee customarily or last communicated with Mortgagor.

36.  Successors and Assigns.  This Mortgage applies to, inures to the benefit of, and binds all parties hereto and their heirs, successors and assigns.  The terms "*Mortgagor*," and "*Mortgagee*" include their heirs, successors and assigns.

37.  Appraisals.  In the event of a default, Mortgagee may obtain a current appraisal of the Property which is to be paid for by Mortgagor.  Appraisals may be commissioned by Mortgagee when required by laws and regulations which govern Mortgagee's lending practices.  The cost of all such appraisals will be borne by Mortgagor.

38.  Mortgagor Different From Obligor.

38.1.  Representations and Warranties of Third Party Mortgagor(s).  Mortgagor represents and warrants to Mortgagee that:  (i) this Mortgage is executed at an Obligor's request; (ii) this Mortgage complies with all agreements between each Mortgagor and any Obligor regarding such Mortgagor's execution hereof; (iii) Mortgagee has made no representation to any Mortgagor as to the creditworthiness of any Obligor; and (iv) each Mortgagor has established adequate means of obtaining from each Obligor on a continuing basis financial and other information pertaining to such Obligor's financial condition.  Each Mortgagor agrees to keep adequately informed from such means of any facts, events or circumstances which might in any way affect such Mortgagor's risks hereunder.  Each Mortgagor further agrees that Mortgagee shall have no obligation to disclose to any Mortgagor any information or material about any Obligor which is acquired by Mortgagee in any manner.  The liability of each Mortgagor hereunder shall be reinstated and revived, and the rights of Mortgagee shall continue if and to the extent that for any reason any amount at any time paid on account of any Obligation secured by this Mortgage is rescinded or must otherwise be restored by Mortgagee, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as though such amount had not been paid.  The determination as to whether any amount so paid must be rescinded or restored shall be made by Mortgagee in its sole discretion; provided however, that if Mortgagee chooses to contest any such matter at the request of any Mortgagor, each Mortgagor agrees to indemnify and hold Mortgagee harmless from and against all costs and expenses, including reasonable attorneys' fees, expended or incurred by Mortgagee in connection therewith, including without limitation, in any litigation with respect thereto.

38.2.  Waivers.

22

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

(a)     Each Mortgagor waives any right to require Mortgagee to:  (A) proceed against any Obligor or any other person; (B) marshal assets or proceed against or exhaust any security held from any Obligor or any other person; (C) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from any Obligor or any other person; (D) take any other action or pursue any other remedy in Mortgagee's power; or (E) make any presentment or demand for performance, or give any notice of nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by Mortgagee as security for or which constitute in whole or in part the Obligations, or in connection with the creation of new or additional obligations.

(b)     Each Mortgagor waives any defense to its obligations hereunder based upon or arising by reason of: (A) any disability or other defense of any Obligor or any other person; (B) the cessation or limitation from any cause whatsoever, other than payment in full, of any Obligation secured by this Mortgage; (C) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf of any Obligor which is a corporation, partnership or other type of entity, or any defect in the formation of any such Obligor; (D) the application by any Obligor of the proceeds of any Obligation secured by this Mortgage for purposes other than the purposes represented by any Obligor to, or intended or understood by, Mortgagee or any Mortgagor; (E) any act or omission by Mortgagee which directly or indirectly results in or aids the discharge of any Obligor or any portion of any Obligation secured by this Mortgage by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Mortgagee against any Obligor; (F) any impairment of the value of any interest in any security for the Obligations or any portion thereof, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security; (G) any modification of any Obligation secured by this Mortgage, in any form whatsoever, including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, any Obligation secured by this Mortgage or any portion thereof, including increase or decrease of the rate of interest thereon; or (H) any requirement that Mortgagee give any notice of acceptance of this Mortgage.  Until all of the Obligations have been paid in full, no Mortgagor shall have any right of subrogation, and each Mortgagor waives any right to enforce any remedy which Mortgagee now has or may hereafter have against any Obligor or any other person, and waives any benefit of, or any right to participate in, any security now or hereafter held by Mortgagee.  Each Mortgagor further waives all rights and defenses it may have arising out of: (1) any election of remedies by Mortgagee, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Obligations, destroys such Mortgagor's rights of subrogation or such Mortgagor's rights to proceed against any Obligor for reimbursement; or (2) any loss of rights any Mortgagor may suffer by reason of any rights, powers or remedies of any Obligor in connection with any anti-deficiency laws or any other laws limiting, qualifying or discharging any Obligor's obligations, or otherwise, including any rights any Mortgagor may have to a fair

23

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

market value hearing to determine the size of a deficiency following any foreclosure sale or other disposition of any security for any portion of the Obligations.

(c)     If any of said waivers is determined to be contrary to any applicable law or public policy, such waiver shall be effective to the extent permitted by applicable law or public policy.

39.     Severability.  In the event any provision contained in this Mortgage shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Mortgage, but this Mortgage shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

40.     Attorneys' Fees.  In the event any action or proceeding is brought to enforce the provisions of this Mortgage, the Mortgagee shall be entitled to recover, as a part of its costs, Attorneys' Fees and Costs.

41.     Entire Agreement.  This Mortgage constitutes the entire and complete agreement of the parties with respect to the subject matter hereof, and supersede all prior or contemporaneous understandings, arrangements and commitments, all of which whether oral or written, are merged herein.

42.     Controlling Document.  In the event of a conflict or inconsistency between the terms and conditions of this Mortgage and the terms and conditions of any other of the Credit Documents or Related Agreements, the Credit Documents or Related Agreements shall control, as applicable.

43.     Rules of Construction.  This Mortgage shall be construed so that, whenever applicable, the use of the singular shall include the plural, the use of the plural shall include the singular, and the use of any gender shall be applicable to all genders and shall include corporations, limited liability companies, partnerships and limited partnerships.

44.     Paragraph Headings.  The headings to the various paragraphs and subparagraphs have been inserted for convenience of reference only and shall not be used to construe this Mortgage.

45.     Choice of Law; Jurisdiction and Venue.  This Mortgage is to be construed in accordance with and governed by the laws of the State of Washington, except for those provisions in this Mortgage pertaining to the creation, perfection, priority or validity of or execution on liens or security interests on property located in the state where the Property is located, which provisions shall be governed by and construed in accordance with the laws of the state where the Property is located.  Any suit or action in regard to or arising out of the terms or conditions of this Mortgage shall be litigated in the state or federal courts situated either in the State of Washington or the state in which the Property is located, and Mortgagor hereby submits to the jurisdiction of these courts, and further agrees not to assert or claim that such venue is inconvenient or otherwise

24

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

inappropriate or unsuitable. If there is a lawsuit, Mortgagor agrees upon Mortgagee's request to submit to the jurisdiction of the courts of King County, Washington.

46.     Waiver of Jury Trial.     MORTGAGOR AND MORTGAGEE EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY CONTROVERSY OR CLAIM, WHETHER ARISING IN TORT OR CONTRACT OR BY STATUTE OR LAW, BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS MORTGAGE (INCLUDING, WITHOUT LIMITATION, THE VALIDITY, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF), OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH. EACH PARTY ACKNOWLEDGES AND AGREES THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY PERSON TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR MORTGAGOR AND MORTGAGEE ENTERING INTO THIS MORTGAGE AND THE PARTIES WOULD NOT HAVE ENTERED INTO THIS MORTGAGE WITHOUT THIS WAIVER. MORTGAGOR AND MORTGAGEE EACH HEREBY IS AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL.

47.     Counterparts.     This Mortgage may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. Signature and acknowledgment pages may be detached from the counterparts and attached to a single copy of this Mortgage to physically form one document.

48.     State Law Provisions.

48.1.     Inconsistencies.     In the event of any inconsistencies between the terms and conditions of this Section 48 and the other provisions of this Mortgage, the terms and conditions of this Section 48 shall control and be binding. In the event any provision in this Mortgage shall be inconsistent with any provision of the Illinois Mortgage Foreclosure Law (the "Act"), 735 ILCS 5/15-1101, et seq., the provisions of this Act shall take precedence over the provisions of this Mortgage, but shall not invalidate or render unenforceable any other provisions of this Mortgage that can be construed in a manner consistent with the Act.

48.2.     Maximum Principal Sum.     The Obligations are to be secured by other mortgages and deeds of trust on other real estate in other counties. Each and all of such mortgages and deeds of trust are intended to and shall constitute security for the entire indebtedness represented by the Obligations without allocation. Notwithstanding anything herein to the contrary, it is agreed that the maximum amount of Indebtedness secured by this Mortgage, including all advancements, at any one time shall not exceed $[63,976,036.3].

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

24-01421-FPC11     Doc 151-10     Filed 10/09/24     Entered 10/09/24 17:19:38     Pg 77 of 85

48.3.  <u>Remedies Against Other Collateral</u>.  Mortgagor hereby acknowledges that certain Credit Documents other than this Mortgage create liens on collateral located in counties and states other than the counties and state in which the Land is located.  Mortgagor further acknowledges that this Mortgage and the other Credit Documents are cross-defaulted and the indebtedness secured hereby is also secured by the other Credit Documents.  Mortgagor agrees that Mortgagee may proceed, at the same or at different times, to foreclose any or all liens against such collateral by any proceedings appropriate in the county and state where such collateral lies, and that no event of enforcement taking place in any county or state pursuant to any of the Credit Documents shall preclude or bar enforcement in the State of Illinois or any other county or state.  Any foreclosure or other appropriate remedy brought in any county or state in which collateral is located may be brought and prosecuted as to any part of such collateral without regard to the fact that foreclosure proceedings or other appropriate remedies have or have not been instituted elsewhere on any other part of the collateral for the indebtedness.

48.4.  <u>Business Loan</u>.  Mortgagor represents and warrants to Mortgagee that the proceeds of the indebtedness secured hereby shall be used solely for business purposes and in furtherance of the regular business affairs of Mortgagor, and the entire principal obligation secured by this Mortgage constitutes (i) a "business loan" as that term is defined in, and for all purposes of, 815 ILCS 205/4(1)(c) and (ii) a "loan secured by a mortgage on real estate" within the purview and operation of 815 ILCS 205/4(l).

48.5.  <u>Collateral Protection Act</u>.  Pursuant to the terms of the Collateral Protection Act, 815 ILCS 180/1 et seq., Mortgagor is hereby notified that:

UNLESS MORTGAGOR PROVIDES MORTGAGEE WITH EVIDENCE OF THE INSURANCE COVERAGE REQUIRED BY THE LOAN DOCUMENTS, MORTGAGEE MAY PURCHASE INSURANCE AT MORTGAGOR'S EXPENSE TO PROTECT MORTGAGEE'S INTERESTS IN THE MORTGAGED PROPERTY, WHICH INSURANCE MAY, BUT NEED NOT, PROTECT THE INTERESTS OF MORTGAGOR. THE COVERAGE PURCHASED BY MORTGAGEE MAY NOT PAY ANY CLAIM MADE BY MORTGAGOR OR ANY CLAIM MADE AGAINST MORTGAGOR IN CONNECTION WITH THE MORTGAGED PROPERTY. MORTGAGOR MAY LATER CANCEL ANY INSURANCE PURCHASED BY MORTGAGEE, BUT ONLY AFTER PROVIDING MORTGAGEE WITH EVIDENCE THAT MORTGAGOR HAS OBTAINED THE INSURANCE AS REQUIRED HEREUNDER. IF MORTGAGEE PURCHASES INSURANCE FOR THE MORTGAGED PROPERTY, MORTGAGOR WILL BE RESPONSIBLE FOR THE COSTS OF SUCH INSURANCE, INCLUDING INTEREST AND ANY OTHER CHARGES IMPOSED IN CONNECTION WITH THE PLACEMENT OF THE INSURANCE, UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR EXPIRATION OF THE INSURANCE. THE COSTS OF THE INSURANCE MAY BE ADDED TO THE OBLIGATIONS SECURED HEREBY. THE COSTS OF SUCH

26

INSURANCE MAY BE GREATER THAN THE COST OF INSURANCE MORTGAGOR MAY BE ABLE TO OBTAIN FOR ITSELF.

48.6.  Future Advances; Revolving Credit.  Mortgagee is obligated under the terms of the WSM Agreement to make advances as provided therein, and Mortgagor acknowledges and intends that all such advances, including future advances whenever hereafter made, shall be a lien from the time this Mortgage is recorded, as provided in Section 5/15-1302(b)(1) of the Act. That portion of the Obligations which comprises the principal amount then outstanding of the Revolving Loans constitutes revolving credit indebtedness secured by a mortgage on real property, pursuant to the terms and conditions of 205 ILCS 5/5d, Mortgagor covenants and agrees that this Mortgage shall secure the payment of all loans and advances made pursuant to the terms and provisions of the WSM Agreement, whether such loans and advances are made as of the date hereof or at any time in the future, and whether such future advances are obligatory or are to be made at the option of Mortgagee or otherwise (but not advances or loans made more than 20 years after the date hereof), to the same extent as if such future advances were made on the date of the execution of this Mortgage and although there may be no advances made at the time of the execution of this Mortgage and although there may be no other indebtedness outstanding at the time any advance is made.  The lien of this Mortgage shall be valid as to all Obligations, including future advances, from the time of its filing of record in the office of the recorder of deeds of the County in which the Property is located.  The total amount of the Obligations may increase or decrease from time to time, but the total unpaid principal balance of the Obligations (including disbursements which Mortgagee may make under this Mortgage or any other document or instrument evidencing or securing the Obligations) at any time outstanding shall not exceed the amount referred to in Section 10.2 of this Mortgage.  This Mortgage shall be valid and shall have priority over all subsequent liens and encumbrances, including statutory liens, except taxes and assessments levied on the Property, to the extent of the maximum amount secured hereby.

48.7.  Illinois Mortgage Foreclosure Law.  It is the intention of Mortgagor and Mortgagee that the enforcement of the terms and provisions of this Mortgage shall be accomplished in accordance with the Act and with respect to the Act Mortgagor agrees and covenants that:

(a)  Mortgagor and Mortgagee shall have the benefit of all of the provisions of the Act, including all amendments thereto which may become effective from time to time after the date hereof.  In the event any provision of the Act which is specifically referred to herein may be repealed, Mortgagee shall have the benefit of such provision as most recently existing prior to such repeal, as though the same were incorporated herein by express reference;

(b)  Wherever provision is made in this Mortgage or the WSM Agreement for insurance policies to bear mortgagee clauses or other loss payable clauses or endorsements in favor of Mortgagee, or to confer authority upon Mortgagee to settle or participate in the settlement of losses under policies of insurance or to hold and disburse or otherwise control use

27

of insurance proceeds, from and after the entry of judgment of foreclosure, all such rights and powers of Mortgagee shall continue in Mortgagee as judgment creditor or mortgagee until confirmation of sale;

(c)     All advances, disbursements and expenditures made or incurred by Mortgagee before and during a foreclosure, and before and after judgment of foreclosure, and at any time prior to sale, and, where applicable, after sale, and during the pendency of any related proceedings, for the following purposes, in addition to those otherwise authorized by the Mortgage or the WSM Agreement or by the Act (collectively "***Protective Advances***"), shall have the benefit of all applicable provisions of the Act, including the following provisions of the Act:

(i)     all advances by Mortgagee in accordance with the terms of the Mortgage to: (1) preserve, maintain, repair, restore or rebuild the improvements upon the Property; (2) preserve the lien of the Mortgage or the priority thereof; or (3) enforce the Mortgage, as referred to in Subsection (b)(5) of Section 5/15-1302 of the Act;

(ii)     payments by Mortgagee of (1) principal, interest or other obligations in accordance with the terms of any senior mortgage or other prior lien or encumbrances; (2) real estate taxes and assessments, general and special, and all other taxes and assessments of any kind or nature whatsoever which are assessed or imposed upon the Property or any part thereof; (3) other obligations authorized by the Mortgage; or (4) with court approval, any other amounts in connection with other liens, encumbrances or interests reasonably necessary to preserve the status of title, as referred to in Section 5/15-1505 of the Act;

(iii)     advances by Mortgagee in settlement or compromise of any claims asserted by claimants under senior mortgages or any other prior liens;

(iv)     reasonable attorneys' fees and other costs incurred: (1) in connection with the foreclosure of the Mortgage as referred to in Section 5/15-1504(d)(2) and 5/15-1510 of the Act; (2) in connection with any action, suit or proceeding brought by or against the Mortgagee for the enforcement of the Mortgage or arising from the interest of the Mortgagee hereunder; or (3) in preparation for or in connection with the commencement, prosecution or defense of any other action related to the Mortgage or the Property;

(v)     Mortgagee's fees and costs, including reasonable attorneys' fees, arising between the entry of judgment of foreclosure and the confirmation hearings as referred to in Section 5/15-1508(b)(1) of the Act;

(vi)     expenses deductible from proceeds of sale as referred to in Section 5/15-1512(a) and (b) of the Act; and

(vii)     expenses incurred and expenditures made by Mortgagee for any one or more of the following: (1) if the Property or any portion thereof constitutes one or more units under a condominium declaration, assessments imposed upon the unit owner thereof; (2) if

28

Mortgagor's interest in the Property is a leasehold estate under a lease or sublease, rentals or other payments required to be made by the lessee under the terms of the lease or sublease; (3) premiums for casualty and liability insurance paid by Mortgagee whether or not Mortgagee or a receiver is in possession, if reasonably required in reasonable amounts, and all renewals thereof, without regard to the limitation to maintaining of existing insurance in effect at the time any receiver or mortgagee takes possession of the Property imposed by Section 5/15-1704(c)(1) of the Act; (4) repair or restoration of damage or destruction in excess of available insurance proceeds or condemnation awards; (5) payments deemed by Mortgagee to be required for the benefit of the Property or required to be made by the owner of the Property under any grant or declaration of easement, easement agreement, agreement with any adjoining land owners or instruments creating covenants or restrictions for the benefit of or affecting the Property; (6) shared or common expense assessments payable to any association or corporation in which the owner of the Property is a member in any way affecting the Property; (7) if the indebtedness secured hereby is a construction loan, costs incurred by Mortgagee for demolition, preparation for and completion of construction, as may be authorized by the applicable commitment, loan agreement or other agreement; (8) payments required to be paid by Mortgagor or Mortgagee pursuant to any lease or other agreement for occupancy of the Property; and (9) if the Mortgage is insured, payment of FHA or private mortgage insurance required to keep such insurance in force;

(d)     All Protective Advances shall be so much additional indebtedness secured by this Mortgage, and shall become immediately due and payable without notice and with interest thereon from the date of the advance until paid at the rate of interest payable after default under the terms of the WSM Agreement. This Mortgage shall be a lien for all Protective Advances as to subsequent purchasers and judgment creditors from the time this Mortgage is recorded pursuant to Subsection (b)(5) of Section 5/15-1302 of the Act;

(e)     In addition to any provision of this Mortgage authorizing Mortgagee to take or be placed in possession of the Property, or for the appointment of a receiver, Mortgagee shall have the right, in accordance with Sections 5/15-1701 and 5/15-1702 of the Act, to be placed in possession of the Property or at its request to have a receiver appointed, and such receiver, or Mortgagee, if and when placed in possession, shall have, in addition to any other powers provided in this Mortgage, all rights, powers, immunities, and duties as provided for in Sections 5/15-1701, 5/15-1703 and 5/15-1704 of the Act;

(f)     Mortgagor acknowledges that the Property does not constitute agricultural real estate, as said term is defined in Section 5/15-1201 of the Act or residential real estate as defined in Section 5/15-1219 of the Act; and

(g)     Mortgagor hereby voluntarily and knowingly waives its statutory rights to reinstatement and redemption pursuant to Section 5/15-1601(b) of the Act.

29

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

*[Remainder of page intentionally left blank.*
*See following page for signature and notary acknowledgement page.]*

COOK COUNTY CLERK OFFICE
RECORDING DIVISION
118 N. CLARK ST. ROOM 120
CHICAGO, IL 60602-1387

COOK COUNTY CLERK OFFICE
RECORDING DIVISION
118 N. CLARK ST. ROOM 120
CHICAGO, IL 60602-1387

COOK COUNTY CLERK OFFICE
RECORDING DIVISION
118 N. CLARK ST. ROOM 120
CHICAGO, IL 60602-1387

30

134777.0001/ 9211114.3
1400 Greenleaf Ave, Elk Grove Village

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

DATED as of the day and year first above written.

**MORTGAGOR:**

**Ideal Greenleaf, LLC,**
a Wyoming limited liability company

By: _____
Name: Ryan Wear
Its: Manager

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF KING         )

I certify that I know or have satisfactory evidence that **Ryan Wear** is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he is authorized to execute the instrument and acknowledge it as **Manager** of **Ideal Greenleaf, LLC, a Wyoming limited liability company**, to be the free and voluntary act of such party for the uses and purposes mentioned in this instrument.

DATED: February 17, 2023

(Seal or Stamp)

_____
Print Name: Ann Catherine Norby
NOTARY PUBLIC for the State of Washington, residing at Seattle

My appointment expires: 09-30-25

134777.0001/9224281.3
1400 Greenleaf Ave, Elk Grove Village
Signature Page

## EXHIBIT "A"

### LEGAL DESCRIPTION

LOT 248 IN CENTEX INDUSTRIAL PARK UNIT NO. 136, BEING A SUBDIVISION IN SECTION 34, TOWNSHIP 41 NORTH, RANGE 11 EAST, OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED MARCH 4, 1970 AS DOCUMENT NO. 21094564, IN COOK COUNTY, ILLINOIS.

PIN(s): 08-34-205-018-0000
Common Address: 1400 Greenleaf Ave, Elk Grove Village, IL 60007

A-1

134777.0001/9224281.3
1400 Greenleaf Ave, Elk Grove Village

**EXHIBIT "B"**

PERMITTED LIENS


1. Mortgage, Assignment of Leases and Rents, Fixture Filing, and Security Agreement dated as of May 13, 2022 and recorded May 19, 2022 as document no. 2213920193 made by Ideal Greenleaf, LLC, a Wyoming limited liability company to Avatar REIT I LLC, a Delaware limited liability company, to secure a note in the amount of $3,080,000.00.

2. Security interest of Avatar REIT I LLC, Secured Party, in certain described chattels on the Land, as disclosed by Financing Statement naming Ideal Greenleaf, LLC, as debtor, and recorded May 19, 2022 as document no. 2213920194.

B-1

134777.0001/9224281.3
1400 Greenleaf Ave, Elk Grove Village